## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RUI HOLDING CORP., *et al.*,[1] | Case No. 19-11509 (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION SEEKING ENTRY OF
### INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
### OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE
### CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
### ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION
### TO THE PREPETITION LENDERS, (V) MODIFYING AUTOMATIC STAY,
### (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully submit this motion (the "DIP Motion")[3] for the relief set forth herein. In support of hereof, the Debtors rely upon the First Day Declaration and the *Declaration of David Bagley, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RUI Holding Corp. (6192); RU Corp. (8259); Restaurants Unlimited, Inc. (8365); and Restaurants Unlimited Texas, Inc. (5733). The Debtors' headquarters and mailing address is: 411 First Ave. South, Suite 200, Seattle, WA 98104. The Debtors operate restaurants under the following names: Clinkerdagger; Cutters Crabhouse; Fondi Pizzeria; Henry's Tavern; Horatio's; Kincaid's; Maggie Bluffs; Manzana; Newport Seafood Grill; Palisade; Palomino; Portland City Grill; Portland Seafood Company; Scott's Bar and Grill; Simon & Seafort's; Skate's on the Bay; Stanford's; and Stanley & Seafort's.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of David Bagley in Support of Debtors' First Day Motions and Applications* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), on July 7, 2019 (the "Petition Date").

[3] Capitalized terms used but not defined herein shall have the meanings given to them in the Interim Order or the DIP Agreement, as applicable, both of which are defined below.

*Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "<u>Bagley Declaration</u>"), filed contemporaneously herewith.  In further support of this DIP Motion, the Debtors respectfully state as follows:

**<u>Relief Requested</u>**

1.    The Debtors seek entry of an interim order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Interim Order</u>"), and a final order (the "<u>Final Order</u>"[4] and, together with the Interim Order, the "<u>DIP Orders</u>"):

> a.    authorizing the Debtors RU Corp., Restaurants Unlimited Texas, Inc. and Restaurants Unlimited, Inc. (collectively, the "<u>Borrowers</u>"), to obtain a senior secured, super-priority, multi-draw term loan of up to $10,000,000 (the "<u>DIP Facility</u>" and the loans made thereunder, the "<u>DIP Loans</u>") on the terms and conditions set forth in the DIP Orders and the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (substantially in the form attached to the DIP Motion as <u>Exhibit B</u>, and as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "<u>DIP Agreement</u>" together with all agreements, documents, certificates, and instruments delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "<u>DIP Documents</u>"), among the Borrowers, Fortress Credit Co LLC, as agent (in such capacity, the "<u>DIP Agent</u>"), and for and on behalf of the lenders party thereto from time to time (collectively, the "<u>DIP Lenders</u>"), secured by the DIP Collateral (as defined below), and authorization for Debtor RUI Holding Corp. to guarantee Borrowers' obligations under the DIP Facility as a guarantor (the "<u>Guarantor</u>" and together with the  Borrowers, the "<u>Loan Parties</u>," as that term is defined in the DIP Agreement) and for each Debtor to grant security interests in the DIP Collateral;

> b.    authorization to use the proceeds of the DIP Facility extended to the Borrowers as expressly provided in the DIP Documents and consistent with the Budget (as defined below) (A) to pay costs, fees, and expenses of the DIP Agent and DIP Lenders as provided for in this Interim Order and

---

[4]    The Debtors will file a proposed Final Order prior to the Final Hearing.

2

the DIP Documents, (B) to provide working capital for other general corporate purposes of the Debtors, and (C) to pay administration costs, fees and expenses of these Cases and claims or amounts approved by the Bankruptcy Court;

c.      authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

d.      grant to the DIP Secured Parties in respect of the DIP Loans, for the benefit of the DIP Secured Parties and any other parties referred to in the DIP Agreement with respect to the respective DIP Obligations (as defined below), in accordance with the relative priorities as set forth more fully below, and subject and subordinate to the Carve Out (as defined below), the following:

1.      pursuant to section 364(c)(1) of the Bankruptcy Code, joint and several superpriority allowed administrative expense claim status in the Cases;

2.      pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on all assets of the Debtors, including all property of their respective estates in the Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired and all proceeds, profits, rents, accessions and substitutes thereof, that is not subject to (i) valid, perfected and non-avoidable liens in existence as of the Petition Date or (ii) valid and non-avoidable liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

3.      pursuant to section 364(d) of the Bankruptcy Code, a first priority, senior priming lien on and security interest in all of the Debtors' assets (other than Excluded Assets and subject to (i) Permitted Prior Liens (other than the Prepetition Secured Party Liens) and (ii) the Carve Out (each as defined in the DIP Documents)), including all property of their respective estates in the Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired and all proceeds, profits, rents, accessions and substitutions thereof;

e.      authorization for the DIP Agent to terminate the DIP Agreement and to terminate the Debtors' use of Cash Collateral upon the occurrence and continuance of an Event of Default (as defined in the DIP Agreement) on terms specified in the Interim Order and in the DIP Agreement;

3

f.      subject to entry of the Final Order, authorization to grant liens to the DIP Secured Parties on the proceeds of the Debtors' claims and causes of action arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions");

g.      authorization for the Debtors to use, among other things, in accordance with the Budget, any cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code and described below, the "Cash Collateral") in which the Prepetition Secured Parties (as defined below) may have an interest and the granting of adequate protection to the Prepetition Secured Parties with respect to any diminution in value of their interests in the Prepetition Collateral (as defined below) arising from, inter alia, the Debtors' use of the Prepetition Collateral (including Cash Collateral), or the imposition of the automatic stay section 362 of the Bankruptcy Code;

h.      subject to, and only effective upon, the entry of a Final Order granting such relief, the waiver by the Debtors of any right to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

i.      the Court's modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

j.      the Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

k.      authorization that during the period (the "Interim Period") commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order and (b) the occurrence of the Maturity Date, a portion of the Commitments shall be borrowed by Borrower, subject to compliance with the terms, conditions, and covenants contained in the DIP Documents, in an amount equal to $3,250,000; and

l.      scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order granting the relief requested in this Motion on a final basis and authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in this DIP Motion and the DIP Documents filed with this Court and approving the Debtors' notice with respect to this DIP Motion.

4

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended

Standing Order of Reference from the United States District Court for the District of Delaware*,

dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection

with this motion to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III

of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363,

364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local

Rules 2002-1(b) and 4001-2.

## Preliminary Statement[5]

5.      Immediate access to incremental liquidity in the form of postpetition financing (as

well as access to Cash Collateral) is vital to preserving the value of the Debtors' estates and

maximizing the likelihood of a successful sale process.  The Debtors will suffer immediate and

irreparable harm absent access to additional liquidity.  Indeed, at the time of the commencement

---

[5] Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Credit Agreement, or the Interim Order, as applicable.

of these cases, the Debtors have approximately $150,000 of cash on hand—an amount insufficient to operate the Debtors' businesses or continue in the ordinary course.

6.       As described in the First Day Declaration, the Debtors commenced these Chapter 11 Cases to conduct prompt sales of all or substantially all of their assets with the goal of maximizing value for all stakeholders.  Consummation of a sale transaction as soon as possible is in the best interests of the Debtors' estates.  The Debtors' ability to use Cash Collateral and access additional liquidity through the available DIP Facility will support the sale process contemplated.

7.       In an effort to support their ongoing business and a marketing and sale process, the Debtors commenced negotiations with the Prepetition Secured Parties in May 2019.  The Debtors sought to obtain financing on an out-of-court basis.  While the Debtors had many conversations with the Prepetition Secured Parties regarding out-of-court funding, it became clear that the needed incremental financing would only be available in connection with the filing of these chapter 11 cases.

8.       In addition, the Debtors, with the assistance of their advisors, solicited proposals for alternative debtor-in-possession financing from a variety of third party potential lenders, including four financial institutions.  No one was willing to provide the Debtors with debtor-in-possession financing on any terms.

9.       As explained in the Bagley Declaration, after significant back and forth with the Prepetition Secured Parties, the DIP Lenders agreed to provide $10,000,000 of new money postpetition financing, including $3,250,000 of new money during the interim period and additional $6,750,000 upon entry of the Final Order.

10.    As discussed below and in the Bagley Declarations, and the First Day Declaration, the provisions of the DIP Agreement and the Interim Order were negotiated at arm's-length and in good faith, and the proposed DIP Facility provides the best terms presently available to the Debtors.  The Debtors firmly believe that incurrence of the DIP Facility will maximize value for the Debtors' stakeholders and is in the exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

**Concise Statements and Highlighted Provisions Pursuant to
Bankruptcy Rule 4001(b) and Local Rule 4001-2[6]**

## I.    Concise Statement Regarding the DIP Credit Facility.

11.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | RU Corp., Restaurants Unlimited Texas, Inc. and Restaurants Unlimited, Inc.<br><br>*See* DIP Agreement Preamble. |
| **Guarantor**<br>Bankruptcy Rule 4001(c)(1)(B) | RUI Holding Corp. ("Holding", and together with the Borrowers, collectively, the "Credit Parties")<br><br>*See* DIP Agreement Preamble. |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Fortress Credit Co LLC acting as the administrative and collateral agent (in such capacities, the "DIP Agent")<br><br>*See* DIP Agreement Preamble. |
| **DIP Lenders**<br>Bankruptcy Rule | Drawbridge Special Opportunities Fund, LP and NXT Capital, LLC, or affiliates thereof and/or other financial institutions selected by the Lenders as lenders (in such |

---

[6]    The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Documents and the Interim Order.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

7

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| 4001(c)(1)(B) | capacity, the "DIP Lenders") *See* DIP Agreement Preamble. |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | <u>Maturity Date</u>. means the date which is the earliest of (i) October 9, 2019, (ii) the date that is thirty (30) days after the Petition Date if the Final DIP Order Entry Date shall not have occurred,  (iii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of a plan of reorganization of the Loan Parties, (iv) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of any of the Loan Parties pursuant to Section 363 of the Bankruptcy Code or otherwise, (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a Chapter 7 case, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, and (vii) such earlier date on which the Term Loans shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents. *See* DIP Agreement definition of "Maturity Date." |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | <u>Commitments</u>.   $3,250,000 Interim Term Loan Commitment and an additional $6,750,000 Final Term Loan Commitment, for a total of $10,000,000. *See* DIP Agreement, definition of "Commitments" |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | <u>Conditions Precedent to Effectiveness of DIP Credit Agreement</u>. Certain deliverables, including (a) Debtor Agreement, (b) Loan Documents, (c) Secretary's Certificates, Resolutions, Organization Documents, (d) Closing Certificate (e) Insurance Certificates, (f) Sources and Uses, (g) such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require. The occurrence of the following with respect to the Chapter 11 Cases (a) the Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders", all related pleadings and all adequate protection payments and critical vendor payments, if any, approved by the Bankruptcy Court in the Interim DIP Order or otherwise shall be in form and substance reasonably satisfactory to the Required Lenders; (b) the Interim DIP Order shall have been entered by the Bankruptcy Court and such order shall be in full force and effect and shall not have been enjoined temporarily, preliminarily or permanently, reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge, absent the prior written consent of the Agent and the Required Lenders; (c) all orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance reasonably satisfactory to the Required Lenders (and, with respect to any provisions that affect the rights or duties of the Agent, the Agent); (d) the Agent, for the benefit of the Secured Parties, shall have been granted a perfected lien on the Collateral by the Interim DIP Order on the terms and conditions set forth herein and in the other Loan Documents; (e) no trustee, examiner or receiver shall have been appointed or designated with respect to Ultimate Parent or its Subsidiaries' business, properties or assets, and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral; (f) the Prepetition Secured Parties shall have received adequate protection with respect to the Prepetition Obligations pursuant to the Interim DIP Order, including replacement Liens |

PHIL1 7972447v.8

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | securing the Prepetition Obligations and payments with respect to interest, fees and expenses, indemnification and other reimbursement obligations payable under the Prepetition Credit Agreement; (g) the Agent and the Lenders shall have received the Budget; and (h) the Borrowers shall have paid in connection with the closing (i) all fees required to be paid to the Agent and the Lenders on or before the Closing Date, (ii) all fees, charges and disbursements of counsel to the Agent and any Lender.<br><br>Conditions Precedent to All Borrowings.<br><br>Satisfaction of the following (a) all representations and warranties of the Borrowers shall be true and correct in all material respects, (b) no Default shall exist, or would result from such proposed Borrowing or from the application of the proceeds thereof, (c) the Agent shall have received a Committed Loan Notice in accordance with the requirements hereof, (d) no event or circumstance, either individually or in the aggregate, has occurred that has a Material Adverse Effect, (e) after giving effect to any Loan and the uses of the proceeds thereof and the other cash and Cash Equivalents of Ultimate Parent and its Subsidiaries during such Budget week in accordance with the Budget, the cash and Cash Equivalents of Ultimate Parent and its Subsidiaries shall not exceed $500,000 (unless otherwise agreed by the Agent in its sole discretion), (f) with respect to any Final Term Loan, the Final DIP Order shall have been entered by the Bankruptcy Court and such order shall be in full force and effect and shall not (in whole or in part) have been enjoined temporarily, preliminarily or permanently, reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge, absent the prior written consent of the Agent and the Required Lenders, (g) the Loan Parties shall be in compliance in all material respects with (i) the DIP Order and (ii) the Budget.<br><br>*See* DIP Agreement §§ 4.01 and 4-02. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | <u>Rates and Payment of Interest.</u><br><br>• For LIBOR Rate Loans, for any Interest Period with respect to a LIBOR Rate Loan, the rate per annum (rounded upward, if necessary, to the next 1/100 of 1%) equal to the greater of (a) the offered rate per annum for deposits of Dollars that appears on Reuters Screen LIBOR01 Page as of 11:00 a.m. (London, England time) two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period and (b) 1.25% per annum..<br><br>• For Base Rate Loans, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate <u>plus</u> 2.00% per annum, (b) the rate publicly quoted from time to time by The Wall Street Journal as the "U.S. prime rate" (or, if The Wall Street Journal ceases quoting a prime rate of the type described, the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the "Bank prime loan rate" or its equivalent and (c) the LIBOR Rate for a one-month Interest Period in effect for such day <u>plus</u> 1.00% per annum.<br><br>• During any Event of Default, Two percent (2.0%) per annum over the applicable interest rate on all outstanding DIP Obligations.<br><br>*See* DIP Agreement § 2.07 |

9

| Bankruptcy Rule | Summary of Material Terms |
| --- | --- |
| **Use of DIP Financing Facility and Cash Collateral Bankruptcy Rule** 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | <u>Use of Proceeds</u>.  Shall be in accordance in all material respects with the terms of the Budget (subject to permitted variances and, in any event, consistent with the Restaurant locations contemplated in the Budget), including (a) to pay amounts due to the Lenders and the Agent hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the Lenders and the Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, and (b) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.<br><br>*See* DIP Agreement § 6.11. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | <u>Adequate Protection Liens</u>.   Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, additional and replacement, continuing, valid, binding, enforceable and automatically perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Adequate Protection Liens</u>").<br><br><u>Adequate Protection Superpriority Claims</u>.   As further adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral since the Petition Date, the Prepetition Agent, on behalf of the Prepetition Secured Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition Superpriority Claim</u>"); *provided,* that such superpriority claim shall be subject to the Carve Out.<br><br><u>Adequate Protection Fees and Expenses</u>. The Debtors are authorized to pay, without further order of the Court, the reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of (x) the Prepetition Agent, including, without limitation, the fees and expenses of (i) Hunton Andrews Kurth LLP, (ii) Gellert Scali Busenkell & Brown, and (iii) Grant Thornton LLP, and (iv) Goldberg Kohn Ltd.. The foregoing professionals shall not be required to comply with the U.S. Trustee fee guidelines or obtain Court approval of their fees; *provided, however,* any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall at least include summaries of tasks and list the rates and hours of each timekeeper, but shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee and counsel for a Creditors' Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors.  Any objections raised by the Debtors, the U.S. Trustee or the Creditors' Committee (if appointed) with respect to such invoices within ten (10) days of the receipt thereof, if not resolved by consent, will be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors.  If no objection is raised within such ten (10) day period, such invoice shall be paid promptly by the Debtors without further order of the Court.  No attorney or advisor to the Prepetition Agent shall be required to file an application |

PHIL1 7972447v.8

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | seeking compensation for services for reimbursement of expenses with the Court. |
| | <u>Additional Adequate Protection</u>.  As additional adequate protection against any Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) and subject to the preservation of rights provided in paragraph 43 herein, the Prepetition Secured Obligations shall continue to accrue interest at the applicable default rate set forth in the Prepetition Loan Documents.<br><br>*See* Interim Order ¶¶ 14, 15, and 16. |
| **Repayment Features**<br>Local Rule 4001-2(a)(i)(E) | Payment due upon Maturity Date with permitted prepayments and mandatory prepayments upon various events.<br><br>*See* DIP Agreement §§ 2.04 and 2.06. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Closing Fee in an amount equal to five percent (5.0%) of the aggregate commitments of the Lenders under the DIP Facility shall be paid to the Lenders, ratably based on their respective commitments as of the Closing, in cash at the Closing from the proceeds of the DIP Loans.  The Closing Fee shall be deemed fully earned at the Closing and non-refundable or pro-ratable.<br><br>Commitment Fee of two percent (2.0%) per annum shall be paid to the Lenders in cash on the actual unused portion of the DIP Facility.  The Commitment Fee shall accrue monthly and shall be payable in full in cash on the DIP Termination Date.<br><br>*See* DIP Agreement § 2.08. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br>Local Rule 4001-2(a)(ii) | <u>Budget</u>.  Attached as <u>Exhibit 1</u> to the Interim Order.<br><br><u>Permitted Variances</u>.  115% of the projected amount of aggregate cash expenditures and disbursements set forth in the Budget.<br><br>*See* DIP Agreement definition of "Budget Event". |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Budget Testing pursuant to Budget Testing Reports for (a) with respect to the initial Budget Testing Date, the period beginning on [July 8], 2019 and ending on the Sunday immediately preceding the initial Budget Testing Date and (b) with respect to each Budget Test Date thereafter, the two-week period ending on the Sunday immediately preceding such Budget Test Date.<br><br>*See* DIP Agreement § 6.01. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | <u>Events of Default</u>.  Usual and customary for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, defaults related to the budget, cross-defaults to other indebtedness, attachment defaults, judgment defaults, invalidity of loan documents, change of control, failure to comply with ERISA rules and regulations, invalidity of collateral documents, change of control, invalidity of postpetition loan documents, failure to achieve any of the Required Milestones the occurrence of any number of adverse actions or consequences in any of the Chapter 11 Cases.<br><br>*See* DIP Agreement § 8.01. |
| **Costs and Expenses:** | Costs and Expenses. |

PHIL1 7972447v.8

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(ix) | All reasonable and documented prepetition and post-petition fees and expenses of the DIP Agent and DIP Lenders in connection with the DIP Facility, as provided in the DIP Documents, including attorneys' fees, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses. Payment of all such fees and expenses shall not be subject to allowance by the Court. Professionals for the DIP Agent and DIP Lenders shall not be required to comply with the U.S. Trustee fee guidelines or to obtain Court approval of their fees and expenses; however, any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee and counsel for a Creditors' Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors. Any objections raised by the Debtors, the U.S. Trustee or the Creditors' Committee (if appointed) with respect to such invoices within ten (10) days of the receipt thereof, if not resolved by consent, will be subject to resolution by the Court. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized to pay on the Closing Date all reasonable and documented fees, costs and out-of-pocket expenses of the DIP Agent and the DIP Lenders incurred on or prior to such date without the need for any professional engaged by the DIP Agent or the DIP Lenders to first deliver a copy of its invoice. No attorney or advisor to the DIP Agent or any DIP Lenders shall be required to file an application seeking compensation for services for reimbursement of expenses with the Court.<br><br>*See* Interim Order ¶ 36. |
| **Milestones:** Bankruptcy Rule 4001(c)(1)(B) | Achieve each of the following Required Milestones:<br><br>On or before July 9, 2019, the Loan Parties shall have filed a motion, in form and substance acceptable to the Agent and the Required Lenders, seeking entry of the DIP Orders.<br><br>On or before July 10, 2019, the Bankruptcy Court shall have entered the Interim DIP Order in the Chapter 11 Cases.<br><br>On or before July 12, 2019, the Loan Parties shall file a motion seeking approval of bidding procedures with respect to the 363 Sale, and the terms of such motion and the related bidding procedures shall be in form and substance reasonably acceptable to the Agent and the Required Lenders.<br><br>On or before August 20, 2019, the Loan Parties shall have obtained a stalking horse bid approved by the Agent and the Required Lenders for the 363 Sale.<br><br>On or before August 21, 2019, the Bankruptcy Court shall have entered an order approving the bidding procedures for the 363 Sale, and the terms of the bidding procedures shall be in form and substance reasonably acceptable to the Agent and the Required Lenders.<br><br>On or before September 17, 2019, the Loan Parties shall have conducted an auction for the 363 Sale. |

12

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | On or before September 20, 2019, the Loan Parties shall have obtained an order of the Bankruptcy Court approving the 363 Sale, and the terms of such order shall be in form and substance reasonably acceptable to the Agent and the Required Lenders (the "363 Sale Order"). <br><br> On or before September 26, 2019, the Loan Parties shall have consummated the 363 Sale in accordance with the 363 Sale Order, and all Obligations hereunder shall have been indefeasibly paid in full. <br><br> *See* DIP Agreement §6.20. |

## II.     Provisions to be Highlighted Pursuant to Local Rule 4001-2(a)(i).

12.     The DIP Facility includes certain provisions the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i) as set forth in the chart below.  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

| Local Rule | Highlighted Provision |
|---|---|
| **Cross Collateralization** <br><br> Local Rule 4001-2(a)(i)(A) | The DIP Facility does <u>NOT</u> contain any cross-collateralization provisions. |
| **Validity, Perfection and Amount of Prepetition Obligations** <br><br> Local Rule 4001-2(a)(i)(B) | The Debtors agree and stipulate that the Prepetition Facility is a valid and binding agreement, and the Liens related thereto constitute valid, binding, enforceable and perfected Liens.  Additionally, the Debtors have waived, discharged and released any right they may have to challenge any of the indebtedness pursuant to the Prepetition Facility or the security for those obligations. <br><br> *See* Interim Order at ¶ F(i)-(iv). |
| **Committee Challenge Periods** <br><br> Local Rule 4001-2(a)(i)(B) | All non-debtor parties in interest (including any trustee or Committee appointed in the Cases) who have been granted the requisite standing shall have until the earlier of (i) the 60th day after the selection of counsel to the Creditors' Committee and (ii) the 75th day after the Petition Date; to investigate the validity, perfection, and enforceability of the Liens of the Prepetition Secured Parties and the claims of the Pre-Petition Lender (and to assert any claims or causes of action against the Prepetition Secured Parties. <br><br> *See* Interim Order at ¶ 43. |
| **Waiver of Section 506(c) Claims** <br><br> Local Rule 4001-2(a)(i)(D) | Subject to entry of the Final Order, neither the DIP Collateral, Cash Collateral or Prepetition Collateral shall be subject to surcharge, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest without the prior written consent of the DIP Lender, Prepetition Secured Parties. |

| Local Rule | Highlighted Provision |
|---|---|
| | Interim Order at ¶ 45. |
| **Liens on Avoidance Actions**<br><br>Local Rule 4001-2(a)(i)(D) | Subject to entry of the Final Order, fully perfected and unavoidable first-priority senior priming security interests in and liens upon avoidance actions under Chapter 5 of the Bankruptcy Code and/or the proceeds thereof pursuant to sections 502(d), 544, 545, 547, 548, 550 and/or 553 of the Bankruptcy Code and the proceeds thereof.<br><br>Interim Order at ¶ 5. |
| **Roll Up**<br><br>Local Rule 4001-2(a)(i) (E) | The DIP Facility does NOT contain any provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt. |
| **Treatment of Committee Professionals**<br><br>Local Rule 4001-2(a)(i)(F) | The Committee's professional fees are included in the Budget and will be funded into the Trust Account.  As discussed above, each of the DIP Liens and Superpriority Claims are subject and subordinate to the Carve Out.<br><br>*See* Interim Order at ¶ 40. |
| **Equities of the Case**<br><br>Local Rule 4001-2(a)(i)(H) | Upon entry of the Final Order, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.<br><br>*See* Interim Order at ¶ 47. |

## **Background**

## I.      **The Debtors' Prepetition Capital Structure.**

13.      As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $37 million and unsecured trade and other debt of approximately $7.6 million.

### A.      **The Secured Credit Agreement.**

14.      The Prepetition Lenders (as defined below) extended a first priority senior secured revolving credit and term loan facility (the "Prepetition Facility"), pursuant to that certain Third Amended and Restated Credit Agreement, dated as of July 31, 2013 (as amended,

14

restated, amended and restated, waived, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement," and together with the other Loan Documents (as defined in the Prepetition Credit Agreement), the "Prepetition Loan Documents"), among the Borrowers, as borrowers, Fortress Credit Co LLC, as agent (the "Prepetition Agent"), and the lenders party thereto from time to time (the "Prepetition Lenders" and collectively with the Prepetition Agent and any other holders of Prepetition Secured Obligations (as defined below), the "Prepetition Secured Parties").

15.     As of the Petition Date, the Debtors are unconditionally jointly and severally indebted to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, without objection, defense, counterclaim, or offset of any kind, in respect of loans in the aggregate outstanding principal amount of approximately $37,741,726.63 *plus* accrued and unpaid interest with respect thereto of $1,703,030.79 as of June 30, 2019, and any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), premiums (if any), reimbursement obligations, indemnification obligations, contingent obligations, and all other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition Credit Agreement) owing under or in connection with the Prepetition Loan Documents (collectively, the "Prepetition Secured Obligations").

16.     Prior to the Petition Date, the Borrowers and Guarantor granted to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, valid, binding, perfected and enforceable first priority liens on, and security interests in, the Prepetition Collateral (as defined in the DIP Agreement) (the "Prepetition Secured Party Liens") subject only to certain exclusions as set forth in the Prepetition Loan Documents.

17.     Pursuant to the Prepetition Loan Documents, the Guarantor delivered to the Prepetition Agent an unconditional joint and several guaranty of the Prepetition Secured Obligations, which guaranty is secured by the Prepetition Secured Party Liens.

18.     Additionally, the Borrowers have entered into deposit account control agreements in favor of the Prepetition Agent with respect to their bank accounts.  Thus, substantially all of the Borrowers' cash is subject to a perfected security interest in favor of the Agent.  As of the Petition Date, the Prepetition Facility is fully drawn and there is no availability remaining.  Additionally, the Prepetition Facility had matured and all amounts due thereunder were immediately due and payable.

## II.     Alternative Sources of Financing Are Not Readily Available.

19.     The Debtors do not have alternative sources of financing readily available.  The Prepetition Secured Parties assert that substantially all of the Debtors' assets are encumbered, which, along with the Debtors' existing capital structure, restricts the availability of, and options for, postpetition financing.  *See* Bagley Declaration ¶¶ 7 and 8.  The Prepetition Secured Parties also made it clear that they would not consent to "priming" debtor-in-possession financing provided by a third party.  *See* Bagley Declaration ¶ 7.  Additionally, as described below, the Debtors' marketing process—which included outreach to four parties for a variety of financing solutions—yielded no actionable results.  Accordingly, the Debtors do not believe third-party debtor-in-possession financing would be reasonably obtainable.

20.     While negotiating the DIP Facility with the Debtors' existing debtholders, the Debtors, with the assistance of its advisors, began soliciting indications of interest from four alternative third-party sources of asset based financing (including specialty lenders, distressed-

oriented investors with experience in retail, and those that routinely provide debtor-in-possession financing), to gauge their interest in providing postpetition financing to the Debtors.  *See* Bagley Declaration ¶¶ 7 and 8.  No party provided a proposal for alternative financing, with several parties explaining that their financing proposal would require priming of the Prepetition Secured Parties—likely resulting in expensive and distracting litigation at the critical start of these chapter 11 cases.  *See id.*

21.    Additionally, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees.  In contrast, the proposed DIP Facility offered by the DIP Lenders allow the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.

## Basis for Relief

### I.    The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.

#### A.    Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.

22.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re*

17

*Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

23.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

24.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a

18

proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy

court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms.  *Relevant features*
> *of the financing must be evaluated, including non-economic*
> *elements such as the timing and certainty of closing, the impact on*
> *creditor constituencies and the likelihood of a successful*
> *reorganization.*  This is particularly true in a bankruptcy setting
> where cooperation and establishing alliances with creditor groups
> can be a vital part of building support for a restructuring that
> ultimately may lead to a confirmable reorganization plan.  That
> which helps foster consensus may be preferable to a notionally
> better transaction that carries the risk of promoting unwanted
> conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

25.    The Debtors' determination to move forward with the DIP Facility is an exercise

of their sound business judgment following an arm's-length process and careful evaluation of the

only two alternatives.  Specifically, the Debtors and their advisors determined that postpetition

financing will create certainty with respect to cash flows necessary for the administration of

these chapter 11 cases through a sale process.  The Debtors negotiated the DIP Agreement and

other DIP Documents with the DIP Agent in good faith, at arm's length, and with the assistance

of their respective advisors.  The Debtors conducted intensive negotiations with their Prepetition

Secured Parties that resulted in the proposed DIP Facility, which provides reasonable milestones

for the Debtors to conduct an appropriate sale process.  Given the Debtors' capital structure and

current circumstances, the Debtors believe that they have obtained the best financing available.

Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a

reasonable exercise of the Debtors' business judgment.

19

**B.  The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

26.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Secured Parties postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order:

a.  The DIP Liens securing the DIP Obligations will be senior priming liens on the Prepetition Collateral, senior in priority to all Prepetition Secured Party Liens thereon and any Adequate Protection Liens thereon, except that the DIP Liens will be junior to:

i.  the Carve Out; and

ii.  Permitted Prior Liens.

27.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

b.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

c.  the credit transaction is necessary to preserve the assets of the estate; and

d.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

20

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

28.     As described above and as set forth in the Bagley Declaration, third-party lenders were unwilling to provide postpetition financing on an unsecured basis or otherwise junior to the Prepetition Secured Parties.    *See* Bagley Declaration ¶ 19.    Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing in connection with a chapter 11 filing would likely require the support of, or be provided by, the Debtors' existing lenders.  *See* Bagley Declaration ¶ 19.  Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases and to continue operating in the ordinary course, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.   Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Agreements, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

29.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."   As described above, the Debtors are unable to obtain unsecured credit.   Therefore, approving superpriority claims in favor of the DIP Secured Parties is reasonable and appropriate.

30.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) Prepetition Lenders' interests in collateral are adequately protected.  *See, e.g.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

31.     Here the Prepetition Secured Parties have consented to the DIP Facility so long as they are provided the adequate protection described in the Interim Order.  The Debtors submit that its provision of adequate protection as described herein is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

32.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see*

22

*also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

33.      As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' unsuccessful solicitation of alternative financing proposals.  Substantially all of the Debtors' existing assets are encumbered.  *See* Bagley Declaration ¶¶ 7 and 19.  Moreover, the Debtors have done a thorough search for actionable alternative proposals—in this regard, the market has spoken.  There are no other options.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  *See* Bagley Declaration ¶¶ 10 and 22.  Therefore, in addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.      The Debtors Should Be Authorized to Use the Cash Collateral.

34.      Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash

Collateral (as well as the Prepetition Collateral), subject to the terms and limitations set forth in the Interim Order.

35.    Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

36.    As described more fully above, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral (as well as the Prepetition Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

     a.    valid and perfected replacement security interests in and liens on the DIP Collateral ("Adequate Protection Liens");

b.      superpriority administrative claims under section 507(b) of the Bankruptcy Code ("Prepetition Superpriority Claim");

c.      payment of the Prepetition Secured Parties' reasonable professional fees and expenses ("Adequate Protection Fees"); and

d.      continued accrual of interest on the Secured Obligations at the applicable default rate set forth in the Prepetition Loan Documents (the "Adequate Protection Interest").

37.      Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any diminution in value to the Cash Collateral and Prepetition Collateral.  In light of the foregoing, the Debtors further submit that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

### III.      The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Documents.

38.      Under the DIP Agreement, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lenders.  In particular, the Debtors have agreed to pay certain fees to the DIP Agent and DIP Lenders (in accordance with the terms of the DIP Documents) consisting of the following:

a.      A Closing Fee in an amount equal to five percent (5.0%) of the aggregate commitments of the Lenders under the DIP Facility shall be paid to the Lenders, ratably based on their respective commitments as of the Closing, in cash at the Closing from the proceeds of the DIP Loans.  The Closing

> Fee shall be deemed fully earned at the Closing and non-refundable or pro-ratable; and

    b.    a Commitment Fee of two percent (2.0%) per annum shall be paid to the Lenders in cash on the actual unused portion of the DIP Facility. The Commitment Fee shall accrue monthly and shall be payable in full in cash on the DIP Termination Date.

39.    Under the circumstances of these cases, these fees and costs are reasonable, customary, and appropriate. Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Agreement in connection with entering into those agreements *See* Bagley Declaration ¶¶ 14 and 15.

## IV.    The Debtors Should Be Deemed Good-Faith Lenders Under Section 364(e).

40.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

41.    As explained herein, in the Bagley Declaration and the First Day Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Secured Parties offered the most favorable terms on which to obtain vital postpetition financing, and (b) arms'-length, good-faith negotiations between the Debtors and the DIP Secured Parties. The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be

26

used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Secured Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

42.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Agent to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Secured Parties and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents, or applicable law.

43.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as

27

necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

44.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

45.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral, including advances under the DIP Facility.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to this liquidity.  The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the operation of their business.  The Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral.  The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to the Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

46.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the

Final Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

47.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event more than 30 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

48.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

49.    The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Agent for the Debtors' prepetition secured credit facility; (d) counsel to the DIP Agent; (e) counsel to NXT Capital LLC; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for all states in which the Debtors conduct business; (j) all known parties that have asserted a lien on the Debtors' assets; and (k) any party that requests service pursuant to Bankruptcy Rule 2002.

The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

50.    No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: July 7, 2019
Wilmington, Delaware

*/s/ Domenic E. Pacitti*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Sally E. Veghte (DE Bar No. 4762)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193
Email:  dpacitti@klehr.com
            myurkewicz@klehr.com
            sveghte@klehr.com

*Proposed Counsel to the Debtors*