## EXHIBIT B

**DIP Agreement**

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of July [__], 2019

among

RU CORP.,
RESTAURANTS UNLIMITED TEXAS, INC.
and
RESTAURANTS UNLIMITED, INC.
each as Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as Borrowers,

RUI HOLDING CORP.
as Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as Guarantor,

FORTRESS CREDIT CO LLC
as Agent

and

The Lenders Party Hereto

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION FACILITY

Table of Contents

**ARTICLE I.      DEFINITIONS AND ACCOUNTING TERMS; WAIVER** ......................1
    Section 1.01      Defined Terms ..........................................................................2
    Section 1.02      Other Interpretive Provisions ...................................................23
    Section 1.03      Accounting Terms ...................................................................24
    Section 1.04      Rounding .................................................................................24
    Section 1.05      Times of Day ...........................................................................25

**ARTICLE II.      THE COMMITMENTS AND CREDIT EXTENSIONS** ...........................25
    Section 2.01      The Loans ................................................................................25
    Section 2.02      Borrowings and Continuations of Loans ..............................25
    Section 2.03      [Reserved] ...............................................................................26
    Section 2.04      Prepayments ...........................................................................26
    Section 2.05      Termination of Commitments ...............................................27
    Section 2.06      Repayment of Loans ..............................................................27
    Section 2.07      Interest .....................................................................................28
    Section 2.08      Fees ..........................................................................................28
    Section 2.09      Computation of Interest and Fees ........................................29
    Section 2.10      Evidence of Debt; Loan Account; Statement of Obligations ..............29
    Section 2.11      Payments Generally; Agent's Clawback .............................29
    Section 2.12      Sharing of Payments by Lenders .........................................31
    Section 2.13      Common Enterprise; Joint and Several Liability of Borrowers..........32

**ARTICLE III.      TAXES, YIELD PROTECTION AND ILLEGALITY** ..............................34
    Section 3.01      Taxes ........................................................................................34
    Section 3.02      Illegality ...................................................................................37
    Section 3.03      Inability to Determine Rates ..................................................37
    Section 3.04      Increased Costs; Reserves on LIBOR Rate Loans ..............37
    Section 3.05      Compensation for Losses .......................................................39
    Section 3.06      Mitigate Loss ..........................................................................39
    Section 3.07      Replacement of Lenders ........................................................39
    Section 3.08      Survival ....................................................................................40
    Section 3.09      Dodd-Frank, Etc .....................................................................40

**ARTICLE IV.      CONDITIONS PRECEDENT TO CREDIT EXTENSIONS** ....................40
    Section 4.01      Conditions Precedent to Closing Date .................................40
    Section 4.02      Conditions to all Credit Extensions ......................................43

**ARTICLE V.      REPRESENTATIONS AND WARRANTIES** ............................................44
    Section 5.01      Existence, Qualification and Power ......................................44
    Section 5.02      Authorization; No Contravention ..........................................45
    Section 5.03      Governmental Authorization; Other Consents .....................45
    Section 5.04      Binding Effect .........................................................................45
    Section 5.05      Budget; No Material Adverse Effect .....................................45
    Section 5.06      Litigation .................................................................................46

i

Section 5.07    No Default ......................................................................46
Section 5.08    Ownership of Property .....................................................46
Section 5.09    Environmental Compliance ..............................................47
Section 5.10    Insurance ..........................................................................48
Section 5.11    Taxes .................................................................................48
Section 5.12    ERISA Compliance ..........................................................48
Section 5.13    Subsidiaries; Equity Interests; Loan Parties ...................49
Section 5.14    Margin Regulations; Investment Company Act .................49
Section 5.15    Disclosure .........................................................................50
Section 5.16    Compliance with Laws .....................................................50
Section 5.17    Intellectual Property; Licenses.........................................50
Section 5.18    Prepetition Obligations ....................................................50
Section 5.19    Casualty.............................................................................50
Section 5.20    Labor Matters ...................................................................51
Section 5.21    Collateral Documents........................................................51
Section 5.22    Deposit Accounts, Securities Accounts ............................51
Section 5.23    Anti-Terrorism Laws ........................................................51
Section 5.24    Broker's, Finder's or Similar Fees ...................................51
Section 5.25    Location of Collateral .......................................................51
Section 5.26    Licenses and Permits.........................................................51
Section 5.27    Parent ................................................................................52
Section 5.28    Ultimate Parent .................................................................52
Section 5.29    Franchise Matters ..............................................................52
Section 5.30    Bankruptcy Matters...........................................................52

**ARTICLE VI.    AFFIRMATIVE COVENANTS.......................................................53**
Section 6.01    Financial Statements; Budget Reports ..............................53
Section 6.02    Certificates; Other Information.........................................54
Section 6.03    Notices ..............................................................................56
Section 6.04    Payment of Obligations.....................................................57
Section 6.05    Preservation of Existence and Properties..........................57
Section 6.06    Maintenance of Properties ................................................57
Section 6.07    Maintenance of Insurance .................................................57
Section 6.08    Compliance with Laws .....................................................57
Section 6.09    Books and Records ...........................................................58
Section 6.10    Inspection Rights ..............................................................58
Section 6.11    Use of Proceeds.................................................................58
Section 6.12    Covenant to Guarantee Obligations and Give Security ....58
Section 6.13    Compliance with Environmental Laws..............................58
Section 6.14    Preparation of Environmental Reports...............................59
Section 6.15    Further Assurances.............................................................59
Section 6.16    Compliance with Terms of Leaseholds..............................59
Section 6.17    Cash Management ..............................................................60
Section 6.18    Lender Meetings ................................................................60
Section 6.19    Collateral Proceeds ...........................................................60
Section 6.20    Required Milestones ..........................................................60

ii

**ARTICLE VII.    NEGATIVE COVENANTS** ........................................................................**61**
    Section 7.01    Liens ..................................................................................62
    Section 7.02    Indebtedness........................................................................63
    Section 7.03    Investments ........................................................................63
    Section 7.04    Fundamental Changes .........................................................64
    Section 7.05    Dispositions........................................................................64
    Section 7.06    Restricted Payments............................................................65
    Section 7.07    Change in Nature of Business..............................................65
    Section 7.08    Transactions with Affiliates ................................................65
    Section 7.09    Burdensome Agreements .....................................................65
    Section 7.10    Use of Proceeds..................................................................65
    Section 7.11    [Reserved] ..........................................................................67
    Section 7.12    Capital Expenditures ..........................................................67
    Section 7.13    Amendments of Organization Documents..............................67
    Section 7.14    Accounting Changes ...........................................................67
    Section 7.15    Payments of Indebtedness....................................................67
    Section 7.16    Amendments of Indebtedness...............................................67
    Section 7.17    Parent as Holding Company ...............................................67
    Section 7.18    Ultimate Parent as Holding Company ..................................68
    Section 7.19    New Collateral Locations ....................................................68
    Section 7.20    Amendments of Material Contracts or the Management Agreement.........................................................................68
    Section 7.21    Contracts ...........................................................................68
    Section 7.22    Chapter 11 Modifications ....................................................68
    Section 7.23    Segregated Operating Account .............................................68
    Section 7.24    Right of Subrogation...........................................................68
    Section 7.25    Change of Credit Card Processor..........................................69

**ARTICLE VIII.  EVENTS OF DEFAULT AND REMEDIES**................................................**69**
    Section 8.01    Events of Default ................................................................69
    Section 8.02    Remedies upon Event of Default ..........................................73
    Section 8.03    Application of Funds...........................................................73

**ARTICLE IX.    AGENT** ...............................................................................................**74**
    Section 9.01    Appointment and Authority ................................................74
    Section 9.02    Rights as a Lender...............................................................75
    Section 9.03    Exculpatory Provisions .......................................................75
    Section 9.04    Reliance by Agent ..............................................................76
    Section 9.05    Delegation of Duties ...........................................................76
    Section 9.06    Resignation of Agent ..........................................................76
    Section 9.07    Non-Reliance on Agent and Other Lenders...........................77
    Section 9.08    Agent May File Proofs of Claim...........................................77
    Section 9.09    Collateral and Guaranty Matters .........................................78
    Section 9.10    Additional Secured Parties..................................................78

Fortress/RUI – DIP Credit Agreement
74475947

**ARTICLE X.      MISCELLANEOUS** ...................................................................79
    Section 10.01      Amendments, Etc ...........................................................79
    Section 10.02      Notices; Effectiveness; Electronic Communications..........80
    Section 10.03      No Waiver; Cumulative Remedies .....................................82
    Section 10.04      Expenses; Indemnity; Damage Waiver..............................82
    Section 10.05      Payments Set Aside..........................................................84
    Section 10.06      Successors and Assigns.....................................................85
    Section 10.07      Confidentiality; Public Disclosures ..................................89
    Section 10.08      Right of Setoff.................................................................90
    Section 10.09      Interest Rate Limitation ...................................................90
    Section 10.10      Counterparts; Integration; Effectiveness...........................91
    Section 10.11      Survival of Representations and Warranties.......................91
    Section 10.12      Severability ....................................................................91
    Section 10.13      Governing Law; Jurisdiction; Etc ....................................91
    Section 10.14      Waiver of Jury Trial ........................................................92
    Section 10.15      No Advisory or Fiduciary Responsibility ..........................92
    Section 10.16      USA Patriot Act Notice ...................................................93
    Section 10.17      Time of the Essence .........................................................93
    Section 10.18      Entire Agreement.............................................................93
    Section 10.19      Administrative Borrower ..................................................93
    Section 10.20      Replacement of Holdout Lender ......................................94
    Section 10.21      Reinstatement; Application of Payments...........................94
    Section 10.22      Taxes and Expenses.........................................................95
    Section 10.23      Article and Section Headings...........................................95
    Section 10.24      Actions in Concert ..........................................................95
    Section 10.25      Conflicts.........................................................................96

**ARTICLE XI.      SECURITY AND PRIORITY** .......................................................96
    Section 11.01      Prepetition Obligations ...................................................96
    Section 11.02      Acknowledgment of Security Interests..............................96
    Section 11.03      Binding Effect of Documents ...........................................96
    Section 11.04      Collateral; Grant of Lien and Security Interest..................97
    Section 11.05      Priority and Liens Applicable to Loan Parties ...................97
    Section 11.06      Grants, Rights and Remedies...........................................98
    Section 11.07      No Filings Required.........................................................98
    Section 11.08      Survival ..........................................................................98

**SCHEDULES**

Schedule 1.01(a)      Accounting Calendar
Schedule 1.01(b)      Material Contracts
Schedule 2.01         Commitments
Schedule 5.08(b)      Owned Real Property
Schedule 5.08(c)      Leased Real Property
Schedule 5.10         Insurance
Schedule 5.13         Subsidiaries and Other Equity Investments; Loan Parties
Schedule 5.17         Intellectual Property
Schedule 5.22         Deposit and Securities Accounts
Schedule 5.26         Liquor Licenses
Schedule 7.01         Existing Liens
Schedule 7.02         Existing Indebtedness
Schedule 7.03         Existing Investments
Schedule 10.02        Agent's Office, Certain Addresses for Notices

**EXHIBITS**

Exhibit A      Assignment and Assumption
Exhibit B      Committed Loan Notice
Exhibit C      Note
Exhibit D      Budget
Exhibit E      Interim DIP Order
Exhibit F      Variance Report

Fortress/RUI – DIP Credit Agreement
74475947

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "**Agreement**") is entered into as of July [__], 2019, among **RESTAURANTS UNLIMITED, INC.**, a Minnesota corporation ("**RUI**"), **RESTAURANTS UNLIMITED TEXAS, INC.**, a Texas corporation ("**RUI Texas**"), and **RU CORP.**, a Washington corporation ("**Parent**"), each as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (as hereinafter defined) (each of RUI, RUI Texas and Parent, a "**Borrower**" and, collectively, the "**Borrowers**"), **RUI HOLDING CORP.**, a Delaware corporation ("**Ultimate Parent**"), as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Guarantor**"), each lender from time to time party hereto (each, a "**Lender**" and, collectively, the "**Lenders**"), and **FORTRESS CREDIT CO LLC**, as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Agent**").

<u>PRELIMINARY STATEMENTS</u>:

On July 7, 2019 (the "**Petition Date**"), the Loan Parties commenced voluntary cases (the "**Chapter 11 Cases**") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and the Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Borrowers have requested that the Lenders provide certain post-petition loans and advances to the Borrowers comprising a term loan facility in an aggregate principal amount of $10,000,000 in order to effectuate the 363 Sale (as hereinafter defined).  The Lenders have severally, and not jointly, agreed to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth.

Each of the Loan Parties acknowledges that such Loan Party will receive substantial direct and indirect benefits by reason of the making of the loans and other financial accommodations to the Loan Parties as provided in this Agreement.

To provide security for the repayment of the Term Loans and the payment of the other Obligations of the Loan Parties hereunder and under the other Loan Documents, the Loan Parties will provide and grant to the Agent, for the benefit of the Secured Parties, certain security interests, liens, and other rights and protections pursuant to the terms hereof, security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, and other rights and protections, as more fully described herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS; WAIVER

**Section 1.01  Defined Terms.**  As used in this Agreement, the following terms shall have the meanings set forth below:

"**363 Sale**" means, collectively, the sale or other Disposition of all or substantially all of the Loan Parties' assets (or a portion thereof reasonably acceptable to the Lenders) pursuant to Section 363 of the Bankruptcy Code, which sale or other Disposition may be effectuated pursuant to a sale of the business as a whole or in one or more than one grouping (based on concept, geographic location or otherwise).

"**363 Sale Order**" has the meaning set forth in Section 6.20(g).

"**Administrative Borrower**" has the meaning set forth in Section 10.19.

"**Administrative Questionnaire**" means an administrative questionnaire, in the form provided by the Agent, to be completed by each Lender.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agent**" has the meaning set forth in the introductory paragraph hereto.

"**Agent Advisors**" means, collectively, any financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Agent or the attorneys or other advisors of the Agent, including, for the avoidance of doubt, Grant Thornton LLP and Hunton Andrews Kurth LLP.

"**Agent's Office**" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify to the Administrative Borrower and the Lenders.

"**Agent Parties**" has the meaning specified in Section 10.02(c).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Anti-Terrorism Laws**" means, collectively, (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Patriot Act, (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts, money laundering and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

2

"**Applicable Margin**" means (a) with respect to a Base Rate Loan, seven percent (7.00%) per annum and (b) with respect to a LIBOR Rate Loan, eight percent (8.00%) per annum.

"**Applicable Percentage**" means, with respect to any Lender at any time, (a) in respect of the Interim Term Loan Commitments, the percentage (carried out to the ninth decimal place) obtained by dividing (i) such Lender's outstanding Interim Term Loan Commitment by (ii) the outstanding Interim Term Loan Commitments of all Lenders, (b) in respect of the Final Term Loan Commitments, the percentage (carried out to the ninth decimal place) obtained by dividing (i) such Lender's outstanding Final Term Loan Commitment by (ii) the outstanding Final Term Loan Commitments of all Lenders, and (c) with respect to all other matters (including the reimbursement obligations arising under Section 10.04(c)), the percentage (carried out to the ninth decimal place) obtained by dividing (i) the sum of such Lender's outstanding Commitments plus the unpaid principal amount of such Lender's portion of the Term Loans by (ii) the sum of the outstanding Commitments of all Lenders plus the unpaid principal amount of the Term Loans.

"**Approved Fund**" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an assignment and assumption agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms of Section 10.06(b) (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit A or any other form approved by the Agent.

"**Attributable Indebtedness**" means, on any date, without duplication (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"**Availability Period**" means, in respect of the Final Term Loan Commitments, the period from and including the Closing Date to (but excluding) the earliest of (i) the Maturity Date, (ii) the date of termination of the Final Term Loan Commitments pursuant to Section 2.05, and (iii) the date of termination of the Final Term Loan Commitments pursuant to Section 8.02.

"**Avoidance Actions**" means all actions for preferences, fraudulent conveyances and other avoidance power claims under Sections 544, 545, 547, 548, 550 and

3

553 of the Bankruptcy Code and all other causes of action arising under Chapter 5 of the Bankruptcy Code.

"**Bankruptcy Code**" means the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended and in effect from time to time and the regulations issued from time to time thereunder.

"**Bankruptcy Court**" has the meaning specified in the preliminary statements hereto.

"**Base Rate**" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 2.00% per annum, (b) the rate publicly quoted from time to time by The Wall Street Journal as the "U.S. prime rate" (or, if The Wall Street Journal ceases quoting a prime rate of the type described, the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the "Bank prime loan rate" or its equivalent and (c) the LIBOR Rate for a one-month Interest Period in effect for such day plus 1.00% per annum.

"**Base Rate Loan**" means a Term Loan that bears interest at a rate based on the Base Rate.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation in form and substance reasonably acceptable to the Agent.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Borrower**" and "**Borrowers**" have the meaning specified in the introductory paragraph hereto.

"**Borrower Materials**" has the meaning specified in Section 10.02(c).

"**Borrowing**" means a borrowing consisting of an Interim Term Loan or a Final Term Loan pursuant to Section 2.01.

"**Budget**" means the 13-week cash flow projection and budget of the Loan Parties broken down by week, including the anticipated receipts and disbursements for such period, a copy of the initial version of which is attached as Exhibit D; provided, that the Borrowers may propose to update such budget and, upon approval thereof by the Required Lenders in their sole discretion, the "Budget" shall give effect to such update; provided, further, that if such budget update is not approved by the Required Lenders, the Budget that is then in effect shall remain in place.

"**Budget Event**" means any of the following:

(a)      the actual amount of aggregate cash receipts during any Budget Testing Period shall be less than 85% of the projected amount of aggregate cash receipts set forth in the Budget for such Budget Testing Period;

(b)      the actual amount of aggregate cash expenditures and disbursements (excluding professional fees and expenses) during any Budget Testing Period shall be greater than 115% of the projected amount of aggregate cash expenditures and disbursements set forth in the Budget for such Budget Testing Period;

(c)      the Loan Parties shall make cash expenditures or disbursements during any Budget Testing Period that are not in the categories set forth in the Budget for such Budget Testing Period; or

(d)      the actual amount of aggregate cash expenditures and disbursements in any line item set forth in the Budget (excluding professional fees and expenses, other than professional fees and expenses of the Loan Parties) on a cumulative basis from and including the Petition Date shall be greater than 110% of the projected amount of aggregate cash expenditures for such line item set forth in the Budget on a cumulative basis from and including the Petition Date through and including the last day of such Budget Testing Period.

"**Budget Testing Period**" means (a) with respect to the initial Budget Testing Date, the period beginning on July 8, 2019 and ending on the Sunday immediately preceding the initial Budget Testing Date and (b) with respect to each Budget Test Date thereafter, the two-week period ending on the Sunday immediately preceding such Budget Test Date.

"**Budget Testing Date**" means, with respect to the Budget, July 24, 2019 and the Wednesday of each week thereafter.

"**Business Day**" means any day other than any Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located or the State of New York and, if such day relates to any LIBOR Rate Loan, the term "Business Day" shall also exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"**Capital Expenditures**" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset by such Person during such period that is a capital expenditure in accordance with GAAP, whether such expenditures are paid in cash or financed.

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"**Carve Out**" has the meaning specified in (a) at any time prior to the Final DIP Order Entry Date, the Interim DIP Order and (b) at any time following the Final DIP Order Entry Date, the Final DIP Order.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Loan Parties free and clear of all Liens (other than Liens created under the Collateral Documents and the Prepetition Collateral Documents):

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than one (1) year from the date of acquisition thereof;

(b)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of not less than $250,000,000, in each case with maturities of not more than two hundred seventy (270) days from the date of acquisition thereof;

(c)    commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than two hundred seventy (270) days from the date of acquisition thereof; and

(d)    Investments, classified in accordance with GAAP as current assets of the Loan Parties, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) and the regulations promulgated thereunder, as amended from time to time.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means an event or series of events by which:

(a)    Sun RUI, LLC shall cease, directly or indirectly, to own and control legally and beneficially (free and clear of all Liens) Equity Interests in Ultimate Parent or Parent

6

representing more than 50% of the combined voting power of all equity securities entitled to vote for members of the board of directors or equivalent governing body of Ultimate Parent or Parent, as applicable, on a fully-diluted basis; or

      (b)    Ultimate Parent shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in Parent; or

      (c)    Parent shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in RUI; or

      (d)    RUI shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in each other Borrower (other than Parent) and their Subsidiaries.

"**Chapter 11 Cases**" has the meaning specified in the preliminary statements hereto.

"**Chief Restructuring Officer**" means David Bagley, in his capacity as Chief Restructuring Officer duly appointed and authorized by the Borrowers, on terms and conditions acceptable to the Agent and the Lenders.

"**Closing Date**" means the first date all the conditions in <u>Section 4.01</u> have been satisfied or waived, which shall not be later than three (3) Business Days after the Petition Date, in either case without the consent of the Required Lenders.

"**Code**" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder, as amended from time to time.

"**Collateral**" means all of the "Collateral" referred to in the Collateral Documents, all of the other property that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Agent, for the benefit of the Secured Parties, and all of the "DIP Collateral" referred to in the DIP Order.

"**Collateral Documents**" means, collectively, each DIP Order, the Security Agreement, each of the pledge agreements, intellectual property security agreements, mortgages, deeds of trust, collateral assignments and control agreements, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Agent, for the benefit of the Secured Parties, in each case as amended, restated, supplemented or otherwise modified from time to time.

"**Collections**" means all cash, checks, notes, instruments, and other items of payment.

"**Commitment**" means an Interim Term Loan Commitment or a Final Term Loan Commitment, as the context may require.

7

"**Committed Loan Notice**" means a notice of a Borrowing pursuant to <u>Section 2.02(a)</u>, which, if in writing, shall be substantially in the form of <u>Exhibit B</u>.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, either to (i) vote 10% or more of the capital stock of such Person having ordinary voting power for the election of directors of such Person or (ii) direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Credit Card Processors**" means Elavon Inc. and any other credit card clearinghouse or processor used by the Loan Parties and disclosed in writing to the Agent on or prior to the Closing Date.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means, when used with respect to the Obligations, an interest rate equal to (i) the Base Rate or LIBOR Rate (as applicable) <u>plus</u> (ii) the Applicable Margin <u>plus</u> (iii) 2.00% per annum.

"**Defaulting Lender**" means any Lender that (a) other than at the direction or request of any regulatory agency or authority, has failed to fund any portion of the Term Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"**Designated Account**" means the Administrative Borrower's account set forth on <u>Schedule 10.02</u> as the Designated Account, or such other account as the Administrative Borrower may from time to time notify to the Agent and the Lenders.

"**DIP Facility**" means the term loan facility under which the Term Loans are provided hereunder.

"**DIP Order**" means the Interim DIP Order or the Final DIP Order, as the context may require.

8

"**DIP Super-Priority Claim**" has the meaning specified in <u>Section 11.05(a)</u>.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any division) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under <u>Section 10.06(b)</u> (subject to such consents, if any, as may be required under <u>Section 10.06(b)</u>).

"**Environmental Laws**" means any and all Laws, judgments, orders, decrees, permits, licenses, writs, injunctions, codes or governmental restrictions relating to public health and safety, pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Group Members directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing described in <u>clause (a)</u>, <u>(b)</u>, <u>(c)</u> or <u>(d)</u> above.

"**Environmental Lien**" means any Lien in favor of any Governmental Authority for any Environmental Liability.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equipment**" means equipment (as that term is defined in the UCC).

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, membership or trust interests therein), whether voting or nonvoting, and whether or

9

not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with Ultimate Parent or any of its Subsidiaries (including the Borrowers) within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any of the Borrowers or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any of the Borrowers or any ERISA Affiliate from a Multiemployer Plan, a notification that a Multiemployer Plan is in reorganization, or insolvency pursuant to Section 4241 or 4245 of ERISA, or a determination that a Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the failure to meet the minimum funding requirements of Section 412 of the Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Code) or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (g) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to Section 303(k) of ERISA or a violation of Section 401(a)(29) of the Code with respect to any Pension Plan; or (h) the imposition of any material liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrowers or any ERISA Affiliate.

"**Event of Default**" has the meaning specified in <u>Section 8.01</u>.

"**Excluded Accounts**" has the meaning specified in <u>Section 6.17</u>.

"**Excluded Taxes**" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it and any other tax imposed in lieu of net income taxes, under the laws of the United States of America (or any political subdivision thereof) or the jurisdiction in which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a

request by the Borrowers under <u>Section 3.07</u>), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office unless such designation is at the request of Parent or the Borrowers) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law occurring after the date such Lender became a party to this Agreement) to comply with <u>Section 3.01(e)</u>, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to <u>Section 3.01(a)</u>.

"**Extraordinary Receipt**" means any cash received by or paid to or for the account of any Person in respect of (a) proceeds of insurance (including business interruption insurance) and (b) condemnation awards (and payments in lieu thereof).

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average (rounded upward, if necessary, to the next 1/100 of 1%) of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the next succeeding Business Day; <u>provided</u>, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next succeeding Business Day as so published, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to the next 1/100 of 1%) charged to any commercial bank designated by the Agent on such day on such transactions as determined by the Agent.

"**Fee Letter**" means that certain letter agreement, dated as of the date hereof, between the Borrowers and the Agent.

"**Final DIP Order**" means, collectively, the final order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Cases after a hearing under Bankruptcy Rule 4001(c)(2), authorizing and approving the DIP Facility and the terms of this Agreement and the other Loan Documents (including the payment of interest, fees, costs and expenses hereunder and thereunder) and granting the Liens, status and protections set forth in <u>Section 11.05</u> and provided for in the Collateral Documents, which order or judgment is in effect and not stayed, and as to which no appeal, petition for certiorari or other proceeding for re-argument or re-hearing shall then be pending, or, if pending, no stay pending appeal shall have been granted, which shall be in form and substance satisfactory to the Agent and the Required Lenders in their sole discretion, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent of the Required Lenders (and, with respect to amendments, supplements or modifications that affect the rights or duties of the Agent, the Agent).

"**Final DIP Order Entry Date**" means the date on which the Final DIP Order shall have been entered on the docket of the Bankruptcy Court.

"**Final Term Loan**" means a loan described in <u>Section 2.01(ii)</u>.

"**Final Term Loan Commitment**" means, with respect to each Lender, the commitment of such Lender to make the Final Term Loans to the Borrowers from time to time pursuant to Section 2.01(ii), which commitment amount is in the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Final Term Loan Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such commitment may be reduced from time to time in accordance with this Agreement.

"**Fiscal Period**" means the four or five week period designated as an accounting period of the Group Members as set forth on the accounting calendar attached hereto as Schedule 1.01(a).

"**Fiscal Quarter**" means the 13 or 14 week period designated as an accounting period of the Group Members as set forth on the accounting calendar attached hereto as Schedule 1.01(a).

"**Fiscal Year**" means the annual accounting period of the Group Members.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than the United States or any political subdivision thereof or therein.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.06(h).

"**Group Members**" means Ultimate Parent, Parent, the Borrowers and each of their Subsidiaries.

"**Guarantee**" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness or other obligation to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "**Guarantee**" as a verb has a corresponding meaning.

"**Guarantor**" has the meaning specified in the introductory paragraph hereto.

"**Guaranty**" means that certain Guaranty, dated as of the date hereof, by Ultimate Parent in favor of the Agent, as amended, restated, supplemented or otherwise modified from time to time.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP except as expressly noted below:

(a)        all indebtedness, obligations and liabilities of such Person for borrowed money and all indebtedness and obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)        the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)        net payment obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than income tax accruals and other payment accruals in the ordinary course of business and trade accounts payable in the ordinary course of business and not past due for more than ninety (90) days after the date on which such trade account was created);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; provided, that the foregoing shall not include any obligations in respect of any Equity Interest if (i) such obligations are not included as indebtedness or liabilities in accordance with GAAP and (ii) such Equity Interest is not redeemable prior to the date that is one hundred eighty (180) days after the Maturity Date;

(h)     all obligations created or arising under any conditional sale or other title retention agreement; and

(i)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning specified in Section 10.04(b).

"**Information**" has the meaning specified in Section 10.07(b).

"**Interest Payment Date**" means, (a) as to any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan and the final maturity date thereof (whether by acceleration or otherwise) and (b) as to any Base Rate Loan, the first day of each month and the final maturity date of such Loan (whether by acceleration or otherwise).

"**Interest Period**" means, as to each LIBOR Rate Loan, the one-month period commencing on the date such LIBOR Rate Loan is disbursed or continued as a LIBOR Rate Loan and ending on the date one month thereafter (or, if earlier, the Maturity Date); provided, that:

14

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day; and

(b)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"**Interim DIP Order**" means the order of the Bankruptcy Court, approving the DIP Facility on an interim basis, in the form of <u>Exhibit E</u> hereto, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent of the Required Lenders (and, with respect to amendments, supplements or modifications that affect the rights or duties of the Agent, the Agent).

"**Interim DIP Order Entry Date**" means the date on which the Interim DIP Order shall have been entered on the docket of the Bankruptcy Court.

"**Interim Term Loan**" means the loan described in <u>Section 2.01(i)</u>.

"**Interim Term Loan Commitment**" means, with respect to each Lender, the commitment of such Lender to make the Interim Term Loan to the Borrowers on the Closing Date pursuant to <u>Section 2.01(i)</u>, which commitment amount is in the amount set forth opposite such Lender's name on <u>Schedule 2.01</u> under the caption "Interim Term Loan Commitment".

"**Inventory**" means inventory (as that term is defined in the UCC).

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IP Rights**" has the meaning specified in <u>Section 5.17</u>.

"**IRS**" means the United States Internal Revenue Service.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof,

15

and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" and "**Lenders**" have the meaning specified in the introductory paragraph hereto.

"**Lending Office**" means, as to any Lender, the branch, branches, office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Administrative Borrower and the Agent.

"**LIBOR Rate**" means, for any Interest Period with respect to a LIBOR Rate Loan, the rate per annum (rounded upward, if necessary, to the next 1/100 of 1%) equal to the greater of (a) the offered rate per annum for deposits of Dollars that appears on Reuters Screen LIBOR01 Page as of 11:00 a.m. (London, England time) two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period and (b) 1.25% per annum.

"**LIBOR Rate Loan**" means a Term Loan that bears interest at a rate based on the LIBOR Rate.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**Liquor Licenses**" has the meaning set forth in Section 5.26.

"**Loan**" means (i) an extension of credit by a Lender to the Borrowers under Article II in the form of an Interim Term Loan or a Final Term Loan and (ii) the capitalization of PIK Interest set forth in Section 2.07(c).

"**Loan Account**" has the meaning set forth in Section 2.10(a).

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Guaranty, (c) the Collateral Documents, (d) the Notes, (e) the Fee Letter and (f) each other agreement executed, now or in the future, by any Loan Party and delivered to the Agent or any Lender in connection with this Agreement, in each case as amended, restated, supplemented or otherwise modified from time to time.

"**Loan Parties**" means, collectively, the Borrowers and the Guarantor.

"**Management Agreement**" means that certain Amended and Restated Consulting Agreement, dated as of April 25, 2012, by and between Parent and Manager.

"**Manager**" means Sun Capital Partners Management IV, LLC.

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or financial condition of Ultimate Parent and its Subsidiaries, taken as a whole, excluding in any event the events leading up to and resulting from the Chapter 11 Cases and the Chapter 11 Cases themselves (and any defaults under pre-petition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court); (b) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"**Material Contract**" means (a) each agreement with a Credit Card Processor (including any settlement or similar agreement) and each other agreement set forth on Schedule 1.01(b) hereto and (b) with respect to any Person, each contract to which such Person is a party involving aggregate consideration payable to or by such Person of $500,000 or more in any year (excluding leases of real property and the Management Agreement) or such other agreements the termination of which would reasonably be expected to result in a Material Adverse Effect.

"**Maturity Date**" means the date which is the earliest of (i) October [__], 2019[1], (ii) the date that is thirty (30) days after the Petition Date if the Final DIP Order Entry Date shall not have occurred,   (iii) the earlier of the effective date and the date of the substantial consumption (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of a plan of reorganization of the Loan Parties, (iv) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of any of the Loan Parties pursuant to Section 363 of the Bankruptcy Code or otherwise, (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a Chapter 7 case, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, and (vii) such earlier date on which the Term Loans shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any of the Borrowers, Ultimate Parent or any ERISA Affiliate makes or is obligated to make contributions or, during the preceding five plan years, has made or been obligated to make contributions.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Ultimate Parent and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable Fiscal Period, Fiscal Quarter or Fiscal Year and for the period from the beginning of

---

[1] To insert date that is 13 weeks after the Closing Date.

the then current Fiscal Year to the end of such period to which such financial statements relate with comparison to and variances from the immediately preceding period.

"**Net Cash Proceeds**" means:

(a)     with respect to any Disposition by any Loan Party, or any Extraordinary Receipts received or paid to the account of any Loan Party, an amount equal to (i) the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), minus (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents or the Prepetition Loan Documents), (B) the reasonable and customary out-of-pocket expenses that are not payable to an Affiliate of any Loan Party and are incurred by such Loan Party in connection with such transaction, (C) transfer and other taxes payable at the time of such Disposition and income taxes reasonably estimated to be actually payable within two (2) years of the date of the relevant transaction as a result of any gain recognized in connection therewith; provided, that if the amount of any estimated taxes pursuant to clause (C) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds, and (D) in the case of the 363 Sale, any other amounts contemplated by the DIP Order; and

(b)     with respect to the sale or issuance of any Equity Interest by any Loan Party, or the incurrence or issuance of any Indebtedness by any Loan Party, an amount equal to (i) the sum of the cash and Cash Equivalents received in connection with such transaction minus (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses that are not payable to an Affiliate of any Loan Party and are incurred by such Loan Party in connection therewith.

"**Note**" means a promissory note made by the Borrowers in favor of a Lender evidencing the Loans made by such Lender, substantially in the form of Exhibit C.

"**NPL**" means the National Priorities List under CERCLA.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document (including all Loans, interest, fees, expenses and indemnities), in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding; provided, that, for the avoidance of doubt, "Obligations" shall not include any of the Prepetition Obligations.

"**Official Committee**" means, if any, an official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code.

"**Organization Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and the operating agreement or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Outstanding Amount**" means, with respect to the Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments of the Loans occurring on such date.

"**Parent**" has the meaning specified in the introductory paragraph hereto.

"**Participant**" has the meaning specified in Section 10.06(d).

"**Participant Register**" has the meaning specified in Section 10.06(d).

"**Patriot Act**" has the meaning set forth in Section 10.16.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**PCAOB**" means the Public Company Accounting Oversight Board.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Section 412 of the Code or to Section 302 or Title IV of ERISA and is sponsored or maintained by any of the Borrowers, Ultimate Parent or any ERISA Affiliate or to which any of the Borrowers, Ultimate Parent or any ERISA Affiliate contributes or has an obligation to contribute, or, in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the preliminary statements hereto.

"**PIK Interest**" has the meaning set forth in Section 2.07(c).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or contributed to by any of the Borrowers or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"**Platform**" means Syndtrak or another similar electronic system on which materials and/or information provided by or on behalf of the Group Members are posted.

"**Prepetition Agent**" means Fortress Credit Co LLC, in its capacity as agent for the Prepetition Lenders under the Prepetition Loan Documents, and any successor thereto.

"**Prepetition Collateral**" means all "Collateral" as defined in the Prepetition Credit Agreement purported to be granted to the Prepetition Agent pursuant to the Prepetition Loan Documents.

"**Prepetition Collateral Documents**" means the "Collateral Documents" as defined in the Prepetition Credit Agreement.

"**Prepetition Credit Agreement**" means that certain Third Amended and Restated Credit Agreement, dated as of July 31, 2013, by and among the Borrowers, the Prepetition Agent and the Prepetition Lenders, as amended, restated, supplemented or otherwise modified from time to time.

"**Prepetition Lenders**" means the lenders party to the Prepetition Credit Agreement from time to time.

"**Prepetition Loan Documents**" means the "Loan Documents" as defined in the Prepetition Credit Agreement.

"**Prepetition Obligations**" means all "Obligations" (as defined in the Prepetition Credit Agreement) of the Loan Parties to the Prepetition Secured Parties incurred prior to the Petition Date.

"**Prepetition Secured Parties**" means, collectively, the Prepetition Agent, the Prepetition Lenders and any other holders of Prepetition Obligations.

"**Register**" has the meaning specified in Section 10.06(c).

"**Registered Public Accounting Firm**" has the meaning specified by the Securities Laws and shall be independent of Ultimate Parent as prescribed by the Securities Laws.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, shareholders, directors, managers, officers, employees, representatives, agents and advisors of such Person and of such Person's Affiliates.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, the Lenders holding more than 50% of the sum of the (a) Total Outstandings and (b) aggregate unused Commitments; provided, that, so long as NXT Capital, LLC and its Affiliates (collectively, "NXT") hold an Applicable Percentage of Loans and Commitments that is greater than or equal to 90% of the Applicable Percentage of Loans and Commitments held by NXT on the Closing Date, "Required Lenders" shall include NXT; provided, further, that the unused Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Required Milestones**" has the meaning set forth in Section 6.20.

"**Responsible Officer**" means, with respect to Ultimate Parent or a Loan Party, the chief executive officer, president, chief financial officer, Chief Restructuring Officer, treasurer or assistant treasurer of such Person.  Any document delivered hereunder that is signed by a Responsible Officer of Ultimate Parent or a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of Ultimate Parent or such Loan Party, and such Responsible Officer shall be conclusively presumed to have acted on behalf of Ultimate Parent or such Loan Party.

"**Restaurant**" means a restaurant that is owned or operated by a Loan Party.

"**Restricted Payment**" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment or (b) any management or similar fees payable to any holder of any Equity Interest in any Group Member or to Manager or any of their respective Affiliates.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Parties**" means, collectively, the Agent, the Lenders, each co-agent or sub-agent appointed by the Agent from time to time pursuant to Section 9.05, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"**Securities Laws**" means the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"**Security Agreement**" means that certain Security Agreement, dated as of the date hereof, by and among the Loan Parties and the Agent, as amended, restated, supplemented or otherwise modified from time to time.

"**Segregated Operating Account**" means the deposit account to be established by the Loan Parties with a depositary bank reasonably satisfactory to the Agent for the purpose of receipt of proceeds of Collateral.

"**SPC**" has the meaning specified in <u>Section 10.06(h)</u>.

"**Sponsor**" means Sun Capital Partners IV, LP and its Affiliates.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "**Subsidiary**" or to "**Subsidiaries**" shall refer to a Subsidiary or Subsidiaries of Ultimate Parent.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Synthetic Debt**" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"**Synthetic Lease Obligation**" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating

obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges in the nature of a tax imposed by any Governmental Authority, including any interest thereon, additions to tax or penalties applicable thereto.

"**Term Loan**" means an Interim Term Loan or a Final Term Loan, as the context may require.

"**Threshold Amount**" means $600,000.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of New York, except as such term may be used in connection with the perfection or priority of any security interest and then in the applicable jurisdiction.

"**Ultimate Parent**" has the meaning specified in the introductory paragraph hereto.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA over the current value of such Pension Plan's assets, determined in accordance with the assumptions used for funding such Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**United States**" and "**U.S.**" mean the United States of America.

"**U.S. Trustee**" means the United States Trustee for the District of Delaware.

"**Variance Report**" has the meaning specified in <u>Section 6.01(e)</u>.

**Section 1.02  Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference

23

herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, restated, modified or supplemented from time to time, (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (vii) any reference herein or in any other Loan Document to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification obligations and termination of the Aggregate Commitments and the Loan Documents in writing, and (viii) any reference herein or in any other Loan Document to the giving of a notice shall mean a written notice delivered in accordance with Section 10.02.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

**Section 1.03  Accounting Terms.**

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrowers or the Required Lenders shall so request, the Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (and the Lenders hereby authorize the Agent to enter into such negotiations and, with the consent of the Required Lenders, to sign such amendments); provided, that until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**Section 1.04  Rounding.**  Any financial ratios required to be maintained pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed

herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**Section 1.05  Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**ARTICLE II.**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

**Section 2.01  The Loans.**  Subject to the terms and conditions set forth herein and entry of the applicable DIP Order:

> (i)     each Lender severally, but not jointly, agrees to make, on the Closing Date, an Interim Term Loan to the Borrowers in an amount equal to such Lender's Interim Term Loan Commitment; and

> (ii)    each Lender severally, but not jointly, agrees to make, from time to time on any Business Day during the Availability Period following the Final DIP Order Entry Date, one or more Final Term Loans in an aggregate amount not to exceed such Lender's Final Term Loan Commitment.

The Borrowers may make only one (1) Borrowing under the Interim Term Loan Commitments that shall be in a principal amount equal to $3,250,000.  The Borrowers may make only one (1) Borrowing per week under the Final Term Loan Commitments that shall be in a principal amount not to exceed 115% of the projected amount of "DIP Loan Proceeds" set forth in the Budget for such week (unless otherwise agreed by the Agent in its sole discretion), up to an aggregate principal amount for all Final Term Loans not to exceed $6,750,000.  The Interim Term Loan Commitments shall terminate automatically immediately after the making of the Interim Term Loan on the Closing Date.  The Final Term Loan Commitments shall reduce automatically immediately after the making of each Final Term Loan by the amount of such Borrowing and shall terminate automatically immediately upon the earlier of (i) the making of the final Borrowing under the Final Term Loan Commitments and (ii) the Maturity Date. Amounts borrowed under this <u>Section 2.01</u> and repaid or prepaid may not be reborrowed.

**Section 2.02  Borrowings and Continuations of Loans.**

> (a)     Each Borrowing shall be made upon the Administrative Borrower's irrevocable notice to the Agent, which may be given by telephone.  Each such notice must be received by the Agent not later than 1:00 p.m. three (3) Business Days prior to the requested date of any Borrowing.  Each telephonic notice by the Administrative Borrower pursuant to this <u>Section 2.02(a)</u> must be confirmed promptly by delivery to the Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Administrative Borrower.  Each Borrowing shall be in a principal amount of $200,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) the requested date of such Borrowing (which shall be a Business Day) and (ii) the principal amount of Loans to be borrowed.  Each Term Loan shall be made as a LIBOR Rate Loan with a one-month Interest Period and shall be automatically continued as a LIBOR Rate

25

Loan effective as of the last day of the Interest Period then in effect with respect to such Term Loan.

(b)        Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage.  Each Lender shall make the amount of its portion of such Term Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the Interim Term Loan, Section 4.01), the Agent shall make all funds so received available to the Borrowers in like funds as received by the Agent either by (i) crediting the loan account of the Borrowers with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Borrowers.

(c)        The Agent shall promptly notify the Administrative Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBOR Rate Loans upon determination of such interest rate.

(d)        After giving effect to all Borrowings and all continuations of Loans, there shall not be more than ten (10) Interest Periods in effect at any time.

**Section 2.03  [Reserved].**

**Section 2.04  Prepayments.**

(a)        Optional.

(i)        Subject to Section 2.04(a)(ii), the Borrowers may, upon notice to the Agent, at any time or from time to time voluntarily prepay Term Loans in whole or in part; provided, that (A) such notice must be received by the Agent not later than 1:00 p.m. two (2) Business Days prior to any date of prepayment and (B) any prepayment of Term Loans shall be in a principal amount of $200,000 or a whole multiple of $100,000 or the balance in excess thereof, or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Interest Period(s) of the Loans to be prepaid.  The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage).  Any prepayment of a Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05 and any other outstanding fees, indemnities, expenses and other amounts payable to the Agent and the Lenders.

(ii)       Optional prepayments of the Term Loans may be made only so long as no Default or Event of Default has occurred and is continuing or would result therefrom.  Each such prepayment shall be paid to the Lenders in accordance with their respective Applicable Percentages.

(b)    <u>Mandatory</u>.

(i)    If any Loan Party (x) Disposes of any property (other than any Disposition of any property permitted by <u>Section 7.05(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u> or <u>(f)</u>) which results in the realization by the Loan Parties of Net Cash Proceeds in excess of $100,000 (in the aggregate for all Dispositions) or (y) receives any Extraordinary Receipt, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of the Net Cash Proceeds received therefrom within three (3) Business Days of receipt thereof by such Person (such prepayments to be applied as set forth in <u>Section 2.04(c)</u>); <u>provided</u>, that Extraordinary Receipts in an aggregate amount of $1,000,000 for the term of this Agreement shall not be required to be applied pursuant to this <u>Section 2.04(b)(i)</u> and may be retained by the Borrowers for use in accordance with the Budget.

(ii)    Upon the sale or issuance by any Loan Party of any of its Equity Interests, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom within three (3) Business Days of receipt thereof by such Person (such prepayments to be applied as set forth in <u>Section 2.04(c)</u>).

(iii)    Upon the incurrence or issuance by any Loan Party or its Subsidiaries of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to <u>Section 7.02</u>), the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom within three (3) Business Days of receipt thereof by such Person (such prepayments to be applied as set forth in <u>Section 2.04(c)</u>).

(c)    <u>Application of Mandatory Prepayments</u>.    Mandatory prepayments pursuant to <u>Section 2.04(b)</u> shall be applied as follows:  <u>first</u>, to the Obligations then outstanding until paid in full in the manner set forth in <u>Section 8.03</u>, and, <u>second</u>, after the Obligations have been paid in full and all Commitments terminated in accordance with the DIP Order, deposited in a segregated interest-bearing deposit account maintained at the Agent and subject to the Liens securing the Obligations and the Prepetition Obligations and the Liens and replacement Liens in favor of the Prepetition Secured Parties, for disposition as provided for under the DIP Order.

(d)    <u>Prepayment of Entire Facility</u>.    The Borrowers may terminate all of the DIP Facility and prepay the Total Outstandings and all other outstanding Obligations with respect to the DIP Facility at any time prior to the Maturity Date upon ten (10) days' notice to the Agent.

**Section 2.05 Termination of Commitments.**   The Borrowers may, upon notice to the Agent, terminate all of the outstanding Final Term Loan Commitments, so long as any such notice shall be received by the Agent not later than 1:00 p.m. three (3) Business Days prior to the date of termination.

**Section 2.06 Repayment of Loans.**    The Borrowers shall repay the entire unpaid principal amount of all Term Loans no later than the earlier of the Maturity Date and the date

that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

**Section 2.07  Interest.**

(a)     Subject to the provisions of Section 2.07(b), (i) each LIBOR Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBOR Rate for such Interest Period plus the Applicable Margin and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)     While any Event of Default exists, the Borrowers shall pay interest on the amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Payment or acceptance of the Default Rate provided for in this Section 2.07(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Default or otherwise prejudice or limit any rights or remedies of the Agent or any Lender.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein; provided, that, on each such payment date other than the Maturity Date, rather than being paid in cash when due, interest shall, without action by any party, instead be capitalized ("**PIK Interest**") and treated as additional principal obligations under the Loans.  Notwithstanding anything herein to the contrary, all accrued PIK Interest shall be deemed the extension of an additional Loan, pursuant to the terms of, and subject to, all Loan Documents; provided, that the Final Term Loan Commitments shall not be reduced as a result of capitalizing any PIK Interest.  The entire unpaid balance of all PIK Interest shall be immediately due and payable in full in cash on the Maturity Date.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**Section 2.08  Fees.**  In addition to fees set forth in the Fee Letter, the Borrowers shall pay to the Agent, for the benefit of the Lenders (to be allocated based on each Lender's Applicable Percentage of the applicable Commitments):

(a)     a closing fee equal to five percent (5.00%) of the aggregate Commitments on the Closing Date (prior to giving effect to any Borrowings), which closing fee shall be due and payable in cash on the Closing Date and shall be deemed fully earned on the Closing Date and non-refundable or pro-ratable; and

(b)     an unused commitment fee, accrued monthly in arrears and calculated on the first Business Day of each month, equal to the product of (i) two percent (2.00%) per annum multiplied by (ii) the aggregate Final Term Loan Commitments on each day of the immediately preceding month (after giving effect to any Borrowings of Final Term Loans on such day), which commitment fee shall be due and payable in cash in arrears on the Maturity Date and shall be deemed fully earned when accrued and non-refundable or pro-ratable.

**Section 2.09  Computation of Interest and Fees.**  All computations of fees and interest shall be made on the basis of a 360-day year with respect to LIBOR Rate Loans and a 365-day year with respect to Base Rate Loans, in each case for the actual number of days elapsed in the period during which such fees and interest accrue.  For purposes of computing interest and other charges hereunder, all payment items and other forms of payment received by the Agent shall be deemed applied by the Agent on account of the Obligations (subject to final payment of such items) after the Agent receives such funds (or is deemed to have received such funds in accordance with Section 2.11(a)).  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Section 2.10  Evidence of Debt; Loan Account; Statement of Obligations.**

(a)  The Agent shall maintain an account on its books in the name of the Borrowers (the "**Loan Account**") on which the Borrowers will be charged with the Term Loans made by the Lenders to the Borrowers or for the Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents, including, principal, accrued interest, fees and expenses.  In accordance with Sections 2.09 and 2.11(a), the Loan Account will be credited with all payments received by the Agent from the Borrowers or for the Borrowers' account.  The Agent shall render statements regarding the Loan Account to the Administrative Borrower, including principal, interest, fees, and an itemization of all charges and expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between the Borrowers and the Lenders unless, within sixty (60) days after receipt thereof by the Administrative Borrower, the Administrative Borrower shall deliver to the Agent written objection thereto describing the error or errors contained in any such statements.  Any failure to record any Obligations on the Loan Account or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the Loan Account and any accounts and records maintained by any Lender in respect of such matters, the Loan Account shall control in the absence of manifest error.  Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which Note shall evidence such Lender's Loans in addition to the Loan Account.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(b)  In addition to the accounts and records referred to in Section 2.10(a), each Lender shall maintain in accordance with its usual practice accounts or records evidencing the Obligations of the Borrowers to such Lender.  In the event of any conflict between the accounts and records maintained by the Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

**Section 2.11  Payments Generally; Agent's Clawback.**

(a)  General.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense (except for defense of payment), recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to

29

which such payment is owed, at the Agent's Office, in each case in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    Funding by Lenders; Presumption by Agent.   Unless the Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Agent such Lender's share of such Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Agent, then the applicable Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans; provided, that the Borrowers shall not be required to pay such corresponding amount to the Agent until two (2) Business Days after such applicable Lender has failed to pay such corresponding amount to the Agent. If the Borrowers and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Borrowing to the Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Agent.

(ii)    Payments by Borrowers; Presumptions by Agent.   Unless the Agent shall have received notice from the Administrative Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the

greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Borrowers with respect to any amount owing under this <u>Section 2.11(b)</u> shall be conclusive, absent manifest error.

(c)    <u>Failure to Satisfy Conditions Precedent</u>.  If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Borrowing set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof, the Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest (unless such funds are not returned within one (1) Business Day, in which case such funds shall bear interest at the Federal Funds Rate until such funds are returned).

(d)    <u>Obligations of Lenders Several</u>.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to <u>Section 10.04(c)</u> are several and not joint.  The failure of any Lender to make any Loan or to make any payment under <u>Section 10.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under <u>Section 10.04(c)</u>.

(e)    <u>Funding Source</u>.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    <u>Insufficient Funds</u>.  If at any time insufficient funds are received by and available to the Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) <u>first</u>, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) <u>second</u>, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(g)    <u>Designated Account</u>.  The Agent is authorized to make the Term Loans under this Agreement based upon telephonic or other instructions received from anyone purporting to be a Responsible Officer of the Administrative Borrower.  The Administrative Borrower agrees to establish and maintain the Designated Account for the purpose of receiving the proceeds of the Term Loans requested by the Administrative Borrower and made by the Agent or the Lenders hereunder.  Unless otherwise agreed by the Agent and the Administrative Borrower, any Loan shall be made to the Designated Account.

**Section 2.12  Sharing of Payments by Lenders.**  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of the DIP Facility due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the

31

amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the DIP Facility due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the DIP Facility due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of the DIP Facility owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the DIP Facility owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations in respect of the DIP Facility owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then the Lender receiving such greater proportion shall (x) notify the Agent of such fact and (y) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the DIP Facility then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be; provided, that:

(i)        if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)        the provisions of this Section 2.12 shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans in accordance with Section 10.06.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**Section 2.13  Common Enterprise; Joint and Several Liability of Borrowers.**

(a)        The successful operation and condition of each Loan Party is dependent on the continued successful performance of the functions of the group of Loan Parties as a whole and the successful operation of each Loan Party is dependent on the successful performance and operation of each other Loan Party.  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly or indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies, regardless of which Borrower requests or receives all or part of any Loan.  Each Loan Party has determined that execution, delivery, and

32

performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interests.  Each Borrower further acknowledges that its ability to obtain the Loans hereunder is made possible by the fact that the Borrowers are co-borrowers under this Agreement and the other Loan Documents, and are engaged in a common enterprise.  Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.13), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation in accordance with the terms hereof.

(d)     Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability.

(e)     Each Borrower represents and warrants to the Agent and the Lenders that such Borrower is currently informed of the financial condition of the Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to the Agent and the Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of the Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(f)     The provisions of this Section 2.13 are made for the benefit of the Agent, the Lenders, the other Secured Parties and their respective successors and permitted assigns, and may be enforced by the Agent from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of the Agent or any Lender, other Secured Party, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any Loan Party or to exhaust any remedies available to it or them against any Loan Party or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 2.13 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If, at any time, any payment, or any part thereof, made in respect of any of the Obligations is rescinded or must otherwise be restored or returned by the Agent or any Lender

33

upon the insolvency, bankruptcy or reorganization of any Loan Party, or otherwise, the provisions of this Section 2.13 will forthwith be reinstated in effect, as though such payment had not been made.

(g)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Loan Party with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agent or any Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Loan Party with respect to any payments to the Agent or any Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations, and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Loan Party, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Loan Party therefor.

(h)    Each Borrower hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Loan Party owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for the Agent, and such Borrower shall deliver any such amounts to the Agent for application to the Obligations in accordance with the Loan Documents.

## ARTICLE III.
## TAXES, YIELD PROTECTION AND ILLEGALITY

**Section 3.01  Taxes.**

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided, that if the Loan Parties shall be required by applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the Agent or such Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions and (iii) the Loan Parties shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

Fortress/RUI – DIP Credit Agreement
74475947

(b)    Payment of Other Taxes by the Loan Parties.    Without limiting the provisions of Section 3.01(a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)    Indemnification by the Loan Parties.    The Loan Parties shall, jointly and severally, indemnify the Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid by the Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.    A certificate as to the amount of such payment or liability delivered to the Loan Parties by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Evidence of Payments.    The Loan Parties shall maintain adequate records of all payments of Indemnified Taxes or Other Taxes by the Loan Parties to a Governmental Authority, and, upon the reasonable request of the Agent, the Loan Parties shall make available to the Agent a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)    Status of Lenders.    Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the Law of the jurisdiction in which the Loan Parties are residents for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Loan Parties (with a copy to the Agent), at the time or times provided for in the next sentence, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding.    Such documentation shall be provided by such Foreign Lender on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement, promptly upon the occurrence of any event that would result in the invalidity or obsolescence of any information provided upon previously provided documentation, and from time to time thereafter as reasonably requested by the Loan Parties or the Agent, provided in each case that the Foreign Lender is legally entitled to provide such documentation.

Without limiting the generality of the foregoing, if the Loan Parties are residents for tax purposes in the United States, any Foreign Lender shall deliver to the Loan Parties and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement, upon the occurrence of any event that would result in the invalidity or obsolescence of any previously provided form, and from time to time thereafter upon the reasonable request of the Loan Parties or the Agent, but only in each event if such Foreign Lender is legally entitled to do so, whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party;

(ii)    duly completed copies of Internal Revenue Service Form W-8ECI;

(iii)   in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate to the effect that such Foreign Lender is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrowers or Ultimate Parent within the meaning of Section 881(c)(3)(B) of the Code, or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) duly completed copies of Internal Revenue Service Form W-8BEN; or

(iv)    any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrowers to determine the withholding or deduction required to be made.

Any Lender that is not a Foreign Lender shall deliver to the Loan Parties (with a copy to the Agent) a duly executed and properly completed copy of Internal Revenue Service Form W-9 (or applicable successor form) establishing an exemption from United States federal backup withholding tax at the following times: (x) on or prior to the date such Lender becomes a party to this Agreement with respect to such Lender; (y) promptly upon the occurrence of any event that would result in the invalidity or obsolescence of any previously provided form; and (z) from time to time thereafter upon the reasonable request of the Loan Parties or the Agent (but only in each such case if such Lender is legally entitled to deliver such form).

(f)     Treatment of Certain Refunds.  If the Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section 3.01, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section 3.01 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender, as the case may be (including any Taxes imposed on the receipt of such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Loan Parties, upon the request of the Agent or such Lender, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent or such Lender if the Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section 3.01(f) shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

**Section 3.02  Illegality.**  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBOR Rate Loans, or to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on written notice thereof by such Lender to the Administrative Borrower through the Agent, any obligation of such Lender to make or continue LIBOR Rate Loans shall be suspended until such Lender notifies the Agent and the Administrative Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Agent), convert all LIBOR Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans.  Upon any such conversion, the Borrowers shall also pay accrued interest on the amount so converted.

**Section 3.03  Inability to Determine Rates.**  If the Agent or the Required Lenders determine that for any reason in connection with any request for a LIBOR Rate Loan or a continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBOR Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan, or (c) the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Administrative Borrower and each Lender in writing.  Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans shall be suspended until the Agent revokes such notice.  Upon receipt of such notice, the Borrowers may revoke any pending request for a Borrowing of LIBOR Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**Section 3.04  Increased Costs; Reserves on LIBOR Rate Loans.**

(a)  <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 3.04(e)</u>);

(ii)  subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any LIBOR Rate Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

37

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBOR Rate Loan (or of maintaining its obligation to make any such Loan) to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon the written request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 3.04(a) or (b) and delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within twenty (20) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six (6)-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on LIBOR Rate Loans.  The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBOR Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and

payable within ten (10) days after such Lender's delivery of a written invoice to the Administrative Borrower therefor (with a copy to the Agent).

**Section 3.05  Compensation for Losses.**  Upon written demand of any Lender (with a copy to the Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Administrative Borrower; or

(c)      any assignment of a LIBOR Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrowers pursuant to Section 3.07;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBOR Rate Loan made by it at the LIBOR Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan was in fact so funded.

**Section 3.06  Mitigate Loss.**  Each Lender agrees that after it becomes aware of the occurrence of an event or the existence of a condition that (a) would cause it to incur any increased cost hereunder or render it unable to perform its agreements hereunder or (b) would require the Borrowers to pay an increased amount hereunder, to the extent not inconsistent with such Lender's internal policies it will use reasonable efforts to make, fund or maintain the affected Loans of such Lender through another Lending Office of such Lender if as a result thereof the additional monies which would otherwise be required to be paid or the reduction of amounts receivable by such Lender thereunder in respect of such Loans would be materially reduced, or such inability to perform would cease to exist, or the increased costs which would otherwise be required to be paid in respect of such Loans would be materially reduced or the taxes or other amounts otherwise payable hereunder would be materially reduced, and if, as determined by such Lender, in its discretion, the making, funding or maintaining of such Loans through such other Lending Office would not otherwise materially adversely affect such Loans or such Lender.

**Section 3.07  Replacement of Lenders.**  If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, if any Lender is

a Defaulting Lender or if any other circumstance exists hereunder that gives the Borrowers the right to replace a Lender as a party hereto, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee reasonably acceptable to the Agent that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, that:

(a)    the Borrowers or such assignee shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**Section 3.08  Survival.**   All of the Borrowers' obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

**Section 3.09  Dodd-Frank, Etc.**  Notwithstanding anything herein to the contrary, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives thereunder or issued in connection therewith, and (b) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or any Governmental Authority, in each case pursuant to Basel III, shall, in the case of clause (a) and clause (b), be deemed to be enacted, adopted, issued, implemented and/or effective after the date hereof (regardless of the date enacted, adopted, issued, implemented and/or effective).

## ARTICLE IV.
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**Section 4.01  Conditions Precedent to Closing Date.**   The effectiveness of this Agreement is subject to satisfaction of the conditions precedent set forth below:

(a) **Deliverables:** The Agent's receipt of the following, each of which shall be originals, telecopies or email transmissions containing executed documents (followed promptly by originals) unless otherwise specified herein, each properly executed by a Responsible Officer of the signing Loan Party and the other parties thereto, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Agent and each of the Lenders:

(i) **Debtor-In-Possession Credit Agreement:** executed counterparts of this Agreement;

(ii) **Loan Documents:** executed counterparts of each other Loan Document;

(iii) **Secretary's Certificates, Resolutions, Organization Documents:** a certificate from the Secretary of each Loan Party (A) attesting to the resolutions or other action of the board of directors (or similar governing body) of such Loan Party approving each Loan Document to which such Loan Party is or is to be a party, (B) authorizing specific officers of such Loan Party to execute the same and attaching all documents evidencing other necessary corporate (or limited liability company) action, (C) attaching and attesting to certified copies of each Organization Document of such Loan Party and (D) attesting to the incumbency and signatories of the Responsible Officers of such Loan Party;

(iv) **Closing Certificate:** a certificate signed by a Responsible Officer of each of the Loan Parties (A) certifying that the conditions specified in Section 4.01(b) and Sections 4.02(a), (b), (d) and (g) have been satisfied and (B) certifying that no consents, licenses or approvals are required in connection with the execution, delivery and performance by the Loan Parties and the validity against the Loan Parties of the Loan Documents, except for those consents, licenses and approvals which have been obtained;

(v) **UCC-1 Financing Statements:** appropriate UCC-1 financing statements for filing under the Uniform Commercial Code of the jurisdiction of organization of each Loan Party;

(vi) **Insurance Certificates:** certificates of insurance, naming the Agent, for the benefit of the Secured Parties, as an additional insured or lender's loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitute Collateral;

(vii) **Sources and Uses:** a flow of funds report and disbursement letter, in each case duly executed by the Borrowers, which report shall be consistent with the Budget and shall otherwise include a statement of all sources and uses of funds on the Closing Date and which disbursement letter shall be in form and substance reasonably satisfactory to the Agent; and

(viii) **Other Assurances:** such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require.

(b) **Chapter 11 Cases:** The occurrence of the following with respect to the Chapter 11 Cases:

(i) **Commencement:** the Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders", all related pleadings and all adequate protection payments and critical vendor payments, if any, approved by the Bankruptcy Court in the Interim DIP Order or otherwise shall be in form and substance reasonably satisfactory to the Required Lenders;

(ii) **Interim DIP Order:** the Interim DIP Order shall have been entered by the Bankruptcy Court and such order shall be in full force and effect and shall not have been enjoined temporarily, preliminarily or permanently, reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge, absent the prior written consent of the Agent and the Required Lenders;

(iii) **Cash Management and Adequate Protection Orders:** all orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance reasonably satisfactory to the Required Lenders (and, with respect to any provisions that affect the rights or duties of the Agent, the Agent);

(iv) **Lien under Interim DIP Order:** the Agent, for the benefit of the Secured Parties, shall have been granted a perfected lien on the Collateral by the Interim DIP Order on the terms and conditions set forth herein and in the other Loan Documents;

(v) **No Trustee, Examiner or Receiver:** No trustee, examiner or receiver shall have been appointed or designated with respect to Ultimate Parent or its Subsidiaries' business, properties or assets, and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral; and

(vi) **Adequate Protection for Prepetition Obligations:** the Prepetition Secured Parties shall have received adequate protection with respect to the Prepetition Obligations pursuant to the Interim DIP Order, including replacement Liens securing the Prepetition Obligations and payments with respect to interest, fees and expenses, indemnification and other reimbursement obligations payable under the Prepetition Credit Agreement.

(c) **Budget:** The Agent and the Lenders shall have received the Budget.

(d) **Payment of Fees and Expenses:** The Borrowers shall have paid in connection with the closing (i) all fees required to be paid to the Agent and the Lenders on or

42

before the Closing Date, (ii) all fees, charges and disbursements of counsel to the Agent and any Lender (directly to such counsel if reasonably requested by the Agent or such Lender) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided, that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent or such Lender) and (iii) all fees, charges and disbursements of counsel to the Prepetition Agent and any Prepetition Lender (directly to such counsel if reasonably requested by the Prepetition Agent or such Prepetition Lender) to the extent due and owing under the Prepetition Credit Agreement as of the Petition Date and invoiced prior to or on the Closing Date, in each case, subject to and in accordance with the Interim DIP Order.

(e)    **UCC Search Results:** The Lenders shall have received the results of a search of the UCC filings (or equivalent filings) made with respect to each Loan Party, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence satisfactory to the Lenders that the Liens indicated in any such financing statement (or similar document) are Permitted Liens or have been released.

(f)    **KYC Documentation:** At least five days prior to the Closing Date:

(i)    the Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act; and

(ii)    any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered a Beneficial Ownership Certification in relation to such Loan Party.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender, unless the Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**Section 4.02 Conditions to all Credit Extensions.** The obligation of each Lender to honor any request for a Borrowing, including any Borrowing on the Closing Date, is subject to the following conditions precedent:

(a)    The representations and warranties of the Borrowers and each other Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties to the extent already qualified or modified by materiality in the text thereof) on and as of the date of such Borrowing, except to the extent that such

43

representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

(b)     No Default shall exist, or would result from such proposed Borrowing or from the application of the proceeds thereof.

(c)     The Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)     No event or circumstance, either individually or in the aggregate, has occurred that has a Material Adverse Effect.

(e)     With respect to any Final Term Loan, after giving effect to any Loan and the uses of the proceeds thereof and the other cash and Cash Equivalents of Ultimate Parent and its Subsidiaries during such Budget week in accordance with the Budget, the cash and Cash Equivalents of Ultimate Parent and its Subsidiaries shall not exceed 125% of the projected amount of "Ending Cash Balance" set forth in the Budget for such week (unless otherwise agreed by the Agent in its sole discretion).

(f)     With respect to any Final Term Loan, the Final DIP Order shall have been entered by the Bankruptcy Court and such order shall be in full force and effect and shall not (in whole or in part) have been enjoined temporarily, preliminarily or permanently, reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge, absent the prior written consent of the Agent and the Required Lenders.

(g)     The Loan Parties shall be in compliance in all material respects with (i) the DIP Order and (ii) the Budget.

Each Committed Loan Notice with respect to a Borrowing submitted by the Borrowers shall be deemed to be a representation and warranty that the conditions specified in this Section 4.02 have been satisfied on and as of the date of such Borrowing.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Agent and the Lenders, as of the Closing Date and as of the date of the making of any Borrowing hereunder, that:

**Section 5.01 Existence, Qualification and Power.**  Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) subject to the entry and the terms of the DIP Order and other orders of the Bankruptcy Court, has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its

ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in <u>clause (b)(i)</u> or <u>(c)</u>, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02 Authorization; No Contravention.**  Subject to the entry and the terms of the DIP Order and other orders of the Bankruptcy Court, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any material breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any post-petition Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law.

**Section 5.03 Governmental Authorization; Other Consents.**  Other than the DIP Order, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof (subject to the Liens permitted under <u>Section 7.01</u>)) or (d) the exercise by the Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for the approvals, consents, exemptions, authorizations, actions and notices which have been duly obtained, taken, given or made and are in full force and effect or which the failure to so obtain, take, give or make would not reasonably be expected to result in a Material Adverse Effect.

**Section 5.04 Binding Effect.**  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry and the terms of the DIP Order, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws or equitable principles from time to time in effect relating to or affecting the rights of creditors generally.

**Section 5.05 Budget; No Material Adverse Effect.**

(a)    <u>Budget</u>.  The Budget and any projected financial information, forward-looking statements, estimates and pro forma financial information contained in any Loan Document or any other document, certificate or statement furnished to the Agent or the Lenders were prepared in good faith on the basis of the assumptions stated therein, which assumptions were reasonable and fair in light of the conditions existing at the time of delivery thereof, and represented, at the time of delivery, the Borrowers' best estimate of its future financial condition

and performance; it being understood that such forecasts are not to be viewed as facts and that the actual results may differ materially.

(b)    Material Adverse Effect.  Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.06  Litigation.  Except for the Chapter 11 Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against Ultimate Parent or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

Section 5.07  No Default.  Neither any Loan Party nor any Subsidiary thereof is in default under or with respect to, or a party to, any post-petition Contractual Obligation if such default could result in a termination of such Contractual Obligation.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.08  Ownership of Property.

(a)    Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business  (as intended to be conducted from and after the Petition Date after giving effect to the proposed rejection of any leases which have been identified to the Agent and the Lenders on or before the Petition Date), except for such defects in title that do not, individually or in the aggregate, materially interfere with the Loan Parties and their Subsidiaries' ability to conduct their respective business or to utilize such assets for their intended purpose or materially impact the value of such assets.  Each Loan Party and each of its Subsidiaries has good and legal title to, or a valid leasehold interest in, its personal property assets, free and clear of Liens except to the extent expressly permitted under Section 7.01.  Other than Equipment that the Loan Parties and their Subsidiaries no longer use in the ordinary course of their business, the Equipment is in good operating condition and repair, reasonable wear and tear and casualty excepted.

(b)    Schedule 5.08(b) sets forth a complete and accurate list of all real property owned by each Loan Party and each of its Subsidiaries as of the Closing Date (and as of any date that Schedule 5.08(b) is required to be updated under this Agreement), showing as of such date the street address, county or other relevant jurisdiction, state and record owner.  Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the real property owned by such Loan Party or such Subsidiary, free and clear of all Liens, except Liens created or permitted by the Loan Documents and such defects in title which do not materially interfere with or impair the use or operation thereof that are not Environmental Liens.

(c)     Schedule 5.08(c) sets forth a complete and accurate list of all leases of real property under which any Loan Party or any Subsidiary of a Loan Party is the lessee as of the Closing Date (and as of any date that Schedule 5.08(c) is required to be updated under this Agreement), showing as of such date the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and the current annual minimum rent in respect thereof. Each such lease is, to the knowledge of the Loan Parties, the legal, valid and binding obligation of the lessor thereof, enforceable in accordance with its terms.

(d)     There are no leases of real property under which any Loan Party or any Subsidiary of a Loan Party is the lessor as of the Closing Date.

**Section 5.09  Environmental Compliance.**

(a)     The Loan Parties and their respective Subsidiaries are in compliance with existing Environmental Laws, and there are no pending, or, to the knowledge of the Loan Parties, threatened, claims against any Loan Party alleging potential liability or responsibility for violation of any Environmental Law related to their respective businesses, operations and properties, except such Environmental Laws and claims that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or that are stayed by the Chapter 11 Cases.

(b)     None of the properties currently or, to the best knowledge of the Loan Parties, formerly owned or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and, to the best knowledge of the Loan Parties, never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or any of its Subsidiaries; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries, except in each case above (or in the aggregate), which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     No Loan Party nor any Subsidiary of a Loan Party is undertaking, or has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except those which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect

(d)     All Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or, to the best knowledge of the Loan Parties,

formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner which could not reasonably be expected to have a Material Adverse Effect.

**Section 5.10  Insurance.**   The properties of Ultimate Parent and its Subsidiaries are insured with financially sound and reputable insurance companies that are not Affiliates of the Borrowers covering loss or damage by fire, theft, explosion, earthquake, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses where Ultimate Parent or its Subsidiaries operate.   The Borrowers shall also maintain business interruption, public liability, director and officer liability, and product liability insurance.   All such policies of insurance shall be in such amounts and with such insurance companies as are reasonably satisfactory to the Agent.   The Borrowers shall deliver copies of all such policies to the Agent, together with, as requested by the Agent, endorsements naming the Agent as the sole loss payee (under a satisfactory lender's loss payable endorsement) or additional insured, as appropriate.   Schedule 5.10 sets forth a list of all insurance policies maintained by each Loan Party on the Closing Date.

**Section 5.11  Taxes.**   Ultimate Parent and its Subsidiaries have filed all federal, state and other material tax returns and reports required to be filed, and have paid all federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP or those for which payment is stayed by the Chapter 11 Cases.   There is no proposed tax assessment against the Loan Parties that would, if made, have a Material Adverse Effect.   No Loan Party is party to any tax sharing agreement.   Proper and accurate amounts have been withheld by each Loan Party from their respective employees for all periods in compliance with tax, social security and unemployment withholding provisions of applicable Law and such withholdings have been timely paid to the respective Governmental Authority, except to the extent any such amounts could not reasonably be expected to have a Material Adverse Effect.

**Section 5.12  ERISA Compliance.**

(a)      Each Plan is in compliance in all respects with the applicable provisions of ERISA, the Code and other Federal or state Laws except to the extent such failure to comply could not reasonably be expected to have a Material Adverse Effect.   Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrowers, nothing has occurred which would prevent, or cause the loss of, such Plan's qualification; and the Borrowers and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)      There are no pending or, to the best knowledge of the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.   There has been

no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)  (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrowers nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Borrowers nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Borrowers nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(d)  Except to the extent required under Section 4980B of the Code, no Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Ultimate Parent, the Borrowers or any ERISA Affiliate.

**Section 5.13  Subsidiaries; Equity Interests; Loan Parties.**  As of the Closing Date (and as of any date that Schedule 5.13 is required to be updated under this Agreement), no Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13, free and clear of all Liens except those created under the Collateral Documents and the Prepetition Collateral Documents.  No Loan Party has any equity investments in any other corporation or entity.  Set forth in Part (b) of Schedule 5.13 is a complete and accurate list of all Loan Parties as of the Closing Date (and as of any date that Schedule 5.13 is required to be updated under this Agreement), showing as of such date (as to each Loan Party) its exact legal name, its type of organization, the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number.  The copy of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01(a) is a true and correct copy as of the Closing Date (and as of any date that Schedule 5.13 is required to be updated under this Agreement) of each such document, each of which is valid and in full force and effect.

**Section 5.14  Margin Regulations; Investment Company Act.**

(a)  No Borrower is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Borrowings made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose that violates the provisions of Regulation T, U or X of the FRB.

(b)  No Borrower, Person Controlling a Borrower nor any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**Section 5.15  Disclosure.**  The Borrowers have disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which they or any of their Subsidiaries or any other Loan Party is subject, and all other matters known to them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, that with respect to projected financial information, the Borrowers represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, it being understood that such forecasts are not to be viewed as facts and the actual results may differ materially.

**Section 5.16  Compliance with Laws.**  Each Loan Party and each Subsidiary thereof is in compliance with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, including all Environmental Laws, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or is stayed by the Chapter 11 Cases or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 5.17  Intellectual Property; Licenses.**  Each Loan Party and each of its Subsidiaries owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person with respect to any material IP Rights, and Schedule 5.17 sets forth a complete and accurate list of all registrations and applications for registration of such IP Rights owned by each Loan Party and each of its Subsidiaries.  To the best knowledge of the Borrowers, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any of its Subsidiaries in the operation of their respective businesses infringes upon any IP Rights held by any other Person.  No written claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrowers, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.18  Prepetition Obligations.**  Except for the Prepetition Obligations and as disclosed on Schedule 7.02, the Loan Parties do not have any other material Indebtedness for borrowed money outstanding on the date hereof.

**Section 5.19  Casualty.**  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not

covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.20  Labor Matters.**  There are no collective bargaining or similar agreements with any union, labor organization, works council or similar representative or any Multiemployer Plans covering the employees of Ultimate Parent or any of its Subsidiaries as of the Closing Date and neither any Borrower nor any Subsidiary has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five (5) years.

**Section 5.21  Collateral Documents.**  The provisions of the Interim DIP Order and the Final DIP Order, as applicable, are effective to create in favor of the Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien (subject to Liens permitted by Section 7.01) on all right, title and interest of the respective Loan Parties in the Collateral described therein (with such priority as provided for in the DIP Order).  Except for filings completed prior to the Closing Date and as contemplated hereby and by the DIP Order, no filing or other action will be necessary to perfect or protect such Liens.

**Section 5.22  Deposit Accounts, Securities Accounts.**  Schedule 5.22 provides a true and accurate list of all deposit accounts and securities accounts maintained by the Loan Parties, including with respect to each such account (i) the name and address of the applicable depositary bank or securities intermediary and (ii) the account number of such account.

**Section 5.23  Anti-Terrorism Laws.**  Each Loan Party is in compliance, in all material respects, with the Anti-Terrorism Laws.  No part of the proceeds of the Borrowings will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**Section 5.24  Broker's, Finder's or Similar Fees.**    There are no brokerage commissions, finder's fees or similar fees or commissions payable based on any agreement, arrangement or understanding with any Loan Party or any action taken by any Loan Party, except in the ordinary course of business in connection with any transaction not prohibited by this Agreement.

**Section 5.25  Location of Collateral.**  All tangible items of Collateral are kept by the Loan Parties at (or are in transit between) one or more of the business locations of the Loan Parties set forth on Schedule 5.08 hereto, except for locations having Collateral less than $25,000 individually and $75,000 in the aggregate.

**Section 5.26  Licenses and Permits.**  Each Loan Party and each of its Subsidiaries is in compliance in all material respects with all governmental permits, licenses, authorizations, approvals, entitlements and accreditations required and material for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or previously acquired, by such Person.  No condition exists or event has occurred which could reasonably be expected to result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no outstanding claim by any Governmental Authority that any such

permit, license, authorization, approval, entitlement or accreditation is not in full force and effect.  Schedule 5.26 sets forth a complete and accurate list, as of the Closing Date, listed by Restaurant, of all licenses, permits or other such rights permitting the Loan Parties and their Subsidiaries to sell and dispense alcoholic beverages within each of the Restaurants for on-premises consumption (the "**Liquor Licenses**").  Each Loan Party and each of its Subsidiaries is in compliance in all material respects with all applicable Laws with respect to the sale of liquor and all alcoholic beverages.  The Loan Parties have the right to sell liquor and all alcoholic beverages at retail for consumption within the Restaurants, subject to and in accordance with all applicable provisions of the Liquor Licenses.

Section 5.27  **Parent.**  Parent does not have any assets (other than the Equity Interests it holds in its Subsidiaries) and does not conduct any business operations other than (a) the ownership of all outstanding Equity Interests in its Subsidiaries, (b) maintaining its corporate existence, (c) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (d) the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, (e) transactions with shareholders not prohibited hereunder, and (f) activities incidental to the businesses or activities described in clauses (a) through (e) of this Section 5.27.

Section 5.28  **Ultimate Parent.**  Ultimate Parent does not have any assets (other than the Equity Interests it holds in Parent) and does not conduct any business operations other than (a) the ownership of all outstanding Equity Interests in Parent, (b) maintaining its corporate existence, (c) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (d) the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, (e) transactions with shareholders not prohibited hereunder, and (f) activities incidental to the businesses or activities described in clauses (a) through (e) of this Section 5.28.

Section 5.29  **Franchise Matters.**  As of the Closing Date, no Loan Party, nor any of its Subsidiaries, has any franchises nor has any Loan Party nor any of its Subsidiaries, within the two (2) years prior to the Closing Date, sold or offered for sale any franchises or prepared or issued any franchise offering circulars, uniform franchise offering circulars or other similar franchise disclosure materials in connection with any franchise of its business.

Section 5.30  **Bankruptcy Matters.**

(a)    Each DIP Order, once entered, is in full force and effect and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Required Lenders.

(b)    Upon the maturity (whether by acceleration or otherwise) of the Obligations, the Lenders shall, subject to the provisions of the DIP Order, be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)     If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, no such order, the making of the Loans or the performance by the Loan Parties of any of their obligations under any of the Loan Documents is or shall be the subject of a presently effective stay pending appeal.  The Loan Parties, the Agent and the Lenders shall be entitled to rely in good faith upon the DIP Order, notwithstanding objection thereto or appeal therefrom by any interested party, and the Loan Parties, the Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(d)     The Loan Parties are in compliance with all material agreements entered into, and all orders entered by the Bankruptcy Court, from and after the Petition Date.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than unasserted contingent indemnification obligations), each Loan Party shall, and shall cause each Subsidiary to:

**Section 6.01 Financial Statements; Budget Reports.**  Deliver to the Agent and each Lender, in form and detail satisfactory to the Agent and the Required Lenders:

(a)     [reserved];

(b)     as soon as available, but in any event within forty-five (45) days after the end of each Fiscal Quarter of Ultimate Parent, a consolidated balance sheet of Ultimate Parent and its Subsidiaries as of the end of such Fiscal Quarter, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Quarter and for the portion of Ultimate Parent's Fiscal Year then ended, setting forth in each case in comparative form (i) the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and (ii) the figures for the corresponding portion of the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such statements to be certified by the chief executive officer, chief financial officer or treasurer of Ultimate Parent as (x) fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of Ultimate Parent and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, and (y) fairly stated in all material respects when considered in relation to the consolidated financial statements of Ultimate Parent and its Subsidiaries;

(c)     as soon as available, but in any event within thirty (30) days after the end of each Fiscal Period of Ultimate Parent, including each Fiscal Period that is the end of a Fiscal Quarter or a Fiscal Year, a consolidated balance sheet of Ultimate Parent and its Subsidiaries as of the end of such Fiscal Period, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Period and for the portion of Ultimate Parent's Fiscal Year than ended, setting forth in each case in comparative form (i) the figures for the corresponding Fiscal Period of the previous Fiscal Year and (ii) the figures for the corresponding portion of the previous Fiscal Year, all in reasonable detail and prepared in

53

accordance with GAAP, such statements to be certified by the chief executive officer, chief financial officer or treasurer of Ultimate Parent as (x) fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of Ultimate Parent and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, and (y) fairly stated in all material respects when considered in relation to the consolidated financial statements of Ultimate Parent and its Subsidiaries;

(d)     concurrently with the delivery of the financial statements referred to in Section 6.01(c), a summary of performance report which shall include (i) an income statement by Restaurant detailing operating profit and (ii) a sales analysis and menu counts with same Restaurant comparison for the previous twelve (12) Fiscal Periods; and

(e)     on each Budget Testing Date, (i) a variance report certified by a Responsible Officer of Ultimate Parent, substantially in the form attached hereto as Exhibit F or otherwise as reasonably acceptable to the Required Lenders in their sole discretion (a "**Variance Report**"), setting forth (x) the actual cash receipts and cash expenditures and disbursements for the immediately preceding calendar week on a line-item basis and the aggregate liquidity as of the end of such calendar week and (y) the variance in dollar amounts of the actual cash receipts and cash expenditures and disbursements (including debt service, professional fees and expenses and capital expenditures) for each weekly period and on a cumulative basis from those reflected for the corresponding periods in the Budget and including explanations for all material variances (including whether such variance is permanent in nature or timing related) and (ii) an analysis, certified by a Responsible Officer of Ultimate Parent, demonstrating that a Budget Event shall not have occurred for such week.

Documents required to be delivered pursuant to Section 6.01(b) or (d) may be delivered electronically and, if so delivered prior to 5:00 p.m. on any Business Day, shall be deemed to have been delivered on the applicable date (or, if delivered after 5:00 p.m., on the next Business Day) (i) on which the Borrowers post such documents, or provide a link thereto, on the Borrowers' website on the Internet at the website address listed on Schedule 10.02, (ii) on which Ultimate Parent sends such documents to the Agent via email transmission, or (iii) on which such documents are posted on the Borrowers' behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent), including the Platform; provided, that (x) the Borrowers shall deliver paper copies of such documents to the Agent or any Lender that requests the Borrowers to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (y) the Administrative Borrower shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrowers with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

**Section 6.02  Certificates; Other Information.**  Deliver to the Agent and each Lender, in form and detail satisfactory to the Agent and the Required Lenders:

(a)     promptly after the same are available and to the extent feasible not later than three (3) days prior to the filing thereof (other than in exigent circumstances, in which case as soon as practicable), all pleadings, motions, applications and any other documents to be filed by or on behalf of the Loan Parties and any other written reports given to the U.S. Trustee and to the Official Committee, if one is appointed, relating to the operations, business, assets, properties or financial condition of the Loan Parties;

(b)     promptly after any request by the Agent or any Lender, copies of any detailed audit reports or management letters of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party or any of its Subsidiaries, or any audit of any of them;

(c)     not later than ten (10) Business Days after a request by the Agent, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries;

(d)     to the extent applicable, promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies, if any, of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(e)     not later than ten (10) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all notices, requests and other documents (including amendments, waivers and other modifications) so received under or pursuant to any instrument, indenture, loan or credit agreement or similar agreement regarding or related to any breach or default by any party thereto or any other event that could reasonably be expected to result in a Material Adverse Effect and, from time to time upon request by the Agent, such information and reports regarding such instruments, indentures, loan and credit agreements and similar agreements as the Agent may reasonably request;

(f)     promptly after the assertion or occurrence thereof, notice of any litigation or other legal proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) reasonably be expected to cause any property of any Loan Party or any of its Subsidiaries to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law (other than ordinary course obligations to comply with Environmental Laws);

(g)     concurrently with the delivery to Sun RUI, LLC, a Narrative Report with respect to the immediately preceding Fiscal Period and any other operating reports prepared by management for such period;

(h)     concurrently with the delivery of the financial statements referred to in Section 6.01(c), the Loan Parties' bank statements in respect of the prior month with respect to the Borrowers' main concentration account as identified as such on Schedule 5.22;

(i)       copies of all management incentive plans, which plans shall be reasonably satisfactory to the Agent;

(j)       (i) as soon as practicable and in any event within ten (10) days following the Agent's or any Lender's request therefor after the Closing Date, all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act; and (ii) as soon as practicable and in any event within five (5) days following the Agent's or any Lender's request therefor after the Closing Date in connection with any change in ownership of any Loan Party, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Loan Party;

(k)       promptly after any request by the Agent, any Lender or any Agent Advisors, information in connection with the sale process for the 363 Sale; and

(l)       promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

Section 6.03  Notices.  Promptly notify the Agent and each Lender:

(a)       of the occurrence of any Default;

(b)       of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Material Contract of any Loan Party or any Subsidiary thereof; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(c)       of the occurrence of any ERISA Event;

(d)       of any material change in accounting policies or financial reporting practices by any Group Member;

(e)       of any written offer by the Group Members to sell any franchises;

(f)       of the occurrence of any Disposition of property or assets or the receipt of any Extraordinary Receipt for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.04(b)(i); and

(g)       of (i) the assertion of any claim, counterclaim, offset or chargeback, (ii) any requirement for the posting of reserves or other amounts or (iii) any other failure or refusal to timely pay in accordance with historical practices by any Credit Card Processor.

Each notice pursuant to this Section 6.03 (other than Section 6.03(f)) shall be accompanied by a statement of a Responsible Officer of Ultimate Parent setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and propose to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**Section 6.04  Payment of Obligations.**  Pay and discharge, as the same shall become due and payable, all its obligations and liabilities arising after the Petition Date, including (a) all federal, state and other material tax liabilities, assessments and governmental charges or levies upon it or any Collateral, unless the same are being contested in good faith by appropriate proceedings and adequate reserves in accordance with GAAP are being maintained by the Loan Parties or such Subsidiary; (b) all lawful claims which, if unpaid, would by law become a Lien upon any Collateral, unless the same are being contested in good faith by appropriate proceedings that conclusively operate to stay the sale of any portion of the Collateral to satisfy such claim and adequate reserves in accordance with GAAP are being maintained by the Loan Parties or such Subsidiary; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing or relating to such Indebtedness; in each case, except where non-payment thereof is permitted under the Bankruptcy Code or order of the Bankruptcy Court.

**Section 6.05  Preservation of Existence and Properties.**  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks that are material to the operation of the Loan Parties' business.

**Section 6.06  Maintenance of Properties.**  Subject to the terms of the Budget, maintain, preserve and protect all of its material properties and Equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear and casualty excepted, and make all necessary repairs thereto and renewals and replacements thereof in accordance with prudent industry practice.

**Section 6.07  Maintenance of Insurance.**  Maintain with financially sound and reputable insurance companies (that are not Affiliates of the Loan Parties) insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and providing for not less than thirty (30) days' prior notice to the Agent of termination, lapse or cancellation of such insurance.

**Section 6.08  Compliance with Laws.**  Comply with (a) the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is

being contested in good faith by appropriate proceedings, (ii) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect, or (iii) such compliance is stayed by the Chapter 11 Cases; and (b) the DIP Order in all material respects.

**Section 6.09  Books and Records.**  (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

**Section 6.10  Inspection Rights.**  Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine and audit its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, and to appraise the Collateral, or any portion thereof, all at the expense of the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired but, so long as no Event of Default has occurred and is continuing, in any event no more than two audits and inspections during any calendar year and one appraisal of Collateral during any calendar year, in each case, upon reasonable advance notice to the Administrative Borrower; provided, that when an Event of Default exists the Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time and without advance notice.

**Section 6.11  Use of Proceeds.**  Use the proceeds of the Loans in accordance in all material respects with the terms of the Budget (subject to permitted variances and, in any event, consistent with the Restaurant locations contemplated in the Budget), including (a) to pay amounts due to the Lenders and the Agent hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the Lenders and the Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, and (b) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.

**Section 6.12  [Reserved].**

**Section 6.13  Compliance with Environmental Laws.**  Comply, and take commercially reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits, except where the failure to comply could not reasonably be expected to have a Material Adverse Effect; obtain and renew all Environmental Permits necessary for its operations and properties, except where the failure to obtain and renew could not reasonably be expected to have a Material Adverse Effect; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws, except where the

failure to take such actions could not reasonably be expected to have a Material Adverse Effect; provided, that neither the Loan Parties nor any of their Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

**Section 6.14  Preparation of Environmental Reports.**  Upon the event of any failure to comply with the provisions of Section 6.13 or otherwise upon the Agent's reasonable belief that the Borrowers are subject to any Environmental Liability that could give rise to a Material Adverse Effect, at the request of the Agent, provide to the Agent within sixty (60) days after such request, at the expense of the Borrowers, an environmental site assessment or other appropriate report ("**Environmental Report**") for the matter described in such request, prepared by an environmental consulting firm acceptable to the Agent, indicating if applicable the presence or absence of Hazardous Materials and the estimated cost of any compliance, removal or remedial action required under Environmental Laws in connection with such Hazardous Materials on such properties; provided, that, so long as no Event of Default is continuing, the Agent shall not request that more than one (1) such report be prepared with respect to each real property.  Without limiting the generality of the foregoing, if the Agent determines at any time that a material risk exists that any such Environmental Report will not be provided within the time referred to above, the Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrowers, and the Borrowers hereby grant and agree to cause any Subsidiary that owns any property described in such request to grant at the time of such request to the Agent, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants, to enter onto their respective properties to undertake such an assessment.

**Section 6.15  Further Assurances.**  Promptly upon reasonable request by the Agent, or any Lender through the Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Agent, or any Lender through the Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable Law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

**Section 6.16  Compliance  with  Terms  of  Leaseholds.**    Make  all  payments  and otherwise perform all obligations in respect of all leases of real property to which Ultimate Parent or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow

59

such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Agent of any default by any party with respect to such leases and cooperate with the Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so (i) either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect or (ii) is permitted under the Bankruptcy Code or order of the Bankruptcy Court.

**Section 6.17  Cash Management.**  (a) Cause all Collections received by such Loan Party to be deposited promptly (and in any event within one (1) Business Day after receipt) into a deposit account maintained with a depositary bank reasonably satisfactory to the Agent and (b) to the extent that the Loan Parties maintain more than two (2) deposit accounts, cause all such Collections to be swept, no later than the second (2nd) Business Day after receipt thereof, into one or more concentration accounts as identified as such on Schedule 5.22.  The provisions of this Section 6.17 shall not apply to (i) deposit accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Loan Parties' employees, (ii) deposit accounts to the extent that all such deposit accounts have an aggregate balance of less than $250,000 at all times, and (iii) deposit account numbers 9000271388, 9000272055, 3382389595 and 1292513353 at Wells Fargo Bank, National Association, to the extent that such deposit accounts have an aggregate balance of less than $968,600 at all times (such accounts in clauses (i), (ii) and (iii), collectively, the "**Excluded Accounts**").

**Section 6.18  Lender Meetings.**  Host a telephonic conference call (or calls) with the Agent, the Lenders and the Agent Advisors with respect to the following:

(a)      Promptly following the delivery of each Variance Report, a call with the Chief Restructuring Officer, the other senior management and Carl Marks Advisors in order to discuss the contents of such Variance Report;

(b)      No less frequently than once every week, a call with Configure Partners in order to discuss the status of the 363 Sale; and

(c)      No less frequently than once every week, a call with the Chief Restructuring Officer, the other senior management and Carl Marks Advisors in order to discuss any matters regarding Ultimate Parent and its Subsidiaries' financial performance and operations.

**Section 6.19  Collateral Proceeds.**  Deposit all proceeds resulting from any Disposition by any Loan Party and any Extraordinary Receipts received or paid to the account of any Loan Party into the Segregated Operating Account.

**Section 6.20  Required Milestones.**  Achieve each of the following milestones (as any such milestone may be extended with the consent of the Agent (in its sole and absolute discretion) for a period of not more than five (5) days or for such longer period with the consent of the Agent and the Required Lenders (in their sole and absolute discretion), collectively, the "**Required Milestones**"), in each case on terms and conditions, and subject to documentation (including, in all cases, forms of all applicable orders) in form and substance, reasonably acceptable to the Agent in all respects:

(a)     On or before July 9, 2019, the Loan Parties shall have filed a motion, in form and substance acceptable to the Agent and the Required Lenders, seeking entry of the DIP Orders.

(b)     On or before July 10, 2019, the Bankruptcy Court shall have entered the Interim DIP Order in the Chapter 11 Cases.

(c)     On or before July 12, 2019, the Loan Parties shall file a motion seeking approval of bidding procedures with respect to the 363 Sale, and the terms of such motion and the related bidding procedures shall be in form and substance reasonably acceptable to the Agent and the Required Lenders.

(d)     On or before August 20, 2019, the Loan Parties shall have obtained a stalking horse bid approved by the Agent and the Required Lenders for the 363 Sale.

(e)     On or before August 21, 2019, the Bankruptcy Court shall have entered an order approving the bidding procedures for the 363 Sale, and the terms of the bidding procedures shall be in form and substance reasonably acceptable to the Agent and the Required Lenders.

(f)     On or before September 17, 2019, the Loan Parties shall have conducted an auction for the 363 Sale.

(g)     On or before September 20, 2019, the Loan Parties shall have obtained an order of the Bankruptcy Court approving the 363 Sale, and the terms of such order shall be in form and substance reasonably acceptable to the Agent and the Required Lenders (the "**363 Sale Order**").

(h)     On or before September 26, 2019, the Loan Parties shall have consummated the 363 Sale in accordance with the 363 Sale Order, and all Obligations hereunder shall have been indefeasibly paid in full.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the Required Milestones specified in this Section 6.20, each Lender that has signed this Agreement shall be deemed to be satisfied with the form of each motion or order required hereunder to be acceptable to the Required Lenders that has been provided to such Lender prior to the Closing Date, unless the Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE VII.
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than unasserted contingent indemnification obligations), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**Section 7.01  Liens.**  Create, incur, assume or permit to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names Ultimate Parent or any of its Subsidiaries as debtor, or assign any accounts or other right to receive income, other than the following:

(a)  (i) Liens pursuant to any Loan Document, (ii) Liens pursuant to any Prepetition Loan Document, (iii) the Carve Out and (iv) Liens in favor of the Prepetition Secured Parties as adequate protection granted pursuant to the DIP Order;

(b)  Liens existing on the Petition Date and listed on <u>Schedule 7.01</u>;

(c)  carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)  pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(e)  deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(f)  easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of Ultimate Parent or any of its Subsidiaries;

(g)  leases or subleases or licenses or sublicenses granted to other Persons in the ordinary course of business and consistent with the Budget, not interfering with the conduct of the business of Ultimate Parent or any of its Subsidiaries;

(h)  precautionary financing statement filings regarding operating leases;

(i)  statutory and common law landlords' liens under leases to which Ultimate Parent or any of its Subsidiaries is a party for amounts not yet overdue or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(j)  cash collateral deposits (and the issuer's Lien thereon) required to secure letters of credit issued for the benefit of the Loan Parties, in an aggregate amount not to exceed $990,000 at any time outstanding; and

(k)    rights of setoff or bankers' liens in favor of banks or other depository institutions arising in the ordinary course of business.

**Section 7.02  Indebtedness.**  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    (i) the Obligations and Indebtedness under the Loan Documents, (ii) the Prepetition Obligations and Indebtedness under the Prepetition Loan Documents as in effect on the Petition Date, (iii) to the extent constituting Indebtedness, the Carve Out and (iv) to the extent constituting Indebtedness, any adequate protection provided to the Agent, the other Secured Parties, the Prepetition Agent and the other Prepetition Secured Parties under the DIP Order;

(b)    [reserved];

(c)    Indebtedness outstanding on the Petition Date and listed on Schedule 7.02;

(d)    Guarantees of any Loan Party in respect of Indebtedness otherwise permitted hereunder or pursuant to any Loan Party's ordinary course Contractual Obligations; provided, that no Indebtedness otherwise permitted by this Section 7.02(d) shall be assumed or created if any Default or Event of Default has occurred or would result therefrom;

(e)    Indebtedness incurred by any Loan Party arising from agreements for indemnification obligations in connection with any Disposition permitted pursuant to the terms hereof; and

(f)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts, to the extent such arrangement is customary and is entered into in the ordinary course of business; provided, that the aggregate amount of such Indebtedness shall not exceed $200,000 at any time.

**Section 7.03  Investments.**  Make or hold any Investments, except:

(a)    Investments held by Parent and its Subsidiaries in the form of Cash Equivalents;

(b)    Investments by Ultimate Parent and its Subsidiaries in their respective Subsidiaries outstanding on the date hereof;

(c)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(d)    Guarantees permitted by Section 7.02;

(e)    Investments existing on the Petition Date and set forth on Schedule 7.03;

(f)      advances to officers, directors and employees of the Borrowers and their Subsidiaries that are permitted by the Budget in an aggregate amount not to exceed $25,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes; and

(g)      Investments consisting of cash collateral to secure letters of credit, to the extent permitted under Section 7.01(j).

**Section 7.04 Fundamental Changes.**   Merge, dissolve, liquidate, divide, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom and so long as no approval of the Bankruptcy Court is required (or such approval is required and shall have been received):

(a)      any Subsidiary may merge with (i) a Borrower; provided, that such Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries that is a Loan Party (other than Ultimate Parent or Parent); provided, that such Loan Party shall be the continuing or surviving Person;

(b)      any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to a Borrower or to another Loan Party (other than Ultimate Parent or Parent); and

(c)      any Subsidiary that is not a Loan Party may dispose of all or substantially all its assets (including any Disposition that is in the nature of a liquidation) to a Loan Party (other than Ultimate Parent or Parent).

**Section 7.05 Dispositions.**   Make any Disposition or enter into any agreement to make any Disposition, except (in each case to the extent authorized by an appropriate order of the Bankruptcy Court if so required):

(a)      Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and for fair market value;

(b)      Dispositions of Inventory in the ordinary course of business and for fair market value;

(c)      Dispositions of Equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(d)      Dispositions of property by any Subsidiary to any Loan Party (other than Ultimate Parent or Parent), including Dispositions permitted by Section 7.04(c);

(e)    Dispositions of IP Rights consisting of (i) non-exclusive licenses of IP Rights granted in the ordinary course of business and substantially consistent with past practice or (ii) abandonment of IP Rights that are, in the reasonable judgment of the Borrowers, no longer economically practicable to maintain or useful in the conduct of the Borrowers' business;

(f)    Dispositions of the cash collateral permitted under Sections 7.01(j), solely to reimburse the issuer of such letters of credit for draws thereunder;

(g)    so long as no Event of Default exists or would result therefrom, bulk sales or other Dispositions of Inventory and Equipment not in the ordinary course of business in connection with Restaurant closings identified to the Agent and the Lenders prior to the Petition Date; provided, that all such sales or other Dispositions are on arm's length terms; and

(h)    the 363 Sale in accordance with the 363 Sale Order.

**Section 7.06 Restricted Payments.**    Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions, except that each Subsidiary may make Restricted Payments to any Borrower ratably according to its holdings of the type of Equity Interest in respect of which such Restricted Payment is being made.

**Section 7.07 Change in Nature of Business.**    Engage in any material line of business substantially different from those lines of business conducted by Ultimate Parent and its Subsidiaries on the Petition Date or any business substantially related or incidental thereto.

**Section 7.08 Transactions with Affiliates.**    Enter into any transaction of any kind with any Affiliate of any Loan Parties, whether or not in the ordinary course of business, other than (a) on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate and (b) transactions permitted under this Agreement, in each case, so long as any payments in respect thereof are expressly contemplated by the Budget.

**Section 7.09 Burdensome Agreements.**    Enter into or permit to exist any Contractual Obligation (other than this Agreement, any other Loan Document, any Prepetition Loan Document or with respect to Indebtedness under Section 7.02(c)) that limits the ability (a) of any Subsidiary to make Restricted Payments to any Loan Party or to otherwise transfer property to or invest in any Loan Party, (b) of any Subsidiary to Guarantee the Indebtedness of the Borrowers or (c) of any Borrower or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person.

**Section 7.10 Use of Proceeds.**    Use the proceeds of any Borrowing, whether directly or indirectly, and whether immediately, incidentally or ultimately:

(a)    to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose;

(b)        for any purpose that is prohibited under the Bankruptcy Code or the DIP Order;

(c)        to investigate, commence, prosecute or finance in any way any action, proceeding or objection with respect to or related to (i) the claims, liens or security interests of the Agent, the Lenders, the other Secured Parties, the Prepetition Agent, the Prepetition Lenders or the other Prepetition Secured Parties or their respective rights and remedies under this Agreement, the other Loan Documents, the DIP Order or the Prepetition Loan Documents, as the case may be, including to commence or prosecute or join in any action against any or all of the Agent, the Lenders, the other Secured Parties, the Prepetition Agent, the Prepetition Lenders or the other Prepetition Secured Parties seeking (x) to avoid, subordinate or recharacterize the Obligations or the Prepetition Obligations or any of the Agent's or the Prepetition Agent's Liens, (y) any monetary, injunctive or other affirmative relief against any or all of the Agent, the Lenders, the other Secured Parties, the Prepetition Agent, the Prepetition Lenders or the other Prepetition Secured Parties or the Collateral or the Prepetition Collateral in connection with the Loan Documents or the Prepetition Loans Documents or (z) to prevent or restrict the exercise by any or all of the Agent, the Lenders, the other Secured Parties, the Prepetition Agent, the Prepetition Lenders or the other Prepetition Secured Parties of any of their respective rights or remedies under the Loan Documents or the Prepetition Loan Documents, (ii) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of a release against the Agent, the Lenders, the other Secured Parties, the Prepetition Agent, the Prepetition Lenders or the other Prepetition Secured Parties, or (iii) certain stipulations to be made by the Loan Parties and approved by the Bankruptcy Court; provided, that advisors to the Official Committee, if one is appointed, may investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition Loan Documents in accordance with the DIP Order at an aggregate expense for such investigation not to exceed $25,000; provided, further, that no portion of such amount may be used to prosecute any such claims or to challenge the validity, enforceability, perfection, priority or extent of such liens or the Prepetition Obligations; or

(d)        to finance in any way (x) any adversary action, suit, arbitration, proceeding, application, motion, contested matter or other litigation of any type materially adverse to the interests of any or all of the Agent, the Lenders, the other Secured Parties, the Prepetition Agent, the Prepetition Lenders or the other Prepetition Secured Parties or their respective rights and remedies under the Loan Documents, the DIP Order or the Prepetition Term Loan Documents or (y) any other action which with the giving of notice or passing of time would result in an Event of Default hereunder or under any of the other Loan Documents.

Nothing herein shall in any way prejudice or prevent the Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Section 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Agent's and the Lenders' right to review and object to any such requests, motions or applications).

**Section 7.11  New Subsidiaries.**  Form or acquire, or permit to be formed or acquired, any Subsidiary.

**Section 7.12  Capital Expenditures.**    Incur, or permit to be incurred, Capital Expenditures that are not consented to by the Required Lenders, other than Capital Expenditures in an amount not exceeding the aggregate amount of Capital Expenditures set forth in the Budget.

**Section 7.13  Amendments of Organization Documents.**    (a) Amend any of its Organization Documents in a manner adverse to the Lenders or (b) change its name, organizational identification number, state of organization, or organizational identity; provided, that any Loan Party may change its name upon five (5) Business Days' prior written notice by the Borrowers to the Agent of such change and so long as (i) at the time of such notice, the Agent is provided with any financing statements necessary to continue the perfection of the Agent's Liens (including maintaining the first-priority status of such Liens) and (ii) promptly (and in any event within ten (10) Business Days) after such name change, the Agent is provided with evidence of such name change (including copies of any related public filings).

**Section 7.14  Accounting Changes.**  Except upon the prior written consent of the Agent (not to be unreasonably withheld), make any change in (a) accounting policies or reporting practices, except as required by GAAP, or (b) Fiscal Year; provided, that the Agent's consent shall not be required for any change in accounting policies or reporting practices that is made in accordance with GAAP so long as the Loan Parties notify the Agent of such change and such change does not have a material impact on the Loan Parties' financial statements.

**Section 7.15  Payments of Indebtedness.**    (a) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Indebtedness, except the prepayment of the Loans in accordance with the terms of this Agreement; or (b) make any payment of principal, interest or otherwise on account of any Prepetition Obligations, other than (i) payments made in compliance in all material respects with the Budget (including with respect to permitted variances), (ii) payments agreed to in writing by the Required Lenders and (iii) payments approved by the DIP Order and, if necessary, authorized by the Bankruptcy Court.

**Section 7.16  Amendments of Indebtedness.**  Amend, waive, modify or change in any manner any term or condition of (a) any Indebtedness set forth in Schedule 7.02 or (b) the Prepetition Loan Documents, other than amendments, waivers, modifications or changes consented to in writing by the Agent and the Required Lenders.

**Section 7.17  Parent as Holding Company.**    In the case of Parent, engage in any business or activity other than (a) the ownership of all outstanding Equity Interests in its Subsidiaries, (b) maintaining its corporate existence, (c) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (d) the execution and delivery of the Loan Documents and the Prepetition Loan Documents to which it is a party and the performance of its obligations thereunder, (e) transactions with shareholders not prohibited hereunder, and (f) activities incidental to the businesses or activities described in clauses (a) through (e) of this Section 7.17.  Parent shall not

67

incur any consensual Liens on Equity Interests of RUI other than Liens securing the Obligations and the Prepetition Obligations and Liens permitted pursuant to the DIP Order.

**Section 7.18 Ultimate Parent as Holding Company.**  In the case of Ultimate Parent, engage in any business or activity other than (a) the ownership of all outstanding Equity Interests in Parent, (b) maintaining its corporate existence, (c) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (d) the execution and delivery of the Loan Documents and the Prepetition Loan Documents to which it is a party and the performance of its obligations thereunder, (e) transactions with shareholders not prohibited hereunder, and (f) activities incidental to the businesses or activities described in clauses (a) through (e) of this Section 7.18.  Ultimate Parent shall not incur any consensual Liens on Equity Interests of Parent other than Liens securing the Obligations and the Prepetition Obligations and Liens permitted pursuant to the DIP Order.

**Section 7.19 New Collateral Locations.**  Open any new business location unless such Loan Party gives the Agent ten (10) days' prior written notice of the intended opening of any such new location; provided, that, notwithstanding the foregoing, no Loan Party may change its principal place of business unless it has given the Agent thirty (30) days' prior written notice. Any notice under this Section 7.19 shall be accompanied by an updated Schedule 5.08.

**Section 7.20 Amendments of Material Contracts or the Management Agreement.** Directly or indirectly amend, modify, alter, increase, or change any of the terms or conditions of (x) any Material Contract in any manner materially adverse to any Loan Party, the Agent or any Lender or (y) the Management Agreement.

**Section 7.21 Contracts.**  No Loan Party or any of its Subsidiaries shall enter into any long-term Contractual Obligations requiring a payment of more than $500,000 (excluding any contracts in connection with insurance or contracts with any vendors of food or beverage products) without the prior consent of the Required Lenders.

**Section 7.22 Chapter 11 Modifications.**  Except as permitted pursuant to the terms of this Agreement:

(a)    Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the DIP Order; or

(b)    Incur, create, assume or suffer to exist or permit any other DIP Super-Priority Claim which is pari passu with or senior to the claims of the Agent and the Lenders hereunder, except for the Carve Out and as otherwise permitted pursuant to the terms of the DIP Order.

**Section 7.23 Segregated Operating Account.**  Create, incur, assume or suffer to exist any Lien upon the Segregated Operating Account other than the Lien created in favor of the Agent under the Loan Documents.

**Section 7.24 Right of Subrogation.**  Assert any right of subrogation or contribution against any other Loan Party.

**Section 7.25  Change of Credit Card Processor.**  Change credit card processing from any Credit Card Processor.

## ARTICLE VIII.
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01  Events of Default.**  Any of the following shall constitute an "**Event of Default**":

(a)    <u>Non-Payment</u>.  The Borrowers or the other Loan Parties fail to (i) pay when and as required to be paid herein, any amount of principal of any Loan, (ii) pay within three (3) days after the same becomes due, any interest on any Loan or any fee due hereunder or under any other Loan Document, or (iii) pay within five (5) days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)    <u>Specific Covenants</u>.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section 6.01</u> (other than <u>Section 6.01(c)</u>), <u>6.02</u>, <u>6.03</u>, <u>6.04</u>, <u>6.05</u>, <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.16</u>, <u>6.17</u>, <u>6.19</u> or <u>Article VII</u>, (ii) any Loan Party fails to perform or observe any term, covenant or agreement contained in <u>Section 6.18</u> and such failure continues for two (2) Business Days, (iii) any Loan Party fails to perform or observe any term, covenant or agreement contained in <u>Section 6.01(c)</u> and such failure continues for five (5) Business Days, (iv) any Loan Party fails to perform or observe any term, covenant or agreement contained in Section 3, 4, 7 or 9 of the Security Agreement, or (v) any Loan Party fails to perform or observe any material term of the DIP Order; or

(c)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>Section 8.01(a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days; or

(d)    <u>Representations and Warranties</u>.  Any representation, warranty or certification made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>.  Any Loan Party or any Subsidiary thereof hereafter (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the

69

giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)     Judgments.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(g)     ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or a Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any of the Borrowers under Title IV of ERISA to such Pension Plan or Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) the Borrowers or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan that could reasonably be expected to result in a liability to any of the Borrowers in an aggregate amount in excess of the Threshold Amount; or

(h)     Invalidity of Loan Documents.  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(i)     Change of Control.  There occurs any Change of Control; or

(j)     Collateral Documents.  The Interim DIP Order and the Final DIP Order, together with the other Collateral Documents after delivery thereof, shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (subject to Liens permitted by Section 7.01) on the Collateral purported to be covered thereby; or

(k)     Indictment for Felony or Fraud.  Any Loan Party is criminally indicted or convicted under any Law that could lead to forfeiture of any material portion of Collateral; or

(l)     Entry of Final DIP Order.  The Final DIP Order Entry Date shall not have occurred within thirty (30) days after the Petition Date; or

(m)     _Conversion to Chapter 7_.  An order shall be entered by the Bankruptcy Court converting any of the Chapter 11 Cases to a Chapter 7 case; or

(n)     _Dismissal of Chapter 11_.  An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases that does not contain a provision for the termination of the Commitments and the payment in full in cash of all Obligations (other than unasserted contingent indemnification obligations) of the Loan Parties hereunder and under the other Loan Documents upon entry thereof; or

(o)     _Appointment of Trustee or Examiner_.  An order shall be entered by the Bankruptcy Court with respect to any of the Chapter 11 Cases appointing, or any Loan Party or any Subsidiary or Affiliate of a Loan Party shall file an application for an order with respect to any of the Chapter 11 Cases seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) a receiver, an interim receiver or a manager; or

(p)     _Alternate Financing_.  Any Loan Party shall file a motion in the Chapter 11 Cases, without the express prior written consent of the Agent and the Lenders, to obtain additional financing from a party other than the Lenders under Section 364(c) or Section 364(d) of the Bankruptcy Code or to use cash collateral under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Agent or provide for the termination of the Commitments and the payment in full in cash of all Obligations (other than unasserted contingent indemnification obligations) upon the incurrence of such additional financing; or

(q)     _Prepetition Claims_.  Any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than as (x) provided for in the "first day orders", (y) contemplated by the Budget (subject to permitted variances), or (z) otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $75,000 in the aggregate (other than with respect to the Restaurant located in Newport River Place (Store #60)) or to permit other actions that would have a Material Adverse Effect, or (iii) except with respect to the Prepetition Obligations as provided in the DIP Order, approving any settlement or other stipulation not approved by the Required Lenders and not included in the Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor; or

(r)     _Challenges to DIP Order; Super-Priority Claims and Liens_.  An order shall be entered by the Bankruptcy Court with respect to any of the Chapter 11 Cases, or any Loan Party takes any action seeking or supporting an order, in each case without the express prior written consent of the Agent and the Lenders, (i) to revoke, reverse, stay, vacate, amend, supplement or otherwise modify the DIP Order, (ii) to grant or permit any DIP Super-Priority Claims or other claims or Liens that are pari passu with or senior to the claims or Liens of the Agent and the other Secured Parties under the Loan Documents (other than the Carve Out) or

(iii) to grant or permit the grant of a Lien on the Collateral (other than Liens permitted by Section 7.01); or

(s)     Application for Order By Third Party.  An application for any of the orders described in Section 8.01(r) above shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within thirty (30) days after filing, or any Person obtains a final order under Section 506(c) of the Bankruptcy Code against the Agent or obtains a final order adverse to the Agent or the Lenders or any of their respective rights and remedies under the Loan Documents or in the Collateral; or

(t)     Challenges to Prepetition Obligations.  Any Loan Party or any Affiliate of a Loan Party shall file a motion in the Chapter 11 Cases seeking (i) to avoid, subordinate, recharacterize or otherwise challenge the Prepetition Obligations or any of the Prepetition Agent's Liens, (ii) any monetary, injunctive or other affirmative relief against any or all of the Prepetition Agent, the Prepetition Lenders or the other Prepetition Secured Parties or the Prepetition Collateral in connection with the Prepetition Loans Documents, (iii) to prevent or restrict the exercise by any or all of the Prepetition Agent, the Prepetition Lenders or the other Prepetition Secured Parties of any of their respective rights or remedies under the Prepetition Loan Documents or (iv) otherwise to challenge the Prepetition Obligations or the Liens securing the Prepetition Obligations under Chapter 5 of the Bankruptcy Code; or

(u)     Budget Event.  The proceeds of any Loan shall have been expended in a manner which is not in accordance in all material respects with the Budget (subject to permitted variances), or there occurs any Budget Event; or

(v)     Required Milestones.  The Loan Parties fail to achieve any of the Required Milestones; or

(w)     Invalidity of Liens.  (i) Any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Agent or the claims or rights against such Loan Party or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) the Liens created by the Interim DIP Order, the Final DIP Order or the other Collateral Documents with respect to the Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the Liens of the Agent created by the Interim DIP Order, the Final DIP Order or any of the other Collateral Documents; or

(x)     Invalidity of Claims.  Any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or contest any material provision of any Loan Document or any material provision of any Loan Document shall cease to be effective (other than in accordance with its terms); or

(y)     Change of Venue.  The Bankruptcy Court grants a change of venue with respect to the Chapter 11 Cases; or

(z)    Interference with Credit Bid. Any Loan Party shall take (or support any Person in taking) any action in order to restrict or prohibit the Agent, any Lender, the Prepetition Agent or any Prepetition Lender from submitting a "credit bid" for any assets of the Loan Parties; or

(aa)    Plan of Reorganization. A plan of reorganization that (i) is not in form and substance satisfactory to the Agent and the Lenders in all respects or (ii) does not provide for all Obligations hereunder and all Prepetition Obligations to be indefeasibly paid in full in cash shall be filed by the Loan Parties in the Chapter 11 Cases, or the Loan Parties shall propose or support, or fail to oppose, any such plan or any motion with respect to any such plan filed by a Person other than the Loan Parties; or

(bb)    Liquidation.    The determination of Ultimate Parent or any of its Subsidiaries, whether by vote of such Person's board of directors or otherwise, to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or to conduct any sales of all or substantially all of such Person's assets other than through the 363 Sale, or the filing of a motion or other application in the Chapter 11 Cases seeking authority to do any of the foregoing, in each case without the express prior written consent of the Agent and the Lenders.

**Section 8.02  Remedies upon Event of Default.**  Subject to the terms of the DIP Order, if any Event of Default occurs and is continuing, the Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)    declare the commitments of each Lender to make Loans to be terminated, whereupon such commitments shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers;

(c)    terminate any Loan Party's ability to use the cash collateral provided for by the DIP Order; and

(d)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents, the DIP Order or applicable law, in each case, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Section 362 or 105 of the Bankruptcy Code.

**Section 8.03 Application of Funds.**  After the taking of any action provided for in Section 8.02, any amounts received on account of the Obligations shall be applied by the Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agent (including

fees and time charges for attorneys who may be employees of the Agent) and amounts payable under Article III) payable to the Agent in its capacity as such, until paid in full;

Second, to the payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender) and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them, until paid in full;

Third, to the payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them, until paid in full;

Fourth, to the payment of that portion of the Obligations constituting unpaid principal on the Loans and other Obligations with respect to the DIP Facility, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth payable to them, until paid in full;

Fifth, to the ratable payment of all other Obligations then due and payable, until paid in full; and

Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrowers or as otherwise required by Law.

For purposes of this Section 8.03, "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees and interest (including default interest).

## ARTICLE IX.
## AGENT

### Section 9.01  Appointment and Authority.

(a)      Each of the Lenders hereby irrevocably appoints Fortress Credit Co LLC (and its successors and permitted assigns) to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article IX are solely for the benefit of the Agent and the Lenders, and neither the Borrowers nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

(b)      The Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on the Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Agent, as

74

"collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Agent), shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

**Section 9.02  Rights as a Lender.**  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

**Section 9.03  Exculpatory Provisions.**    The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided, that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (y) in the absence of its own gross negligence or willful misconduct.  The Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Agent by the Borrowers or a Lender.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

Section 9.04  **Reliance by Agent.**  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05  **Delegation of Duties.**  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

Section 9.06  **Resignation of Agent.**  The Agent may at any time give notice of its resignation to the Lenders and the Administrative Borrower.  Upon such resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor, which shall be a financial institution with an office in the United States and assets of at least $100,000,000, or an Affiliate of any such financial institution with an office in the United States and assets of at least $100,000,000.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; provided, that if the Agent shall notify the Administrative Borrower and the Lenders that no qualifying Person

has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section 9.06.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06).  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.   After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.  If Agent and its Affiliates are no longer a Lender, the Required Lenders, with the consent of the Administrative Borrower, may agree in writing to remove and replace Agent with a successor Agent pursuant to the terms and conditions of this Section 9.06.

**Section 9.07  Non-Reliance on Agent and Other Lenders.**  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**Section 9.08  Agent May File Proofs of Claim.**   In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent under Sections 2.08 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.08 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Agent to vote in respect of the claim of any Lender or in any such proceeding.

**Section 9.09  Collateral and Guaranty Matters.**  The Lenders irrevocably authorize the Agent, at its option and in its discretion, to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon payment in full of all Obligations, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with Section 10.01.  Upon request by the Agent at any time, the Required Lenders will confirm in writing the Agent's authority to release its interest in particular types or items of property pursuant to this Section 9.09.  In each case as specified in this Section 9.09, the Agent will, at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request, in form and substance reasonably satisfactory to the Agent, to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents and this Section 9.09.

**Section 9.10  Additional Secured Parties.**  The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender as long as, by accepting such benefits, such Secured Party agrees, as among the Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Agent, shall confirm such agreement in a writing in form and substance acceptable to the Agent) this Article IX, Section 10.04(c) (Expenses), Section 10.08 (Right of Setoff), Section 2.12 (Sharing of Payments by Lenders) and Section 10.07 (Confidentiality; Public Disclosures) and the decisions and actions of the Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) to the same extent a Lender is bound; provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 10.04(c) only to the extent of liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of Applicable Percentage or similar concept, (b) except as set forth specifically herein, each of the Agent and the Lenders shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the

78

Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as set forth specifically herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

# ARTICLE X.
# MISCELLANEOUS

**Section 10.01 Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than the Fee Letter), and no consent to any departure by the Borrowers or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrowers or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, that no such amendment, waiver or consent shall:

(a)    extend or increase any Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of all Lenders;

(b)    postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document, or permit any repayment of any Obligations in any consideration other than cash (excluding, for the avoidance of doubt, any PIK Interest), in each case, without the written consent of each Lender directly affected thereby; provided, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(d)    change Section 2.04(c), Section 2.12 or Section 8.03 in any manner without the written consent of each Lender;

(e)    (i) change any provision of this Section 10.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, or (ii) amend or modify the definition of "Obligations" or Section 10.04 to delete or exclude any obligation or liability described therein without the written consent of each Lender directly affected thereby; or

(f)    except as expressly permitted under the Loan Documents, release any material portion of the Collateral in any transaction or series of related transactions, or

subordinate any Lien granted in favor of the Agent for the benefit of the Secured Parties (including any increase to the Carve Out), in each case, without the written consent of each Lender;

(g)    amend, modify or waive Section 2.04(b), Section 7.05(g), Section 7.05(h), Section 7.22(b), Section 7.23, Section 8.01(l), Section 8.01(m), Section 8.01(n), Section 8.01(o), Section 8.01(p), Section 8.01(r), Section 8.01(s), Section 8.01(w), Section 8.01(x), Section 8.01(z), Section 8.01(aa), Section 8.01(bb), Section 11.04 or Section 11.05 without the written consent of each Lender;

(h)    amend, modify or waive Section 10.06 in any manner adverse to any Lender without the written consent of such Lender; or

(i)    permit or submit any "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or any other provision of the Bankruptcy Code or any other Debtor Relief Law with respect to the Obligations of any Lender without the written consent of such Lender;

provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; (ii) Section 10.06(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; and (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (x) no Commitment of such Defaulting Lender may be increased or extended, (y) the principal of such Defaulting Lender's Loans may not be reduced or forgiven and (z) the interest rate applicable to the Obligations owing to such Defaulting Lender may not be reduced, in each case without the consent of such Defaulting Lender.

**Section 10.02  Notices; Effectiveness; Electronic Communications.**

(a)    Notices Generally.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.02(b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Administrative Borrower or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)    if to any Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent permitted under Section 10.02(b) shall be effective as provided in such Section.

(b)    Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent; provided, that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE MATERIALS AND/OR INFORMATION PROVIDED BY OR ON BEHALF OF THE BORROWERS HEREUNDER (THE "**BORROWER MATERIALS**").  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrowers' or the Agent's transmission of any Borrowers Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, that in no event shall any Agent Party have any liability to the Group Members, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc.  Each Loan Party and the Agent may change its address, electronic mail address, telecopier number or telephone number for notices and other

communications hereunder by notice to the other parties hereto. Each Lender may change its address, electronic mail address, telecopier number or telephone number for notices and other communications hereunder by notice to the Administrative Borrower and the Agent. In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Agent and Lenders. The Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers. All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**Section 10.03 No Waiver; Cumulative Remedies.** No failure by any Lender or the Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

**Section 10.04 Expenses; Indemnity; Damage Waiver.**

(a)     Costs and Expenses. Whether or not the Closing Date, the Interim DIP Order Entry Date or the Final DIP Order Entry Date occurs or the transactions contemplated hereby are consummated, the Borrowers shall jointly and severally pay (i) reasonable and documented out-of-pocket fees and charges paid or incurred by the Agent or any Lender acting reasonably in connection with the Agent's and the Lenders' transactions with the Group Members, including out-of-pocket fees and charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, and the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals (including patent appraisals) and business valuations), real estate surveys, real estate title policies and endorsements, environmental audits (if applicable) and the Agent's attendance at meetings with the Borrowers, (ii) reasonable and documented out-of-pocket fees and charges paid or incurred by the Agent acting reasonably in the disbursement of funds to the Borrowers or the Lenders (by wire transfer or otherwise), (iii) charges paid or incurred by the Agent resulting from the dishonor of checks, (iv) reasonable and documented costs and expenses paid or incurred by the Agent or any Lender to correct any default or enforce any provision of

82

the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (v) subject to any limitations set forth in this Agreement, reasonable and documented audit fees and expenses of the Agent related to any inspections or audits of the Collateral, (vi) costs and expenses of third party claims or any other suit paid or incurred by the Agent or any Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Agent's and the Lenders' relationship with any Loan Party, (vii) the Agent's, each Lender's and each of their respective Affiliates' and Approved Funds' reasonable and documented costs and expenses (including reasonable and documented attorneys' fees (other than in-house counsel) and all fees payable to rating agencies) incurred in advising, structuring, drafting, reviewing, administering (including any payments made pursuant to Section 10.22), syndicating (including rating any Loan), or amending the Loan Documents and (viii) the Agent's and each Lender's reasonable and documented costs and expenses (including reasonable and documented attorneys' (other than in-house counsel), accountants', consultants', and other advisors' fees and expenses) incurred in terminating, enforcing (including reasonable and documented attorneys' (other than in-house counsel), accountants', consultants', and other advisors' fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding or other proceeding under Debtor Relief Laws concerning any Loan Party or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought.

(b)      _Indemnification by the Borrowers_.  Whether or not the Closing Date, the Interim DIP Order Entry Date or the Final DIP Order Entry Date occurs or the transactions contemplated hereby are consummated, the Borrowers shall jointly and severally indemnify the Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee) actually incurred by any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual presence or release of Hazardous Materials on or from any property owned or operated by the Group Members, or any Environmental Liability related in any way to the Group Members, or (iv) any actual claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of any Borrower's or any other Loan Party's directors, shareholders, other Related Parties or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; _provided_, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a

claim brought by any Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    <u>Reimbursement by Lenders</u>.    To the extent that the Borrowers for any reason fail to pay any amount required under <u>Section 10.04(a)</u> or <u>(b)</u> to be paid by them to the Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, or if any Lender fails to reimburse the Agent for amounts required to be paid by such Lender to the Agent pursuant to the Loan Documents, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; <u>provided</u>, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this <u>Section 10.04(c)</u> are subject to the provisions of <u>Section 2.11(d)</u>.

(d)    <u>Waiver of Consequential Damages</u>.    To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    <u>Payments</u>.    All amounts due under this <u>Section 10.04</u> shall be payable not later than twenty (20) days after demand therefor.

(f)    <u>Survival</u>.    The agreements in this <u>Section 10.04</u> shall survive the resignation of the Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**Section 10.05 Payments Set Aside.**  To the extent that any payment by or on behalf of the Borrowers are made to the Agent or any Lender, or the Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Agent or such Lender in its discretion) to be repaid to a trustee, a receiver or any other party, in connection with any proceeding under

any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**Section 10.06  Successors and Assigns.**

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither any Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f), or (iv) to an SPC in accordance with the provisions of Section 10.06(h) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.06(d) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided, that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment (x) of the entire remaining amount of the assigning Lender's Commitments and the Loans at the time owing to it or (y) to a Lender, an Affiliate of a Lender or an Approved Fund, in each case whose primary investments are purchasing and participating in commercial loan transactions, no minimum amount need be assigned; and

(B)    in any case not described in Section 10.06(b)(i)(A), the aggregate amount of the Commitments and the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 so assigned,

85

unless each of the Agent and, so long as no Event of Default has occurred and is continuing, the Administrative Borrower otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed); provided, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Required Consents.  In addition to the consents required by Section 10.06(b)(i)(B), the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required unless such assignment is made to a Lender, an Affiliate of a Lender or an Approved Fund, in each case whose primary investments are purchasing and participating in commercial loan transactions.

(iii)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, that (A) the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and (B) such fee shall not be required in connection with an assignment by a Lender to an Affiliate or an Approved Fund.  The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

(iv)    No Assignment to Borrowers.  No such assignment shall be made to the Group Members or their Affiliates without the consent of the Lenders.

(v)    No Assignment to Natural Persons.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Agent pursuant to Section 10.06(c), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, the Borrowers (at their expense) shall execute and deliver a note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.06(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)    Register.  The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and

the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrowers, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Agent, sell participations to any Person (other than to Persons specified in Sections 10.06(b)(iv) or (v)) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitments and/or the Loans owing to it); provided, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible for the performance of such obligations and (iii) the Borrowers, the Lenders and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 10.01(c) that affects such Participant.  Subject to Section 10.06(e), the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b).  To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender. Each Lender that sells a participation pursuant to this Section 10.06(d) shall, acting solely for U.S. federal income tax purposes as an agent of the Borrowers, maintain a register on which it records the name and address of each Participant and the principal amounts of each Participant's participation interest with respect to the Loans and Commitments (each, a "**Participant Register**"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(e)    Limitations upon Participant Rights.  Each Participant shall deliver the applicable tax forms required by Section 3.01.  No Participant shall be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Administrative Borrower is notified of the participation sold to such

87

Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 3.01(e) as though it were a Lender.

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    Special Purpose Funding Vehicles.  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle that is an Affiliate or an Approved Fund of such Granting Lender and that is identified as such in writing from time to time by the Granting Lender to the Agent and the Borrowers (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided, that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Agent as is required under Section 2.11(b).  Each party hereto hereby agrees that (x) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrowers under this Agreement (including their obligations under Section 3.04), (y) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (z) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the applicable Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (A) with notice to, but without prior consent of, the Administrative Borrower and the Agent and with the payment of a processing fee in the amount of $3,500 (which processing fee may be waived by the Agent in its

88

sole discretion) assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (B) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

**Section 10.07  Confidentiality; Public Disclosures.**

(a)     Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, shareholders, directors, managers, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 10.07, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations or (iii) any prospective purchasers of the Equity Interests or assets of the Loan Parties, (g) with the consent of the Borrowers or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 10.07, (ii) becomes available to the Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrowers or their Affiliates or agents or (iii) is independently developed by the Agent or any Lender without reference to the information disclosed by any Loan Party.

(b)     For purposes of this Section 10.07, "**Information**" means all information received from any Loan Party or any Subsidiary or Affiliate thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary or Affiliate thereof.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(c)     Anything in this Agreement to the contrary notwithstanding, the Agent may provide information concerning the terms and conditions of this Agreement and the other Loan Documents customarily reported to loan syndication and pricing reporting services.

(d)     Each Loan Party agrees that neither it nor any of its Affiliates will issue any press release or other public disclosure using the name of the Agent, any Lender or any of

Fortress/RUI – DIP Credit Agreement
74475947

their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of the Agent and such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable Law (in which event, such Loan Party or such Affiliate, as applicable, will consult with the Agent and such Lender before issuing such press release or other public disclosure).  Each Loan Party hereby authorizes the Agent and each Lender, after consultation with the Administrative Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as the Agent and the Lenders shall deem appropriate, including announcements commonly known as tombstones, in such trade publications, business journals and newspapers of general circulation and to such selected parties as the Agent or such Lender shall deem reasonably appropriate consisting of disclosures customary with same.

(e)     Each of the Agent and the Lenders acknowledge and agree that (i) the Information may include material non-public information concerning the Borrowers or their Subsidiaries, as the case may be, (ii) it has developed compliance procedures regarding the use of material non-public information and (iii) it will handle such material non-public information in accordance with applicable Law.

**Section 10.08  Right of Setoff.**  Subject to the terms of the DIP Order and the Carve Out, if an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower or any other Loan Party against any and all of the obligations of the Borrowers and the other Loan Parties now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers and the other Loan Parties may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and their respective Affiliates under this <u>Section 10.08</u> are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have, subject to the terms of the DIP Order and the Carve Out. Each Lender agrees to notify the Administrative Borrower and the Agent promptly after any such setoff and application; <u>provided</u>, that the failure to give such notice shall not affect the validity of such setoff and application.

**Section 10.09 Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum

Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**Section 10.10  Counterparts; Integration; Effectiveness.**  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 10.11  Survival of Representations and Warranties.**  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Agent and each Lender, regardless of any investigation made by the Agent or any Lender or on their behalf and notwithstanding that the Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**Section 10.12  Severability.**  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 10.13  Governing Law; Jurisdiction; Etc.**

(a)    GOVERNING LAW.  EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    SUBMISSION TO JURISDICTION.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, AND EACH OF THE PARTIES

HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY BORROWER OR ANY OTHER LOAN PARTY OR THEIR PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE.    EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SECTION 10.13(b).  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02, AND EACH LOAN PARTY FURTHER IRREVOCABLY CONSENTS TO SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**Section 10.14 Waiver of Jury Trial.**    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.14.

**Section 10.15 No Advisory or Fiduciary Responsibility.**  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment,

waiver or other modification hereof or of any Loan Document), each Group Member acknowledges and agrees that (a) (i) the arranging and other services regarding this Agreement provided by the Agent are arm's-length commercial transactions between the Group Members, on the one hand, and the Agent, on the other hand, (ii) each Group Member has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) each Group Member is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Group Member or any other Person and (ii) none of the Agent or any Lender has any obligation to any Group Member or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Agent and the Lenders may be engaged in a broad range of transactions that involve interests that differ from those of the Group Members and their respective Affiliates, and neither Agent nor any Lender has any obligation to disclose any of such interests to any Group Member or any of their respective Affiliates.  To the fullest extent permitted by Law, each Group Member hereby waives and releases any claims that it may have against each of the Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**Section 10.16  USA Patriot Act Notice.**  Each Lender that is subject to the Patriot Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that, pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Patriot Act.

**Section 10.17  Time of the Essence.**  Time is of the essence of the Loan Documents.

**Section 10.18  Entire Agreement.**  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

**Section 10.19  Administrative Borrower.**  Each Loan Party hereby designates RUI as the borrowing agent and attorney-in-fact for all Loan Parties (in such capacity, the "**Administrative Borrower**"), to act on its behalf for the purposes of issuing borrowing notices, giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants and amendments to the Loan Documents) on behalf of any Loan Party or Loan Parties under the Loan Documents. RUI hereby accepts such appointment as Administrative Borrower.  The Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from the

Administrative Borrower as a notice or communication from all Loan Parties, and may give any notice or communication required or permitted to be given to any Loan Party or Loan Parties hereunder to the Administrative Borrower on behalf of such Loan Party or Loan Parties. Each Loan Party agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Administrative Borrower shall be deemed for all purposes to have been made by such Loan Party and shall be binding upon and enforceable against such Loan Party to the same extent as if the same had been made directly by such Loan Party. Each Loan Party hereby jointly and severally agrees to indemnify the Agent and each Lender and hold the Agent and each Lender harmless against any and all liability, expense, loss or claim of damage or injury, made against the Agent or the Lenders by any Loan Party or by any third party whosoever, arising from or incurred by reason of the Lenders' relying on any instructions of the Administrative Borrower.

**Section 10.20 Replacement of Holdout Lender.** If any action to be taken by the Lenders or the Agent hereunder requires the unanimous consent, authorization or agreement of all Lenders, and a Lender (a "**Holdout Lender**") fails to give its consent, authorization or agreement, then the Agent or the Borrowers (with the approval of Agent), upon at least five (5) Business Days' prior irrevocable notice to such Holdout Lender, may permanently replace such Holdout Lender with one or more substitute Lenders that are Eligible Assignees (each, a "**Replacement Lender**"), and such Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace such Holdout Lender shall specify an effective date for such replacement, which date shall not be later than fifteen (15) Business Days after the date such notice is given.

Prior to the effective date of such replacement, such Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to such Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If such Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, such Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 10.06. Until such time as each Replacement Lender shall have acquired all of the Obligations, the Commitments and the other rights and obligations of any Holdout Lender hereunder and under the other Loan Documents, such Holdout Lender shall remain obligated to make such Holdout Lender's pro rata share of Loans.

**Section 10.21 Reinstatement; Application of Payments.** To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside, defeased or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment shall be revived and shall continue as if such payment had not been received by the Agent or any Lender and the Liens created by the Loan Documents shall be revived automatically without any action on the part of any party hereto and shall continue as if such payment had not been received by the Agent or such Lender. Any payments with respect to the Obligations received shall be credited and applied in such manner and order as set forth in

Fortress/RUI – DIP Credit Agreement
74475947

this Agreement.  Anything contained in any Loan Document to the contrary notwithstanding, only upon payment in full in cash (other than unasserted contingent indemnification obligations), termination of the Commitments and the execution and delivery of a written release by the Loan Parties of all claims against the Agent and the Lenders, and so long as no suits, actions proceedings, or claims are pending or threatened against any Indemnitee asserting any damages, losses or liabilities that are indemnified liabilities hereunder, the Agent shall deliver to the Borrowers termination statements, mortgage releases and other documents necessary or appropriate to evidence the termination of the Liens securing the Obligations.

Section 10.22  **Taxes and Expenses.**  If any Loan Party fails to pay any monies (whether taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then the Agent, in its sole discretion, may make payment of the same or any part thereof.  Any such amounts paid by the Agent shall constitute expenses of the Agent hereunder and shall be reimbursed by the Borrowers in accordance with Section 10.04(a).  Any such payments shall not constitute an agreement by the Agent or the Lenders to make similar payments in the future or a waiver by the Lenders of any applicable Event of Default under this Agreement.

Section 10.23  **Article and Section Headings.**  Numbered and titled article and section headings are for convenience only and will not affect the interpretation of this Agreement or any other Loan Document or be construed as amplifying or limiting any of the provisions of this Agreement.

Section 10.24  **Actions in Concert.**  Anything in this Agreement or any other Loan Document to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or otherwise with respect to the Obligations without first obtaining the prior written consent of the Agent or the Required Lenders (as applicable), it being the intent of the Lenders that any such action to protect or enforce rights under this Agreement or otherwise with respect to the Obligations shall be taken in concert and at the direction or with the consent of the Agent or the Required Lenders (as applicable).  In furtherance of the foregoing, and notwithstanding anything contained in any of the Loan Documents to the contrary, the Loan Parties, the Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under this Agreement and the other Loan Documents may be exercised solely by the Agent, on behalf of the Lenders in accordance with the terms hereof and thereof, and (ii) in the event of a foreclosure by the Agent on any of the Collateral pursuant to a public or private sale, the Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Agent at such sale.

**Section 10.25 Conflicts.**    If any provision in this Agreement or any other Loan Document expressly conflicts with any provision in the Interim DIP Order or the Final DIP Order, the provisions in the Interim DIP Order or the Final DIP Order, as applicable, shall govern and control.

## ARTICLE XI.
## SECURITY AND PRIORITY

**Section 11.01  Prepetition Obligations.**  Each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that the Borrowers and the other Loan Parties are indebted to the Prepetition Agent, the Prepetition Lenders and the other Prepetition Secured Parties for the Prepetition Obligations, as of the Petition Date, in an aggregate principal amount of not less than $37,741,726.63, plus accrued and unpaid interest (in an aggregate principal amount of not less than $1,703,030.79 as of June 30, 2019), and any fees, costs, and expenses incurred in connection therewith, in respect of Prepetition Obligations under the Prepetition Credit Agreement, plus indemnities, reimbursement obligations and other charges now or hereafter owed by the Borrowers and the other Loan Parties to the Prepetition Agent, the Prepetition Lenders and the other Prepetition Secured Parties pursuant to the terms of the Prepetition Credit Agreement, all of which are unconditionally owing by the Borrowers and the other Loan Parties to the Prepetition Agent, the Prepetition Lenders and the other Prepetition Secured Parties, without offset, defense or counterclaim of any kind, nature and description whatsoever.

**Section 11.02  Acknowledgment of Security Interests.**  As of the Petition Date, each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (a) the Prepetition Agent, for the benefit of the Prepetition Secured Parties, has valid, enforceable (except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity) and perfected first priority and senior liens upon and security interests in all of the Prepetition Collateral granted pursuant to the Prepetition Collateral Documents as in effect on the Petition Date to secure all of the Prepetition Obligations (subject only to Liens permitted under the Prepetition Credit Agreement) and (b) such Liens are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

**Section 11.03  Binding Effect of Documents.**    Each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that as of the Petition Date (a) each of the Prepetition Loan Documents to which it is a party is in full force and effect as of the date hereof, (b) the agreements and obligations of the Borrowers, the other Loan Parties and their Subsidiaries contained in the Prepetition Loan Documents constitute the legal, valid and binding obligations of each of the Borrowers, the other Loan Parties and their Subsidiaries, enforceable against each of them in accordance with their respective terms, and none of the Borrowers, the other Loan Parties or their Subsidiaries has any valid defense, offset or counterclaim to the enforcement of such obligations and (c) the Prepetition Agent and the other Prepetition Secured Parties are and shall be entitled to all of the rights, remedies and benefits provided for in the Prepetition Loan

Documents, except to the extent clauses (b) and (c) above are subject to the automatic stay under the Bankruptcy Code upon commencement of the Chapter 11 Cases.

### Section 11.04  Collateral; Grant of Lien and Security Interest.

(a)       Pursuant to, and otherwise subject to the terms of, the DIP Order and in accordance with the terms thereof and subject to the Carve Out, as security for the full and timely payment and performance of all of the Obligations, the Loan Parties hereby pledge and grant to the Agent, for the benefit of the Secured Parties, a security interest in and to and a Lien on all of the Collateral.

(b)       Notwithstanding anything herein to the contrary, (i) all proceeds received by the Agent and the Lenders from the Collateral subject to the Liens granted in this Section 11.04 and in each other Loan Document and by the Interim DIP Order and the Final DIP Order shall be subject to the Carve Out, and (ii) no Person entitled to amounts in respect of the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

### Section 11.05  Priority and Liens Applicable to Loan Parties.

(a)       Upon entry of the Interim DIP Order and subject to the terms thereof and of the Final DIP Order, as applicable, at all times, subject to the Carve Out, pursuant to Sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the Obligations shall constitute allowed super-priority administrative expense claims ("**DIP Super-Priority Claims**"), which DIP Super-Priority Claims shall rank superior to all other claims.

(b)       Upon entry of the Interim DIP Order and subject to the terms thereof and of the Final DIP Order, as applicable, at all times, subject to the Carve Out, the Liens and security interests in favor of the Agent, for the benefit of the Secured Parties, referred to in Section 11.04(a) shall constitute:

(i)       pursuant to Section 364(c)(2) of the Bankruptcy Code, with respect to all "DIP Collateral" (as defined in the Interim DIP Order or the Final DIP Order, as applicable) that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date, a first priority Lien on and security interest in all such Collateral;

(ii)       pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority Lien on and security interest in the proceeds of Avoidance Actions;

(iii)       pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority Lien on the Segregated Operating Account, the funds maintained in such account and all proceeds thereof; and

(iv)       pursuant to Section 364(d) of the Bankruptcy Code, a first priority priming Lien on and security interest in (the "**Priming Liens**") all assets of the Loan Parties encumbered by a first priority lien under the Prepetition Loan Documents not

otherwise described in <u>clauses (i)</u> through <u>(iii)</u> above (now or hereafter acquired and all proceeds thereof) that were subject to a lien as of the Petition Date; <u>provided</u>, that such Priming Liens shall be senior in priority to the Liens in respect of the Prepetition Obligations under the Prepetition Loan Documents.

(c)    The Priming Liens shall prime all of the Liens securing the Prepetition Obligations, but the Liens so created as described in <u>Section 11.05(b)(i)</u> shall be subject to the Liens permitted under Section 7.01 of the Prepetition Credit Agreement.

(d)    The Liens to be granted by the Bankruptcy Court shall cover all property of the Loan Parties (now or hereafter acquired and all proceeds thereof), including property or assets that do not secure the Prepetition Obligations and as expressly excluded under the Security Agreement, except (i) until entry of the Final DIP Order, proceeds of any Avoidance Actions and (ii) as otherwise agreed to by the Required Lenders in their sole discretion.

(e)    Except as expressly set forth above as to Liens to become effective upon entry of the Final DIP Order, all of the Liens described herein with respect to the assets of the Loan Parties shall be effective and perfected as of the Interim DIP Order Entry Date and without the necessity of the execution or filing of security agreements, pledge agreements, financing statements, mortgages or other instruments or agreements.

**Section 11.06  Grants, Rights and Remedies.**  The Liens and security interests granted pursuant to <u>Section 11.04(a)</u> and the administrative priority and lien priority granted pursuant to <u>Section 11.05</u> may be independently granted by the Collateral Documents and by other Loan Documents hereafter entered into.  This Agreement, the Interim DIP Order, the Final DIP Order and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agent and the other Secured Parties hereunder and thereunder are cumulative; <u>provided</u>, that, to the extent of conflict, the Interim DIP Order or the Final DIP Order, as applicable, controls.

**Section 11.07  No Filings Required.**  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim DIP Order and entry of the Interim DIP Order shall have occurred on or before the date of the Borrowing of the Interim Term Loan. The Agent shall not be required to file any security agreements, pledge agreements, financing statements, mortgages, notices of Lien or similar instruments or agreements in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim DIP Order or the Final DIP Order, as the case may be, or any other Loan Document.

**Section 11.08  Survival.**  The Liens, lien priorities, administrative priorities and other rights and remedies granted to the Agent and the other Secured Parties pursuant to this Agreement, the Interim DIP Order, the Final DIP Order and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11

Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)     except with respect to the Carve Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agent and the other Secured Parties against the Loan Parties in respect of any Obligation;

(b)     the Liens in favor of the Agent, for the benefit of the Secured Parties, set forth in Section 11.04(a) shall constitute valid and perfected Liens and security interests, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever (subject to Section 11.05(b)); and

(c)     the Liens in favor of the Agent, for the benefit of the Secured Parties, set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Agent file security agreements, pledge agreements, financing statements, mortgages, notices of Lien or similar instruments or agreements, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWERS**:

**RU CORP.**
**RESTAURANTS UNLIMITED, INC.**
**RESTAURANTS UNLIMITED TEXAS, INC.,**
**each as a Debtor and a Debtor-In-Possession**
**under Chapter 11 of the Bankruptcy Code**


By: _____
Name:
Title:


**GUARANTOR**:

**RUI HOLDING CORP.,**
**as a Debtor and a Debtor-In-Possession**
**under Chapter 11 of the Bankruptcy Code**


By: _____
Name:
Title:

**AGENT**:

**FORTRESS CREDIT CO LLC**, as Agent

By: _____
Name:
Title:


**LENDERS**:

**DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LP**

**By:    Drawbridge Special Opportunities GP LLC, its general partner**

By: _____
Name:
Title:

**<u>LENDERS</u>**:

**NXT CAPITAL, LLC**


By: _____
Name:
Title:


**NXT CAPITAL CLO 2017-2, LLC**

**By:    NXT Capital Investment Advisers, LLC,
        its Collateral Manager**


By: _____
Name:
Title:


**NXT CAPITAL SENIOR LOAN FUND II, LP**

**By:    NXT Capital Investment Advisers, LLC,
        its Investment Manager**


By: _____
Name:
Title:

**Schedule 2.01**

**Commitments**

| Lender | Interim Term Loan Commitment | Final Term Loan Commitment |
|---|---:|---:|
| Drawbridge Special Opportunities Fund LP | $2,068,181.82 | $4,295,454.56 |
| NXT Capital, LLC | $623,414.15 | $1,294,783.22 |
| NXT Capital CLO 2017-2, LLC | $381,131.30 | $791,580.39 |
| NXT Capital Senior Loan Fund II, LP | $177,272.73 | $368,181.83 |
| **Total** | **$3,250,000.00** | **$6,750,000.00** |

## Schedule 10.02

## <u>Agent's Office, Certain Addresses for Notices</u>

**Borrowers' website for posting documents:** None

**Agent's Account:**

Bank of America, NA
ABA No.: 026-009-593
Account Number 2047628893919
Account Name: Fortress Credit Co LLC
Reference: Restaurants Unlimited

**Designated Account:**

Wells Fargo Bank N.A. – San Francisco, CA
Account Name: Control Concentration
ABA No.: 121-000-248
Account Number 4124913468

**Notice Addresses**

<u>Loan Parties</u>:

Restaurants Unlimited, Inc.
411 First Avenue South, Suite 200
Seattle, WA 98104
Attention: Crystal Grays, Chief Financial Officer
Telephone: (206) 838-1314
Telecopier: (206) 838-1351
Electronic Mail:  cgrays@r-u-i.com

with a copy to (such copy not to constitute notice):

Sun Capital Partners
5200 Town Centre Circle, Suite 600
Boca Raton, FL 33486
Attention: C. Deryl Couch and Stephen Cella
Telephone: (561) 394-0550
Telecopier: (561) 394-0540
Electronic Mail: DCouch@suncappart.com and SCella@suncappart.com

with a copy to (such copy not to constitute notice):

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801
Attention: Domenic E. Pacitti
Telephone: (302) 552-5511
Telecopier: (302) 426-9193
Electronic Mail: dpacitti@klehr.com

Agent:

Fortress Credit Co LLC
c/o Fortress Investment Group LLC
1345 Avenue of the Americas, 46th Floor
New York, NY 10105
Attention: Peter Leibman
Telephone: (212) 515-7711
Telecopier: (212) 798-6090
Electronic Mail: pleibman@fortress.com

and to:

Fortress Investment Group LLC
3290 Northside Parkway NW, Suite 350
Atlanta, GA 30327
Attention: Morgan McClure
Telephone: (404) 264-4780
Telecopier: (678) 550-9105
Electronic Mail: mmcclure@fortress.com

and to:

Fortress Investment Group LLC
10250 Constellation Boulevard, Suite 1600
Los Angeles, CA 90067
Attention: Joshua A. Pack
Telephone: (310) 228-3015
Telecopier: (310) 228-3030
Electronic Mail: jpack@fortress.com

and to:

Fortress Investment Group LLC
1345 Avenue of the Americas, 46th Floor
New York, NY 10105

Attention: David Brooks, General Counsel
Telephone: (212) 479-5300
Electronic Mail: dbrooks@fortress.com

with a copy to:

Hunton Andrews Kurth LLP
600 Peachtree Street, NE, Suite 4100
Atlanta, GA 30308
Attention: John R. Schneider
Telephone: (404) 888-4000
Telecopier: (404) 888-4190
Electronic Mail: jschneider@huntonak.com