## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) ) | Chapter 11 |
| RUI HOLDING CORP., *et al.*, [1] | ) ) ) | Case No. 19-11509 (___) |
| Debtors. | ) ) | (Joint Administration Requested) |

Sale Procedures Hearing Date:
August [●], 2019 @ [●][●].m.
Sale Procedures Objection Deadline:
August [●], 2019 @ [●][●].m.
Sale Hearing Date: TBD
Sale Objection Deadline: TBD

### DEBTORS' COMBINED MOTION FOR ORDERS:

**(I)(A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF DEBTORS' ASSETS; (B) SCHEDULING AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (C) APPROVING PROCEDURES RELATED TO ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING FORM AND MANNER OF NOTICES THEREOF; AND (E) GRANTING RELATED RELIEF; AND**

**(II)(A) AUTHORIZING SALE O R  S A L E S OF DEBTORS' ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2],

hereby submit this motion (the "Motion") requesting entry of two orders pursuant to sections

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RUI Holding Corp. (6192); RU Corp. (8259); Restaurants Unlimited, Inc. (8365); and Restaurants Unlimited Texas, Inc. (5733). The Debtors' headquarters and mailing address is: 411 First Ave. South, Suite 200, Seattle, WA 98104. The Debtors operate restaurants under the following names: Clinkerdagger; Cutters Crabhouse; Fondi Pizzeria; Henry's Tavern; Horatio's; Kincaid's; Maggie Bluffs; Manzana; Newport Seafood Grill; Palisade; Palomino; Portland City Grill; Portland Seafood Company; Scott's Bar and Grill; Simon & Seafort's; Skate's on the Bay; Stanford's; and Stanley & Seafort's.

[2]    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of David Bagley in*

105, 363, 365, 503 and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

(the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9008 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"):

(1)    The first order, substantially in the form attached hereto as Exhibit A (the "Sale

Procedures Order"), (a) authorizing and approving procedures for (i) submitting bids for the

sale or sales (the "Sale") of the Debtors' assets (the "Purchased Assets") and (ii) conducting

an auction for the Purchased Assets (the "Auction"); (b) authorizing the Debtors, in their

discretion, to enter into an asset purchase agreement with a stalking horse purchaser

subject to court approval of any stalking horse protections; (c) authorizing and approving

procedures for the assumption and assignment of certain executory contracts in connection

with the sale of the Purchased Assets; (d) scheduling (i) a deadline to submit bids for the

Purchased Assets, (ii) the date and time of the Auction, and (iii) the date and time of the

hearing to consider the approval of the proposed sale of the Purchased Assets (the "Sale

Hearing"); (e) authorizing the form and manner of notices with respect to the Sale; and (d)

granting related relief.

(2)    The second order(s) (the "Sale Order")[3]: (a) authorizing the Sale or Sales of the

Purchased Assets to the successful bidder(s) free and clear of all liens, claims, interests, and

encumbrances; (b) authorizing the assumption and assignment of certain unexpired leases and

---

Support of Debtors' First Day Motions and Applications (the "First Day Declaration"), filed contemporaneously
with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code, 11 U.S.C.
§§ 101–1532 (the "Bankruptcy Code"), on July 7, 2019 (the "Petition Date").

[3]    The Debtors will file the applicable form or forms of Sale Order as soon as practicable after such document
is negotiated and finalized with the applicable purchaser or purchasers.

executory contracts in connection with the Sale; and (c) granting certain related relief as set forth herein.

In further support of this Motion, the Debtors incorporate and rely upon the statements contained in the First Day Declaration, the Declaration of Vineet Batra in Support of the Debtors' Sale Motion (the "Batra Declaration") filed contemporaneously with this Motion, and further respectfully state as follows:

### Jurisdiction and Venue

1.      On July 7, 2019 (the "Petition Date"), the Debtors each filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      No official committee of general unsecured creditors (the "Committee") has been appointed in these cases by the Office of the United States Trustee to date.

3.      United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3

5.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, along with Bankruptcy Rules 2002, 6003, 6004, 6006, 9008 and 9014, and Local Rule 6004-1.

## Background

6.      As of the Petition Date, the Debtors lacked the funds necessary to meet projected short-term cash needs due to a lack of availability under the pre-petition credit agreement and lower than expected cash flow from operations.

7.      Debtors RU Corp., Restaurants Unlimited, Inc., and Restaurants Unlimited Texas, Inc., as borrowers, and RUI Holding Corp., as guarantor, were parties to that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2013 (as amended. Amended and restated, supplemented or otherwise modified from time to time, the "Pre-Petition Credit Agreement") with Fortress Credit Co LLC, as agent (the "Pre-Petition Agent"), and the lenders party thereto form time to time (the "Pre-Petition Lenders"), pursuant to which the Pre-Petition Lenders provided certain various extensions of credit to the Debtors.

8.      Prior to the Petition Date, the Debtors were in default under the Prepetition Credit Agreement, which matured in July 2018 and which led to a series of Forbearance Agreements (collectively, the "Forbearance Agreement"), the latest of which was dated as of March 1, 2019. Pursuant to the Forbearance Agreement, the Pre-Petition Agent and Pre-Petition Lenders agreed to, among other things, forbear from exercising certain rights and remedies under the Prepetition Credit Agreement for a limited period of time, subject to certain terms and conditions.

9.      Notwithstanding the Forbearance Agreement, on May 2, 2018 the Pre-Petition Agent and Pre-Petition Lenders agreed to make an additional loan to the Debtors in the amount of $500,000 (the "Additional Loan").

4

10.    The forbearance period set forth under the Forbearance Agreement subsequently terminated by its terms, and there is no availability to the Debtors under the matured Pre-Petition Credit Agreement.

11.    No other financing has been available to the Debtors beyond the Additional Loan and the Debtors have operated solely based on their cash flow from operations through the Petition Date.  The Debtors' cash, however, is dwindling, and operating solely on cash flow is not sustainable on a long term basis.

12.    As of the Petition Date, the Obligations (as defined in the <u>Pre-Petition Credit Agreement</u>, the "<u>Pre-Petition Obligations</u>") owed by the Debtors to the Pre-Petition Lenders under the Prepetition Credit Agreement totaled not less than $37,741,726.63 in aggregate outstanding principal *plus* accrued and unpaid interest with respect thereto of $1,703,030.79 as of June 30, 2019.

13.    The Debtors, in the exercise of their considered business judgment, and after consultation with the Pre-Petition Agent and Pre-Petition Lenders regarding an agreeable path forward, determined that the only path forward that could preserve and maximize value of their assets for the benefit of their estates and creditors is to seek approval of an expeditious sale of their assets through a chapter 11 process.

<u>**The Proposed Sale of the Purchased Assets**</u>

14.    As described in the First Day Declaration, the Debtors commenced these Chapter 11 Cases to conduct prompt sales of all or substantially all of their assets with the goal of maximizing value for all stakeholders.  As discussed below, consummation of a sale transaction of the Purchased Assets as soon as possible is in the best interests of the Debtors' estates.  The Debtors' ability to use Cash Collateral and access additional liquidity through the available

5

debtor-in-possession financing will only support the sale process contemplated by this Motion and thereby necessitates the completion of a Sale of all of the Purchased Assets as expeditiously as possible.

**A.    The Purchased Assets**

15.    As more specifically set forth in the First Day Declaration, the Debtors' operate 18 different restaurant brands in 35 locations throughout 6 states  (the "Business").  The Debtors are offering for sale all of their assets associated with the operation of their Business.   A summary of the key elements of the Sale as will be set forth in the form of APA includes, *inter alia*:

| Key Terms of Form of APA | |
| --- | --- |
| Purchaser | To be determined. |
| Sellers | RU Corp., Restaurants Unlimited, Inc., Restaurants Unlimited Texas, Inc. and RU Holding Corp. |
| Purchase Price (other than Assumed Liabilities) | To be determined. |
| Purchased Assets | Buyer will purchase all operating assets, receivables, cash, licenses, tradenames, trademarks, Assumed Contracts, equipment and inventory required to operate retail restaurant operations at the  "Operating Locations" and "Run-Out Locations" (each as defined in the APA) |
| Excluded Assets | The following assets are excluded from the Purchased Assets under the Sale: all cash, cash equivalents, bank deposits and similar cash items of Sellers other than Restaurant Petty Cash; all bank accounts of Sellers; all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity; all equity securities of any Seller and all net operating losses of any Seller; all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts; the Excluded Claims; any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees); any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such |

| | |
|---|---|
| | information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset; all liquor licenses associated with any Excluded Restaurants or which the Sellers presently hold in safe keeping; all Permits other than the Assumed Permits; all of Sellers' right, title and interest in and to all of the assets primarily related to the Excluded Restaurants; all directors' and officers' liability insurance policies; and the rights of Sellers under the APA and all cash and non-cash consideration payable or deliverable to Sellers under the APA. |
| **Assumed Liabilities** | The following liabilities will be assumed by the Purchaser at Closing: (a) 503(b)(9) claims, subject to reconciliation; (b) PACA/PASA claims, subject to reconciliation; (c) Accrued Payroll & Taxes, including the accrued quarterly operating bonuses; (d) all Accrued Employee Benefits, including but not limited to unpaid wages, health care costs, paid time off, and vacation time; and  (e) all Sales & Use Taxes accrued through the Closing Date; (f) all Gift Card Liability; (g) all cure costs associated with Assumed Contracts and all obligations under such Assumed Contracts from and after the Closing Date. |
| **Excluded Liabilities** | The following liabilities are excluded from the Sale: Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities |
| **Transition Services** | To the extent necessary, the Debtors will allow Buyer to use various licenses for a reasonable time period, and Seller will use best efforts to facilitate the timely transfer of licenses to the Buyer. |
| **Due Diligence Condition** | There are no conditions with respect to completion of any due diligence by the Purchaser. |
| **Financing Condition** | There are no conditions with respect to obtaining financing to consummate the Sale. |
| **Closing Date** | The APA sets forth the conditions and terms for the Closing of the Sale, and the APA provides an outside Closing date of September 26, 2019. |

## B.    The Need to Sell the Purchased Assets.

16.    As more specifically set forth in the First Day Declaration, prior to the Petition Date, the Debtors explored multiple transaction alternatives, including the sale of all or some

portion of the Debtors' assets, the issuance of new debt or equity capital infusions, and the reorganization of the Debtors' operations.  After exploration of these alternatives and given the circumstances facing the Debtors, it was apparent that prospects for raising new debt or equity were unlikely.

17.    As a consequence of the termination of the Forbearance Agreement and after discussions with the Pre-Petition Agent and Pre-Petition Lenders regarding an agreeable path forward, the Debtors determined in consultation with their advisors that the value of the Debtors' estates is likely to be maximized and additional needed liquidity would only be available through the filing of these Chapter 11 Cases and proceeding with a prompt sale of their assets. Consequently, the Debtors are pursuing a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code.

18.    The Debtors' proposed timeline is to conduct the Auction and Sale Hearing during the week of September 16, 2019, with other related proposed dates, subject to Court availability and approval, as set forth below:

| Contemplated Date | Task/Event |
|---|---|
| Petition Date - July 7, 2019 | Filing of Combined Sale Procedures and Sale Motion |
| August 13, 2019 | Sale Procedures Objection Deadline |
| August 20, 2019 | Sale Procedures Hearing |
| August 23, 2019 | Mailing Deadline |
| September 12, 2019 | Sale Objection Deadline |
| September 12, 2019 | Contract Objection Deadlines |
| September 13, 2019 | Bid Deadline |
| September 17, 2019 | Auction |
| September 19, 2019 | Sale Hearing |
| September 26, 2019 | Closing Date |

19.    The Debtors believe that conducting a sale process for the Purchased Assets according to this timeline will produce a fair and robust auction and will provide their estates

with the best opportunity to maximize the value of the Purchased Assets. At the same time, the Debtors will continue to evaluate any other strategic alternatives that may be identified.

**C.      The Debtors' Marketing Efforts Thus Far**

20.      In May 2019, the Debtors engaged Configure Partners, LLC ("Configure") as their proposed investment banker to locate investors and to continue to market their assets for sale, to assist in the evaluation of strategic alternatives, including the sale of the Company, or other alternatives, such as the closure of additional restaurants.

21.      Configure prepared marketing materials intended for distribution to prospective buyers of the Debtors' assets including a teaser, confidential investment memorandum and the aggregation of key company documents located in an online data room for further diligence. In addition, Configure worked with the Debtors and the Pre-Petition Agent and Pre-Petition Lenders to develop a list of suitable potential buyers to be contacted on a discreet and confidential basis, after approval by the Debtors.

22.      As of the Petition Date, Configure and/or the Debtors contacted approximately 69 potential strategic buyers and 213 financial buyers, out of which 45 executed confidentiality agreements and received the confidential information memorandum and access to key documents in an online data room. To date, Debtors have received initial indications interest from multiple strategic and financial buyers.

23.      The Debtors are encouraged by the interest in a sale transaction from prospective third party buyers. The Debtors, however, have not yet finalized an initial or "stalking horse" agreement for their Purchased Assets. Consequently, the best option to obtain the highest and best offer for the Purchased Assets is pursuant to the Sale Procedures (hereafter defined). The Debtors remain optimistic that they will secure a stalking horse bidder before the proposed Sale

Procedures Hearing.  Accordingly, the Debtors have filed this Motion to ensure that the sale process for the Purchased Assets can be completed expeditiously, yet reserving the right to add a stalking horse bidder in the sale process in an effort to achieve maximum value for the Debtors' stakeholders.

24.     The Debtors are in the process of preparing a form asset purchase agreement (the "APA") which will be filed with the Court and provided to Potential Bidders (as defined below). Potential Bidders will be required to submit a revised APA to the Debtors (in both a clean version and a redlined version marked against the form APA to be filed with the Court) on or before the Bid Deadline (as defined below).  The Debtors will also entertain the possibility of entering into an agreement in the form of a revised APA (the "Stalking Horse Agreement") with a stalking horse purchaser (the "Stalking Horse Purchaser") prior to the Bid Procedures Hearing. As is customary, if the Debtors select a Stalking Horse Purchaser, the Debtors would likely seek approval of certain bid protections (the "Stalking Horse Bid Protections") (as may be agreed between the Debtors and the Stalking Horse Purchaser) including one or more of the following: break up fee, expense reimbursement, modifications or amendments to the Sale Procedures, or other limited bid protections.  Accordingly, the Debtors are reserving the right to request that the Court approve the Debtors' selection of a Stalking Horse Purchaser and approval of any Stalking Horse Bid Protections with appropriate notice thereof.

**Summary of Relief Requested**

25.     The Debtors seek, pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9008 and 9014 and Local Rule 6004-1, the Court's approval of: (a) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets

(collectively, the "Sale Procedures," attached as Annex 1 to the Sale Procedures Order); (b) the sale of the Purchased Assets free and clear of Claims (as defined below) to the Prevailing Bidder (as defined in the Sale Procedures); and (c) the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder.

26.      More specifically, through this Motion, the Debtors request that the Court enter two orders:

First, at a hearing (the "Sale Procedures Hearing"), the Debtors request entry of an order in substantially the form attached hereto as Exhibit A (the "Sale Procedures Order"), which, among other things:

(a)      schedules a hearing (the "Sale Hearing") on or about **September 19, 2019**, subject to the Court's calendar (or as soon as the Court is available) to consider approval of the sale of the Purchased Assets to the Prevailing Bidder (if any) (and subject to extension);

(b)      authorizes and approves (i) the Debtors' proposed procedures for the submission and consideration of bids for the Purchased Assets (the "Sale Procedures"), as set forth in Annex 1 attached to the proposed Sale Procedures Order and incorporated herein in its entirety by reference; and (ii) the form and manner of notice of these matters, including (A) notice of the Sale Hearing in the form attached as Annex 2 to the proposed Sale Procedures Order (the "Sale Notice") to be served on parties in interest, and (B) a one-time publication version of the Sale Notice (modified as necessary or appropriate for publication); and

(c)      authorizes and approves (i) the Debtors' proposed procedures for (A) the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder in connection with any proposed Purchased Assets acquisition transaction, and (B) curing defaults under these executory contracts and unexpired leases; and (ii) notice of the assumption and assignment of such executory contracts and unexpired leases and the proposed amounts necessary to cure defaults related thereto (the "Cure Costs") in the form attached as Annex 3 to the proposed Sale Procedures Order (the "Assignment Notice").

Second, upon conclusion of the Sale Hearing, the Debtors request the entry of an order or orders (the "Sale Order"), authorizing:

(a) the sale of the Purchased Assets free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), interests, and encumbrances, of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the

11

effectiveness of the transfer of the Purchased Assets to one or more Prevailing Bidders or to be excused from accepting performance by one or more Prevailing Bidders or performing for the benefit of a Prevailing Bidder under any executory contracts or unexpired leases assumed and assigned to a Prevailing Bidder and all rights at law or in equity (collectively, "Claims") in accordance with section 363(f) of the Bankruptcy Code other than any Claims expressly assumed by a Prevailing Bidder, with such Claims to attach to the net proceeds of the sale; and

(b) the assumption and assignment of certain executory contracts and unexpired leases intended to be acquired by the Prevailing Bidder as part of any Purchased Asset acquisition transaction.

## Proposed Notice, Bidding and Other Procedures

**A.    Notice Procedures**

27.    The Debtors request approval of the following notice procedures in connection

with the Auction and Sale:

(a)    Date, Time and Place of the Sale Hearing.  The Debtors propose that the Sale Hearing be held before the United States Bankruptcy Court for the District of Delaware, on or about **September 19, 2019** subject to the Court's calendar, or such other date and time that the Court may direct.  The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

(b)    Sale Notice.  Within two (2) business days after entry of the Sale Procedures Order (the "Mailing Deadline"), the Debtors will serve the Sale Notice by first-class mail, postage prepaid upon: (i) counsel to the DIP Agent; (ii) counsel to any official committees appointed in these Chapter 11 Cases; (iii) any party that expressed in writing to the Debtors or Configure an interest in acquiring the Purchased Assets or that Configure or the Debtors previously contacted or identified as potentially having an interest in acquiring the Purchased Assets; (iv) non-Debtor counterparties to all Potential Designated Contracts (as defined below); (v) all parties who are known to assert liens upon the Purchased Assets; (vi) the Internal Revenue Service and applicable state and local taxing authorities; (vii) the U.S. Trustee; and (viii) all entities that have requested notice in these Chapter 11 Cases under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

(c)    Deadline for Objection to Relief Sought in the Motion.  The Debtors propose that, to be timely and otherwise eligible for consideration by the Court, objections to the approval of the sale of Purchased Assets to one or more Prevailing Bidder – other than an objection to the proposed assumption and assignment of the Potential Designated Contracts or to any proposed Cure Costs including, but not limited to, the sale of the Purchased Assets free and clear of Claims pursuant to section 363(f) of the Bankruptcy Code for all parties in interest must: (i) be in writing; (ii) clearly specify the grounds for the objection; (iii) conform to the Bankruptcy Rules and the Local Rules; and (iv) be filed with the Court and served so as to be received by the following parties (collectively, the "Objection Notice Parties") by no later than

12

4:00 p.m. (ET) on April 18, 2019 (the "Sale Objection Deadline"):  the Debtors, Restaurants Unlimited, Inc., 411 1st Avenue S., Seattle, WA 98104, Attn: Jim Eschweiler, CEO and David Bagley, CRO; proposed counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn:  Domenic E. Pacitti and Michael W. Yurkewicz;  counsel to the DIP Agent and Pre-Petition Agent, Hunton Andrews Kurth LLP, Riverfront Plaza East Tower, 951 East Byrd Street, Richmond, VA 23219, Attn: Tyler P. Brown (tpbrown@huntonak.com) and Justin F. Paget (jpaget@huntonak.com); and Gellert Scali Busenkell & Brown, LLC, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801, Attn: Michael Busenkell (mbusenkell@gsbblaw.com); (d) counsel to any statutory committee appointed in these cases; counsel to NXT, Goldberg Kohn, Ltd., 55 East Monroe, Suite 3300, Chicago, Illinois 60603, Attn: Randall Klein (Randall.klein@goldbergkohn.com) and Prisca Kim (Prisca.kim@goldbergkohn.com); and (e) Office of The United States Trustee, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer (linda.richenderfer@usdoj.gov).

(d)     Information Provided to Interested Parties.  The Sale Notice provides that any party that wishes to obtain a copy of this Motion and the Sale Procedures Order, including all exhibits thereto, may make such a request by sending a written request to counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn:  Domenic E. Pacitti and Michael W. Yurkewicz.  All parties that have expressed, or may express, an interest in purchasing the Purchased Assets or who the Debtors believe may have an interest in purchasing the Purchased Assets, may obtain access to certain due diligence materials, subject to satisfying the conditions required to become a Qualified Bidder set forth in the Sale Procedures.

**B.     Proposed Sale Procedures**

28.     The Debtors believe the proposed Sale Procedures will maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors and other interested parties.  The Sale Procedures contemplate an auction process pursuant to which bids for the Purchased Assets will be subject to higher or otherwise better offers.   The Sale Procedures primarily benefit the Debtors by creating a bidding process that ensures, among other things: (a) structure and logistical certainty; (b) the Debtors' ability to compare the relative values of competing offers, if any; (c) that potential purchasers have the financial wherewithal to timely consummate a purchase of the Purchased Assets; and (d) meaningful bidding increments.

29.     The Sale Procedures are set forth in detail in Annex 1 to the Sale Procedures Order.  The Sale Procedures describe, among other things, the requirements for prospective

13

purchasers to participate in the bidding process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a bid, the method and criteria for bids to become "qualified," the manner in which qualified bids will be negotiated, clarified and improved, and the criteria for selecting one or more Prevailing Bidders, including if necessary, through a public auction.

30.     As described below and more fully in the Sale Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auction. Specifically, consistent with Local Rule 6004-1(c), set forth below is a summary of such Sale Procedures, which summary is qualified in its entirety by the Sale Procedures[4]:

**Participation Requirements and Due Diligence**

(a)     In order to participate in the bidding process, the Auction, or otherwise be considered for any purpose hereunder, a person interested in purchasing the Purchased Assets (a "Potential Bidder") must first deliver the following materials to the Debtors and their counsel:

(i)     An executed confidentiality agreement in form and substance satisfactory to the Debtors and their counsel (the "Confidentiality Agreement"). Without limiting the foregoing sentence, the Confidentiality Agreement will provide that all non-public information about the Debtors received by a Potential Bidder, or if the bidder is qualified, a Qualified Bidder (as defined below), will be kept strictly confidential and used only in connection with analyzing a transaction for the Purchased Assets.

(ii)     Written evidence that enables the Debtors and their advisors to determine, in their sole discretion, in consultation with the DIP Agent and the Pre-Petition Agent, whether a Potential Bidder has the financial and other ability to close the contemplated sale transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in connection therewith.

(iii)     The advisors to the Debtors shall provide these Sale Procedures, together with a copy of the form Asset Purchase Agreement (the "APA") to be filed separately with the Court, to each Potential Bidder. All Potential Bidders, whether deemed Qualified Bidders (as defined below) or not, consent to the jurisdiction of the Bankruptcy

---

[4]     This summary is provided in accordance with Local Rule 6004-1(c)(i) and is qualified in its entirety by reference to the provisions of the Sale Procedures. Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Sale Procedures. To the extent there exists any inconsistency between this summary and the provisions of the Sale Procedures, the provisions of the Sale Procedures shall control.

Court to determine matters concerning the sale, their Bid and otherwise with respect to the process and waive any right to any other venue.

(b)     Any Potential Bidder wishing to conduct due diligence concerning a prospective acquisition transaction of the Purchased Assets shall be granted access to all relevant information regarding the Purchased Assets and the related business of each of the Debtors reasonably necessary to enable a Potential Bidder to evaluate the Purchased Assets and the prospective transaction.  The Debtors shall make such access available to Potential Bidders during normal business hours as soon as reasonably practicable following execution of the Confidentiality Agreement.  Potential Bidders interested in conducting due diligence should contact Configure Partners LLC, 450 Lexington Ave., New York, NY 10017, Attn: Vin Batra (vbatra@configurepartners.com).  Notwithstanding the foregoing, the debtors and their advisors are not required to provide confidential or proprietary information to any person if the Debtors, in consultation with the DIP Agent and the Pre-Petition Agent and their advisors, believe that such disclosure would be detrimental to the interests of the Debtors' estates.  All due diligence must be completed before the Bid Deadline (as defined below).  No condition(s) allowing or regarding further due diligence will be accepted or authorized after the Bid Deadline.  Potential Bidders are required to exercise their own discretion before relying on any information regarding the Purchased Assets provided by the Debtors.  Neither the Debtors nor their representatives (nor DIP Agent, the Pre-Petition Agent nor their representatives) are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto.

(c)     The Debtors and their advisors, in consultation with DIP Agent and the Pre-Petition Agent, shall: (i) receive and evaluate any Bids from Potential Bidders; (ii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid (as defined below); and (iii) take any other actions contemplated under these Sale Procedures.

**Submission of Bids**

(d)     Any Potential Bidder interested in purchasing the Purchased Assets must submit a Bid prior to **4:00 p.m. prevailing Eastern time on September [●], 2019** (the "Bid Deadline"). The Debtors may extend the Bid Deadline, and shall promptly notify all Potential Bidders of any such extension.  In order for such Bid to be considered, however, it must be a "Qualified Bid." The Debtors and their advisors, in consultation with the DIP Agent and the Pre-Petition Agent, will determine if a Bid is a Qualified Bid based on the requirements herein.  A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtors and their advisors, in their sole discretion, in consultation with counsel to the DIP Agent, the Pre-Petition Agent, the Required Lenders and counsel to any official committee appointed in these Chapter 11 Cases, determine that such Potential Bidder submitted either a Qualified Aggregate Bid or a Qualified Partial Bid.

(e)     A Bid will be considered a "Qualified Aggregate Bid" only if the Bid is for the sale of all or substantially all of the Purchased Assets and fulfills the following requirements prior to the Bid Deadline (capitalized terms used in this section are defined later in the Sale Procedures):

15

(i)      Provides that the Qualified Bidder's Bid shall remain open and irrevocable until the earlier of (X) thirty (30) days following the date of entry of a Sale Order; (Y) the date of the closing of the sale of the Purchased Assets pursuant to the Sale Order; or (Z) such date as the Debtors affirm in writing that they do not intend to pursue a sale transaction based on such Qualified Bidder's Bid (the "Bid Expiration Date");

(ii)     Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

(iii)    Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the proposed transaction, in each case acceptable to the Debtors in their sole discretion, in consultation with the DIP Agent and the Pre-Petition Agent;

(iv)     Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the APA, or a representation that no such authorization or approval is required;

(v)      Provides that the purchase price will be paid in cash, cash equivalents, assumption of debt, or such other consideration acceptable to the Debtors, in consultation with the DIP Agent and the Pre-Petition Agent;

(vi)     Provides by wire transfer of immediately available funds to the Debtors or an appropriate escrow agent before the Bid Deadline of an earnest money deposit equal to the greater of (X) 10% of the dollar amount of the purchase price of such Bid; or (Y) 10% of the value otherwise ascribed to such Bid (the "Deposit"), provided, however, that Pre-Petition Agent and DIP Agent or its designee shall not be required to submit a Deposit in connection with the submission of a Bid or the exercise of its credit bid rights;

(vii)    Provides evidence satisfactory to the Debtors, in consultation with the DIP Agent and the Pre-Petition Agent, that the Qualified Bidder is reasonably likely to obtain prompt regulatory approval and any other consents, licenses, or permits, if any is required, to purchase the Purchased Assets;

(viii)   Is submitted in a writing in the form of the APA with any proposed changes to the APA set forth in an electronic form both clean and marked to reflect such changes signed by the Qualified Bidder, that:

(1)      Identifies the Qualified Bidder and any members of its investor group, if applicable;

(2)      Is not subject to conditions, representations or terms that the Debtors determine, in consultation with the DIP Agent and the Pre-Petition Agent, to be unacceptable;

16

(3)      Specifies the consideration allotted to each Purchased Asset, or class of Purchased Assets, as applicable, such Qualified Bidder proposes to purchase pursuant to the APA;

(4)      Is not conditioned upon the Bankruptcy Court's approval of any Bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment; provided, however, the Debtors may accept an Initial Highest Bid (as defined below) with such bid protections to the extent authorized by the Court according to the procedure outlined below;

(5)      Does not contain any financing or due diligence contingencies to closing of the proposed transaction;

(6)      Does not contain any condition to closing of the transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval);

(7)      Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets and the proposed transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Purchased Assets in making its Bid or that of any of its legal, financial or other advisors, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors or the Purchased Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the APA ultimately accepted and executed by the Debtors;

(8)      Identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the Debtors to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code) along with the Bid; and

(ix)      Contains other information reasonably requested by the Debtors.

(f)      A "Qualified Partial Bid" for less than substantially all of the Purchased Assets will be considered for the Auction, and Qualified Bidders submitting Qualified Partial Bids shall be allowed to participate in the Auction only if the Qualified Partial Bid, or the Qualified Partial Bid when combined with other additional non-overlapping Qualified Partial Bids, if accepted and executed without modification, would yield individual asset sales amounting to a Qualified Aggregate Bid or would otherwise exceed the value of or be considered a better offer than any Qualified Aggregate Bid after considering, among other things, the Bid Assessment Criteria (as defined below).  Bids that offer to purchase only a portion of the Debtors' business market may, at the discretion of the Debtors after consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, not be

17

considered Qualified Partial Bids.  The Debtors in their sole discretion, in consultation with the DIP Agent and the Pre-Petition Agent shall determine which non-overlapping Qualified Partial Bids to include in determining whether they amount to a Qualified Aggregate Bid and shall assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Bids against all other Qualified Bids.  To constitute a Qualified Partial Bid, a Bid must fulfill the following requirements prior to the Bid Deadline:

> (i)      Fulfills each of the requirements set forth in paragraphs (e)(i) through and including (e)(ix) above;

> (ii)     Conspicuously states that the Qualified Bidder offers to purchase a portion of the Purchased Assets, which assets shall be described in detail; and

> (iii)    Fully discloses the identity of each entity participating in connection with such Bid, and the complete terms of any such participation.

(g)      A Qualified Bidder that desires to make a Bid must deliver written electronic copies of its Bid prior to the Bid Deadline to the following representatives of the Debtors: Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn:  Domenic E. Pacitti and Michael W. Yurkewicz.  The Debtors shall deliver copies of any such Bids to counsel to the DIP Agent, the Pre-Petition Agent, the Required Lenders and to any official committee appointed in these Chapter 11 Cases.

(h)      Persons who collectively are referred to as a "Qualified Bidder" need not be affiliated persons and need not act in concert with one another and the Debtors may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, however, all bidders shall remain subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

(i)      After the Bid Deadline, the Debtors, in consultation with the DIP Agent and the Pre-Petition Agent, shall determine which Qualified Aggregate Bid or group of Qualified Partial Bids represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder").  Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid or a Qualified Partial Bid will be advised of such Initial Highest Bid and the Debtors may, at its discretion:  (a) distribute copies of other Qualified Aggregate Bids or Qualified Partial Bids to other Qualified Bidders prior to or during the Auction; or (b) proceed with the open or sealed bidding process set forth in the Sale Procedures Order to the extent authorized therein.

## Due Diligence From Potential Bidders or Qualified Bidders

(j)      Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Purchased Assets.  Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtors to determine that a Potential Bidder is not a Qualified Bidder.  Similarly, each Qualified Bidder shall comply with all reasonable requests

for additional information by the Debtors or their advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Purchased Assets as the Auction progresses.  Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtors to determine that the Qualified Bidder may no longer participate in the Auction.

### *"As Is, Where Is"*

(k)      The sale of the Purchased Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates or any other party, except to the extent set forth in the APA between the Debtors and the Prevailing Bidder.  Except as otherwise provided in the Prevailing Bidder's APA, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Claims") pursuant to section 363(f) of the Bankruptcy Code, such Claims to attach to the net proceeds of the sale of the Purchased Assets, with the same validity and priority as existed immediately prior to such sale.

### Later Award of Break-Up Fee and Expense Reimbursement on Shortened Notice

(l)      Subject to the consent of the DIP Agent and the Pre-Petition Agent, the Debtors may seek authority prior to the Sale Procedures Hearing to enter into a Stalking Horse Agreement with a Stalking Horse Purchaser who agrees to provide a Qualified Aggregate Bid for substantially all of the Purchased Assets that will serve as a "stalking horse" bid at the Auction and offer to such Stalking Horse Purchaser, as an actual and necessary cost and expense of preserving the value of the Debtors' estates, (i) a break-up fee in an amount not to exceed 3% of the total guaranteed cash price contained in its Initial Highest Bid (the "Break-Up Fee") and (ii) expense reimbursement of actual documented out of pocket expenses up to an agreed cap (the "Expense Reimbursement").    Any agreement to provide a Break-Up Fee and Expense Reimbursement shall be (a) approved by the Court by separate order and (b) expressly conditioned on the consummation of a sale of the Purchased Assets to a Prevailing Bidder who made a cash Bid.  The Break-Up Fee and Expense Reimbursement, if any is approved, shall be an administrative expense claim against the Debtors' estates pursuant to section 503(b) of the Bankruptcy Code; provided, however, in the event that the Debtors agree to a Break-Up Fee and Expense Reimbursement, which is approved by the Court, and (i) the Prevailing Bidder is a result of such Bidder's exercise of any credit bid right, or (ii) a sale of the Purchased Assets does not close for any reason on or before ten (10) days after entry of the Sale Order, the Break-Up Fee and Expense Reimbursement will not be paid by the Debtors, their estates, or any other person or party, and no administrative obligation will be created, and any agreement by the Debtors to pay a Break-Up Fee and Expense Reimbursement and the Court's order approving such Break-Up Fee and Expense Reimbursement will provide and acknowledge the same.  If the Debtors designate a Stalking Horse Purchaser and obtain the Court's approval of a Break-Up Fee, and Expense Reimbursement the Debtors shall provide notice of the order approving same prior to the Bid Deadline to any other party that expressed an interest in acquiring the Purchased Assets in writing to the Debtors.

**The Auction**

(m)    If more than one Qualified Bid has been submitted for the Purchased Assets in accordance with these Sale Procedures, the Debtors will conduct the Auction on **September [●], 2019, at 10:00 a.m., prevailing Eastern time**, with respect to such Qualified Bids in order to determine the highest and best Bid (the "Prevailing Bid") to submit for approval by the Bankruptcy Court at the Sale Hearing (as defined below).  The Auction shall be organized and conducted by the Debtors at the Philadelphia offices of their counsel, Klehr Harrison Harvey Branzburg LLP, or such other location as may be announced prior to the Auction to all Qualified Bidders, the DIP Agent, the Pre-Petition Agent, the Required Lenders and the U.S. Trustee and any official committee appointed in these Chapter 11 Cases.

(n)    The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by the Debtors, the Debtors' advisors, the DIP Agent, the Pre-Petition Agent, the Required Lenders and their advisors, and any duly appointed official committee, and their respective counsel, financial advisors, and/or other authorized representatives.  All creditors of the Debtors' estates shall be permitted to attend; *provided*, *however*, that in order to attend the Auction, a creditor must advise the Debtors in writing no later than 48 hours prior to the Auction, provided, further, however, that the Debtors may seek relief from the Bankruptcy Court in the event that they object to such creditor's attendance.

(o)    The Debtors are authorized to conduct the Auction in accordance with such procedures and requirements as may be established at the discretion of the Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, which rules may include the determination of the amount of time between Qualified Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open or sealed bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

(p)    The Qualified Bid that is deemed the Initial Highest Bid, determined as set forth above, shall be the first Qualified Bid to begin the Auction.  The next Qualified Bid at the Auction shall be an amount equal to or greater than the Initial Highest Bid *plus* if the Stalking Horse Bid is the Initial Highest Bid, the amount of the approved Breakup Fee and Expense Reimbursement (if any) *plus* the Minimum Bid Increment (as defined below).  Thereafter, the Auction will continue in the manner determined by the Debtors above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, although received from a Qualified Bidder that made a Qualified Bid prior to the Bid Deadline, need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in increments greater than the prior Qualified Bid *plus* $250,000.00 or such other increment as determined by the Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, and announced at the start of or during the Auction (the "Minimum Bid Increment").  In the event the Debtors in their sole discretion, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases,

determine that the Auction has failed to result in sufficient consideration for the Purchased Assets, the Debtors reserve the right to terminate the Auction without further notice except to those parties that are present at the Auction.

(q)    In the case of a Qualified Bid based upon Qualified Partial Bids, such Qualified Bid may be altered or re-submitted in the sole discretion of the Qualified Bidders, provided that such Bid remains a Qualified Partial Bid in accordance with the requirements set forth in paragraph (f) above.  A Qualified Partial Bid will be considered for any given round of the Auction only if such Bid individually or in combination with other Qualified Partial Bids yields a Qualified Aggregate Bid (individually, a "Qualified Partial Overbid" and collectively, a "Qualified Aggregate Overbid"), provided that the Qualified Aggregate Overbid must, considered as a whole, meet all the requirements of paragraph (e) above.  The Debtors shall, in their sole discretion and in consultation with the DIP Agent, the Pre-Petition Agent. The Required Lenders  and any official committee appointed in these Chapter 11 Cases, determine which Qualified Partial Overbids to include in the Qualified Aggregate Overbid, and shall, in each round of the Auction, as necessary, assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Overbid as against all other Qualified Bids received in that round of the Auction.

(r)    The Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, shall determine, in their sole discretion and subject to final determination by the Bankruptcy Court, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

(s)    At the conclusion of the Auction: (i) the Debtors shall, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, select (X) the Prevailing Bid(s) and (Y) the second highest or best offer for the Purchased Assets (the "Back-Up Bid"); (ii) the Debtors shall notify the Prevailing Bidder that such person's offer has been determined by the Debtors to be the Prevailing Bid and will be contingent only on Bankruptcy Court approval, and shall notify the person that made the Back-Up Bid (the "Back-Up Bidder") that such person's offer has been determined by the Debtors to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid to close as set forth below and Bankruptcy Court approval; and (iii) the Debtors shall file a notice with the Bankruptcy Court announcing the Prevailing Bidder or Bidders.  Prior to the commencement of the Sale Hearing, the Prevailing Bidder or Bidders shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder or Bidders to all of the terms and conditions contemplated by the Prevailing Bid.

(t)    In making the determination of which Qualified Bid(s) constitutes the Prevailing Bid(s), the Debtors may, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, including, but not limited to: (a) the number, type, and nature of any changes to the APA requested by the Qualified Bidder, including the type and amount of the Purchased Assets sought and the liabilities of the Debtors to be assumed in the Bid; (b) the amount and nature of the total consideration, including the extent of assumed liabilities; (c) the

likelihood of the Bidder's ability to close a transaction, the conditions thereto, and the timing thereof, including whether the Bidder has or can obtain all necessary consents, licenses, permits, or other regulatory approvals to operate the Purchased Assets sought in the Bid; (d) any excluded assets, executory contracts, or unexpired leases; (e) any purchase price adjustments; (f) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid; (g) whether the Bid is a bulk bid or a partial bid for only some of the Purchased Assets; and (h) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").[5]

(u)　　The Deposit of the Prevailing Bidder or the Back-Up Bidder, as the case may be, shall be applied by the Debtors against the purchase price to be paid by the Prevailing Bidder or the Back-Up Bidder, as applicable, at the closing of the relevant transaction approved by the Bankruptcy Court.  The Prevailing Bidder's Deposit shall be held by the Debtors and forfeited to the Debtors if the Prevailing Bidder breaches its obligations to close under the APA in accordance with the Prevailing Bid and such forfeited Deposit shall constitute collateral of the DIP Agent and Pre-Petition Agent, and be subject to the debtor-in-possession financing orders.

(v)　　The Debtors shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtors' acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

**Back-Up Bidder**

(w)　　If for any reason the Prevailing Bidder fails to consummate the acquisition of the Purchased Assets in accordance with the Prevailing Bid, and in any event no later than ten (10) days from the entry of the Sale Order, the Debtors are authorized to proceed with the sale of the applicable Purchased Assets to the Back-Up Bidder in accordance with the Back-Up Bid without further order of the Bankruptcy Court.  If for any reason the Back-Up Bidder fails to consummate the acquisition of the Purchased Assets in accordance with the Back-Up Bid, the Back-Up Bidder's Deposit shall be forfeited to the Debtors and such forfeited Deposit shall constitute collateral of the DIP Agent and Pre-Petition Agent, and be subject to the debtor-in-possession financing orders.

**Deposit**

(x)　　No later than the Bid Expiration Date, the Debtors shall return to each Qualified Bidder(s), other than the Prevailing Bidder and the Back-Up Bidder, their respective Deposit(s). No later than the seventh (7th) business day after the closing of the sale of the Purchased Assets to the Prevailing Bidder, the Debtors shall return the Back-Up Bidder's Deposit to the Back-Up Bidder.

---

[5]　　The Bid Assessment Criteria listed herein are not mandatory, not exhaustive, and are provided for illustrative purposes only.  The Debtors, in their sole discretion in the exercise of their business judgment and in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, may consider any criteria that the Debtors consider reasonably relevant to the value of any Qualified Bid.

22

**Modifications**

(y)     The Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, may (a) extend the deadlines set forth in the Sale Procedures Order or the Sale Procedures, (b) waive any requirement for a Bid to be a Qualified Bid or to be the Prevailing Bid, including, but not limited to, designating one or more Qualified Partial Bids for less than substantially all the Purchased Assets as the Prevailing Bid or Prevailing Bids, (c) determine not to sell Purchased Assets pursuant to these Sale Procedures, and/or (d) adopt, implement, and/or waive such other, additional or existing procedures or requirements that in their discretion serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend the Auction or participate in the Auction, as appropriate.

(z)     The Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, may (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of the Sale Order approving the Prevailing Bid, any Bid that, in the discretion of the Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Sale Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors.  At or before the conclusion of the Auction, the Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in this case.

**Right to Credit Bid**

(aa)     The Pre-Petition Agent and the DIP Agent, or either of them, or their designees, shall be entitled to credit bid all or a portion of the outstanding obligations under the Prepetition Credit Agreement or the DIP Agreement in accordance with section 363(k) of the Bankruptcy Code and as directed by the Pre-Petition Lenders and DIP Lenders, as applicable, pursuant to the DIP Agreement.  The Pre-Petition Agent and the DIP Agent, or their designees, each shall be deemed to be a Qualified Bidder for all purposes hereunder, and any Bid timely submitted by the Pre-Petition Agent and/or the DIP Agent shall be deemed to be a Qualified Bid for all purposes hereunder, regardless of whether such Bid is submitted by the Bid Deadline.

31.     Unless otherwise determined by the Debtors, after consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, the Debtors will consider proposals for the acquisition of all of the

Purchased Assets in a single sale to a single Qualified Bidder or in multiple sales to multiple Qualified Bidders.

32.     The Debtors reserve the right to modify the Sale Procedures as necessary, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtors, in consultation with the DIP Agent, the Pre-Petition Lenders, the Required Lenders and any official committee appointed in these Chapter 11 Cases, as they deem appropriate to maximize value for the Debtors' estates and creditors.  In addition, the Debtors reserve their right, after consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, to withdraw any or all Purchased Assets from the sale at any time prior to the Court's approval of such sale.

33.     The Debtors will present the results of the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted and the Prevailing Bidder (or Bidders) was properly selected in accordance with these Sale Procedures; (b) the Auction was fair in substance and procedure; and (c) consummation of the Purchased Asset sale by the Prevailing Bidder will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Debtors, their estates and creditors.

34.     The Debtors believe that the Sale Procedures are fair and reasonable, and are not likely to dissuade any serious potential purchaser from bidding for the Purchased Assets.

C.     **Authority to Enter into Stalking Horse Agreement and Proposed Stalking Horse Bid Protections**

35.     The Debtors believe that seeking the relief requested herein without first entering into a "stalking horse" agreement is warranted and necessary.  However, to the extent that the Debtors determine, in their reasonable business judgment and after consultation with the DIP

24

Agent and the Pre-Petition Agent to enter into an agreement with a Stalking Horse Purchaser, it may be appropriate to provide the Stalking Horse Purchaser with certain Stalking Horse Bid Protections, including an expense reimbursement and break up fee. The Debtors are, however, continuing their discussions with potential purchasers, and as set forth above, and subject to the consent of the Pre-Petition Agent and the DIP Agent, reserve the right to enter into a stalking horse agreement to serve as the Initial Highest Bid (and/or to seek approval of a Break-Up Fee) if the Debtors believe that such an agreement will further the purposes of the Auction, by among other things, enticing value maximizing bids.

36.     Accordingly, the Debtors request authority, in the exercise of their sound business judgment, and subject to the consent of the DIP Agent and the Pre-Petition Agent, to reserve the right to seek the Court's later approval, of an Expense Reimbursement and a Break-Up Fee in an amount not to exceed 3% of the total guaranteed cash price offered by a Qualified Bidder who agrees to provide a Qualified Bid for the Purchased Assets that will serve as Stalking Horse Purchaser at the Auction. Any agreement to provide a Break-Up Fee and Expense Reimbursement would be expressly conditioned on the Court's approval of it at the Sale Procedures Hearing and consummation of a sale of the Purchased Assets to a Prevailing Bidder who made a cash Bid. The Break-Up Fee and Expense Reimbursement, if any is approved, will be an administrative expense claim against the Debtors' estates under section 503(b) of the Bankruptcy Code; provided, however, in the event that the Debtors agree to a Break-Up Fee and Expense Reimbursement that is approved by the Court, and (a) the Prevailing Bidder is a result of such bidder's exercise of any credit bid right, or (b) a sale of the property does not close for any reason on or before ten (10) days after entry of the Sale Order, the Break-Up Fee and Expense Reimbursement will not be paid by the Debtors, their estates, or any other person or

party, and no administrative obligation will be created, and any agreement by the Debtors to pay a Break-Up Fee and Expense Reimbursement and the Court's order approving any such Break-Up Fee and Expense Reimbursement will provide and acknowledge the same.

37.     Any Qualified Bidder that might be selected as the Stalking Horse Purchaser will have expended considerable time, money and energy pursuing the transaction and will have engaged in extended and lengthy good faith negotiations.   In particular, the Stalking Horse Purchaser would have taken part in an extensive process undertaken by the Debtors and their professionals to identify and negotiate a transaction that the Debtors believe to be the highest or best proposal for an acquisition of the Purchased Assets in order to maximize the value realized for the benefit of the Debtors' estates and their creditors.   Accordingly, the Debtors may not be able to find a Stalking Horse Purchaser willing to serve as a stalking horse without having the flexibility to offer a Break-Up Fee and Expense Reimbursement and obtain the Court's approval of it on shortened notice.

**D.     Proposed Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases**

38.     In accordance with Bankruptcy Rule 6006(c), the Debtors must also provide notice of: (a) the potential assumption and assignment of executory contracts and unexpired leases and rights thereunder; (b) the proposed maximum Cure Costs that the Prevailing Bidder may pay to cure all defaults, if any, under executory contracts and unexpired leases and rights thereunder that the Debtors propose to assume and assign; and (c) the deadline to file objections to such assumption and assignment, maximum Cure Costs, the existence of any defaults, and/or adequate assurance of the future performance.

39.    The Debtors propose the following procedures (the "Contract Procedures") to govern the assumption and assignment of the Potential Designated Contracts in connection with the sale of the Purchased Assets:[6]

(a)    By the Mailing Deadline, which is two (2) business days after entry of the Sale Procedures Order, the Debtors shall file with this Court and shall serve an Assignment Notice by overnight delivery service on each non-debtor counterparty to an executory contract or unexpired lease with any of the Debtors (each a "Non-Debtor Counterparty") that may be assumed and assigned to the Prevailing Bidder (the "Potential Designated Contracts").  The Debtors shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to the Potential Designated Contracts and the proposed corresponding Cure Costs under the Potential Designated Contracts as of the Petition Date.

(b)    At any time prior to the closing of any sale transaction for the Purchased Assets, the Prevailing Bidder may direct the Debtors to serve a notice excluding any of the Potential Designated Contracts on (i) the Non-Debtor Counterparty to such Potential Designated Contracts and (ii) all Objection Notice Parties other than the Debtors, indicating, by reasonably specific information, which Potential Designated Contracts have been excluded, and stating that the Prevailing Bidder has excluded such Potential Designated Contracts.  Upon consummation of the sale with the Prevailing Bidder and service of such notice, the executory contracts and/or unexpired leases referenced in such notice (x) shall no longer be considered Potential Designated Contracts; (y) shall not be deemed to be, or to have been, assumed or assigned; and (z) shall remain subject to assumption, rejection or assignment by the Debtors.

(c)    For each Potential Designated Contract, on the Assignment Notice, the Debtors shall indicate the proposed Cure Costs relating to such Potential Designated Contract.  The Assignment Notice also may identify any additional terms or conditions of assumption and assignment.

(d)    Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the Potential Designated Contracts, excluding objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received no later than thirty (30) days after the Mailing Deadline (the "Cure/Assignment Objection Deadline").  The Non-Debtor Counterparties shall have until the Sale Hearing to submit an objection to the Debtors' ability to assign the Potential Designated Contract to the Prevailing Bidder without the Non-Debtor Counterparty's consent or to the adequate assurance of future performance to be provided (the "Adequate Assurance Objection Deadline," and together with the Cure/Assignment Objection Deadline, the "Contract Objection Deadlines").

---

[6]    If requested by the Prevailing Bidder, these Contract Procedures may be modified if necessary by further order of this Court after expedited notice and a hearing.

(e)     Where a Non-Debtor Counterparty to a Potential Designated Contract files an objection meeting the requirements of subparagraph (d), objecting to the assumption by the Debtors and assignment to the Prevailing Bidder of such Potential Designated Contract (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtors and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtors and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Court at the Sale Hearing, unless the Debtors, the Prevailing Bidder and the Non-Debtor Counterparty to the Potential Designated Contract in dispute agree otherwise or the Court orders otherwise.  If the Court determines at the Sale Hearing that the Potential Designated Contract will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered a Potential Designated Contract.  If any objection related to a Disputed Designation or Disputed Cure Costs is continued beyond the Sale Hearing, the Prevailing Bidder shall escrow the portion of the Cure Costs that is disputed pending such resolution.

(f)     Any Non-Debtor Counterparty to a Potential Designated Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Potential Designated Contract by the Contract Objection Deadlines, as applicable, is deemed to have consented to such Cure Costs and the assumption and assignment of such Potential Designated Contract by the Debtor and to the Prevailing Bidder, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates or the Prevailing Bidder.

(g)     If the Non-Debtor Counterparty to a Potential Designated Contract fails to timely object to the assumption and assignment of a Potential Designated Contract or the proposed Cure Cost relating thereto by the Contract Objection Deadlines, as applicable, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Potential Designated Contract shall be deemed to be assumed by the Debtors and assigned to the Prevailing Bidder and the proposed Cure Cost related to such Potential Designated Contract shall be established and approved in all respects, subject to the conditions set forth in subparagraph (h) below.

(h)     The Debtors' decision to assume and assign the Potential Designated Contract is subject to Court approval and consummation of a Purchased Asset sale transaction with a Prevailing Bidder.  Accordingly, subject to the satisfaction of conditions in subparagraph (g) above, the Debtors shall be deemed to have assumed and assigned each of the Potential Designated Contracts as of the date of and effective only upon the closing date of a Purchased Asset sale transaction with a Prevailing Bidder, and absent such closing, each of the Potential Designated Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.  Also, assumption and assignment of the Potential Designated Contracts is subject to the Prevailing Bidder's right set forth in subparagraph (b) above (and inclusion of any document on the list of Potential Designated Contracts shall not constitute or be deemed to be a determination or admission by the Debtors or the Prevailing Bidder that such document is, in fact, an executory

28

contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved).  The Prevailing Bidder shall have no rights in and to a particular Potential Designated Contract until such time as the particular Potential Designated Contract is assumed and assigned in accordance with the procedures set forth herein.

(i)    Except as may otherwise be agreed to in an APA with a Prevailing Bidder or by the parties to a Potential Designated Contract, the defaults under the Potential Designated Contract that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: without any reduction of or credit against the amount of the Prevailing Bid, the Purchaser shall pay all Cure Costs relating to an assumed executory contract or unexpired lease within ten days after the later of (i) the closing date specified in the APA entered into with a Prevailing Bidder or (ii) the date on which such executory contract or unexpired lease is deemed assumed and assigned, in accordance with subparagraph (h) of these Contract Procedures.

### Basis For Relief

**A.    Approval of the Sale Procedures Is Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors**

*(1)    The Sale Procedures Are Appropriate under the Circumstances*

40.    Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property.  In the hope of maximizing the value received by the estate, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process.  *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

41.    Although the Debtors commenced efforts to market the Purchased Assets for sale prior to the Petition Date, a stalking horse bid has not yet been finalized.  Notwithstanding that, the Debtors believe that the Sale Procedures will help the Debtors receive the maximum value for the Purchased Assets by establishing a competitive bidding process in which potentially

29

interested parties can step forward and bid, knowing, among other things, the quality of the title they will receive if they are the Prevailing Bidder.  The Debtors believe that the Sale Procedures will encourage active bidding from seriously interested parties who possess the financial and operational capacity to purchase and/or operate the Purchased Assets.  Furthermore, the proposed Sale Procedures will allow the Debtors to conduct an auction in a controlled, fair and competitive fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the Purchased Assets.  Therefore, the Debtors believe the Sale Procedures will confirm that they are receiving the greatest possible consideration for the Purchased Assets.

42.    Procedures to dispose of assets, similar to the proposed Sale Procedures, have been approved in other large, complex chapter 11 cases in this District.  *See e.g. In re Things Remembered Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019);  *In re Argos Therapeutics Inc.*, No. 18-12714 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings Inc.*, No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *GAL Liquidating Corp.*, No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017); *Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res., Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015).  In sum, the Debtors believe that the proposed Sale Procedures provide an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for the Purchased Assets.  Accordingly, the proposed Sale Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

*(2)    The Overbid Protections Are Appropriate Under the Circumstances*

43.    The Minimum Bid Increment is appropriate under the circumstances and will enable the Debtors to simultaneously maximize the value for the Purchased Assets while limiting the chilling effect in the marketing process.  This provision also is consistent with the overbid

30

increments previously approved by courts in this District. *See e.g. In re Things Remembered Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019); *In re Argos Therapeutics Inc.*, No. 18-12714 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings Inc.*, No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *GAL Liquidating Corp.*, No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017); *Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res., Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015).

       *(3)    The Break-Up Fee and Expense Reimbursement, if Approved by the Court,  Is an Actual and Necessary Cost of Preserving the Debtors' Estate*

44.      The Debtors, subject to the consent of the DIP Agent and the Pre-Petition Agent, reserve the right to seek the Court's approval, upon no less than three (3) days' notice to certain parties in interest, of a Qualified Bidder to serve as a Stalking Horse Purchaser at any time after entry of the Sale Procedures Order and to offer that bidder a Break-Up Fee and Expense Reimbursement.  While such procedures are, admittedly, not always found in "naked" auctions, the Debtors believe that, in this case, such relief may be warranted to ensure the Debtors' ability to take advantage of a potentially value maximizing initial bid.

45.      Break-up fees and expense reimbursements are a vital means by which a debtor-in-possession can manage value maximization risk by setting a value floor for the assets to be sold, which is a key benefit to the Debtors and their estates and weighs heavily in favor of approving the procedures for later offering the Break-Up Fee and Expense Reimbursement. Moreover, without the ability to later offer the Break-Up Fee and Expense Reimbursement upon shortened notice, the sale and reorganization process might be substantially hampered.  Such fees encourage the investment of time, effort and money necessary to consummate a sale of the Purchased Assets, despite the possibility that the Initial Highest Bidder may not ultimately

effectuate the Transaction.  A break-up fee and expense reimbursement is an important tool to be used to encourage bidding.

46.    The ability of the Debtors to later offer and obtain approval of the Break-Up Fee and Expense Reimbursement provides the incentive required to induce a Qualified Bidder to become the Stalking Horse Purchaser or increase its bid prior to the Auction.  To the extent bids can be improved prior to the Auction, a higher floor is established for further bidding.  Thus, even if the Stalking Horse Purchaser is granted the Break-Up Fee and Expense Reimbursement and ultimately is not the Prevailing Bidder, the Debtors and their estates will have benefited from the higher floor established by the improved bids.  The Debtors submit that the proposed procedures for later awarding the Break-Up Fee and Expense Reimbursement will not chill bidding – instead, it will only be offered if the Debtors receive a Bid that is worthy of such protection.

47.    Thus, the Debtors submit that the Break-Up Fee and Expense Reimbursement, to the extent offered by the Debtors, consented to by the DIP Agent and the Pre-Petition Agent and approved by the Court would be: (a) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (b) commensurate to the real and substantial benefit conferred on the Debtors' estates by the Stalking Horse Purchaser, and (c)  reasonable and appropriate in light of, among other things (i) the size and nature of the Purchased Asset sale contemplated and comparable transactions, (ii) the substantial efforts that will need to be expended by the Stalking Horse Purchaser, (iii) the benefits the Initial Highest Bidder will have provided to the Debtors' estate, their creditors and other parties in interest, notwithstanding that the Stalking Horse Agreement may be terminated by the Debtors if any higher or otherwise better transaction is identified and consummated at the

32

conclusion of the Auction, and (d) necessary to induce the Stalking Horse Purchaser to serve as a "stalking horse" bidder and to continue to pursue the Purchased Asset sale transaction.

48.     The determination of whether a break-up fee should be allowed is made based on standards established by the Third Circuit in *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy. Inc.),* 181 F.3d 527 (3d Cir. 1999).  *O'Brien* held that while bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  *Id.*  To be approved, bidding incentives, such as break-up fees, must provide benefit to a debtor's estate.  *Id.* at 533; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("the allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").

49.     *O'Brien* identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a breakup fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would [be] limited." *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

50.     The Debtors submit that the Break-Up Fee and Expense Reimbursement, if agreed upon by the Debtors in the exercise of their business judgment, with the consent of the DIP Agent and Pre-Petition Agent, and approved by the Court following a hearing, is consistent with

PHIL1 7975327v.8

the *O'Brien* standard and should be approved as fair and reasonable.  First, the Debtors and their professionals are negotiating with any and all bidders willing to serve as the Stalking Horse Purchaser, which dispenses of any notion of self-dealing or non-arm's-length negotiations under the circumstances.  Second, the Debtors believe, based on their reasoned business judgment, that their ability to designate a Stalking Horse Purchaser to serve as a "stalking horse" would enhance their ability to maximize value without chilling bidding.  The presence of the ability to later offer a Break-Up Fee and Expense Reimbursement, first and foremost, signifies the existence of a contractually-committed bidder at a floor price believed to be fair and reasonable.  In addition, such an incentive provides the Debtors with the upside opportunity of potentially receiving a higher or otherwise better offer which, absent such a bid floor, might not otherwise be realized.  Third, the Debtors believe, based on their reasoned business judgment, that the amount of the Break-Up Fee and Expense Reimbursement would be reasonable and appropriate relative to the commitments made and resources expended by the Stalking Horse Purchaser.  Further, if the Break-Up Fee and Expense Reimbursement were to be paid, it will be because the Debtors have received a higher or otherwise superior offer.  Additionally, the proposed Break-Up Fee and Expense Reimbursement is well within the range of such fees approved by this and other courts, as noted above.

> (4)    *The Proposed Sale Notice and Assignment Notice and Proposed Dates for the Sale Objection Deadlines, the Contract Objection Deadlines and the Sale Hearing Are Appropriate*

51.    Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the sale and the deadline for filing any objections related thereto.  The Debtors submit that the Sale Notice fully complies with Bankruptcy Rules

2002(a) and (l) and includes adequate information to (a) enable interested parties to bid on the Purchased Assets pursuant to the Sale Procedures and by the Bid Deadline, and (b) inform such parties of the Sale Hearing and the relevant Sale Objection Deadline related thereto.

52.    The Debtors submit that the proposed Sale Objection Deadline is reasonable and appropriate under the circumstances.    Parties in interest are provided adequate notice in accordance with the Bankruptcy Rules and the Local Rules.

53.    The Debtors submit that the notice to be provided via the Assignment Notice is reasonably calculated to provide all counterparties to the Potential Designated Contracts with proper notice of the potential assumption and assignment of their executory contracts or unexpired leases, any Cure Costs relating thereto and the Contract Procedures, including, but not limited to, the Contract Objection Deadlines. As such, the proposed Assignment Notice is appropriate and sufficient under the circumstances.

54.    The Debtors submit that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale Procedures and the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadlines; and (d) the Sale Hearing.    Therefore, the Debtors respectfully request this Court to approve the proposed notice procedures.

**B.    Approval of the Proposed Sale Is Appropriate and
In the Best Interests of the Debtors' Estates and Creditors**

*(1)    The Sale of the Assets is Within the Sound
Business Judgment of the Debtors and Should be Approved*

55.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).    Section 363 of the Bankruptcy

35

Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991).

56.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with a sale of the Purchased Assets to the Prevailing Bidder, if any, is based upon sound business judgment and should be approved.  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient

business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071.

57.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152,154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctrs. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

58.     The Debtors submit that more than ample business justification exists to sell the Purchased Assets to the Prevailing Bidder pursuant to the Sale Procedures, thereby satisfying the first prong of *Abbotts Dairies* and that further justification for the sale of the Purchased Assets will be demonstrated at the Sale Hearing.  In addition, the Debtors believe that the Sale Procedures are the best method by which they can obtain the most value for the Purchased Assets and provide interested parties with accurate and reasonable notice of the Asset sale.  The Sale

Procedures will allow the Debtors to conduct the Auction in a controlled, fair and competitive fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets by helping ensure a competitive and fair bidding process.

59.     The Debtors believe the sale of their Purchased Assets must occur quickly in order to maximize the value of their estates, and that significant time spent in Chapter 11 increases the real and palpable risk of business loss and value deterioration.  The Debtors' liquidity is constrained and they have little ability to invest in their businesses.  Absent a prompt sale of the Purchased Assets pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Purchased Assets will be significantly compromised.

60.     Finally, the debtor in possession financing order and corresponding budget thereunder requires that the Debtors consummate a sale of their Purchased Assets as soon as possible.  Therefore, it is imperative that the Debtors effect a sale of the Purchased Assets as early on in these Chapter 11 Cases as possible.  The Debtors respectfully submit that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of the Debtors and their stakeholders.

61.     In addition, the notice described herein and in the Sale Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets in the past year. Accordingly, the proposed sale of the Purchased Assets satisfies the second prong of the *Abbotts Dairies* standard.

62.    The Sale Procedures are also designed to maximize the value received for the Purchased Assets.  The process proposed by the Debtors provides bidders ample time and information to submit a timely bid, while maximizing the sale of the Purchased Assets as a going-concern.  Along with the Debtors' marketing process, the Sale Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price.  The Debtors' right to cancel the Auction precludes the possibility of a Qualified Bidder reaping a windfall by acquiring the Purchased Assets at a significant discount as a result of an uncompetitive Auction.  The Debtors are subjecting the value of the Purchased Assets to market testing and permitting Qualified Bidders to bid on the Purchased Assets at the Auction, thereby subjecting the proposed sale to a market check through the solicitation of competing bids in a court-supervised process. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable, thereby satisfying the third prong of the *Abbotts Dairies* standard.

(2)    *The Prevailing Bidder Should Be Entitled to "Good Faith"*
       *Purchaser Protection Under Section 363(m) of the Bankruptcy Code*

63.    The Debtors request that the Court find that the Prevailing Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Purchased Assets.

64.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased **.** . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

65.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.  Additionally, the United States Court of Appeals for the Third Circuit has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code.  *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,* 141 F.3d 490, 497-98 (3d Cir. 1998) (concluding that, despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale).  In light of *Krebs,* the Debtors respectfully submit that section 363(m) applies to protect the Prevailing Bidder with respect to both the Purchased Assets and any Potential Designated Contracts.

66.    As required by section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the sale of the Purchased Assets and the assignment of the Potential Designated Contracts related thereto.  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *Abbotts Dairies*, 788 F.2d at 147.  To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders."  *Id.* (citing *In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir. 1978)).  Due to the absence of a bright-line test for

40

good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceeding*s." In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach. Corp.*, 572 F.2d at 1198).

67.     Here, the sale of the Purchased Assets and the assignment and/or transfer of the Potential Designated Contracts will be in good faith.  As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of a negotiation process in which all parties will be represented by counsel and all negotiations have been and will continue to be conducted on an arm's-length, good faith basis.

68.     Moreover, the Debtors will not choose a Prevailing Bidder whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and would be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.  Finally, the Sale Procedures are designed to ensure that no party is able to exert undue influence over the process.  Under the circumstances, the Prevailing Bidder should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.  The "good faith" prong of the *Abbotts Dairies* standard for the approval of a sale pursuant to section 363(b) of the Bankruptcy Code is likewise satisfied.

69.     All parties in interest will receive notice of the sale of the Purchased Assets pursuant to the Sale Notice and will be provided with an opportunity to be heard.  Additionally, all counterparties to Potential Designated Contracts will be provided notice of assumption and assignment and of any proposed Cure Costs associated therewith and an opportunity to be heard pursuant to the Assignment Notice.  The Debtors submit that such notice is adequate for entry of

the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

> (3)    *The Proposed Purchased Asset Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code*

70.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f*). See In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

71.    The Debtors submit that the sale of the Purchased Assets will satisfy the requirements of section 363(f) of the Bankruptcy Code. For example, the Debtors will provide all parties asserting Claims against the Purchased Assets, including, but not limited to, all creditors and interest holders of the Debtors, with notice of, and an opportunity to object to, the sale of such Purchased Assets. Absent objection, each such party will be deemed to have

consented to the sale of the Purchased Assets.  In addition, the Debtors believe that certain of the parties asserting Claims against the Purchased Assets could be compelled to accept a monetary satisfaction of such interests.  Finally, any Claim against the Purchased Assets will attach to the net proceeds of the Purchased Assets sale with the same validity and in the relative priorities established under the debtor in possession financing order and applicable non-bankruptcy law.  Accordingly, approval of the sale of the Purchased Assets free and clear of all Claims is warranted.

        *(4)*     *The Non-Debtor Counterparties are Adequately Protected and Assumption and Assignment of Potential Designated Contracts is a Sound Exercise of the Debtors' Business Judgment*

        72.     To facilitate and effectuate the sale of the Purchased Assets, the Debtors seek authority to assume and assign various Potential Designated Contracts to the Prevailing Bidder to the extent required by such Prevailing Bidder under the Contract Procedures.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.,* 318 U.S. 523 (1943) (applying Bankruptcy Act section 77 subsection (b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. National Fuel Gas Dist. Corp. (In re Sharon Steel*

*Corp.),* 872 F.2d 36, 39-40 (3d Cir. 1989); *In re AbitibiBowater, Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009).

73.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *In re Bygaph, Inc.,* 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").  The Prevailing Bidder will desire to take assignment of certain executory contracts and unexpired leases related to the Purchased Assets.  To the extent Potential Designated Contracts are identified for assumption and assignment, the Debtors believe that it can and will demonstrate that all requirements for assumption and assignment of the Potential Designated Contracts will be satisfied at the Sale Hearing.  The Debtors, as required by the Sale Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Purchased Assets.   Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Purchased Assets and assuming and assigning to the Prevailing Bidder the Potential Designated Contracts would be in the best interests of their estates.  Moreover, the Debtors will provide all parties to the Potential Designated Contracts an opportunity to be heard pursuant to an Assignment Notice in accordance with the Contract Procedures.  Finally, the Debtors propose

44

to satisfy all amounts due and owing under the Potential Designated Contracts in accordance with the Contract Procedures.  Thus, the Debtors request that the assumption and assignment of the Potential Designated Contracts be approved.

### Disclosures Under Local Rule 6004-1(b) and Limited  Waiver of Same

74.    Local Rule 6004-1(b) requires, among other things, that any motion to sell property of the estate pursuant to section 363 of the Bankruptcy Code attach "[a] copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale [and a] copy of a proposed form of sale order."  Del. Bankr. L. R. 6004-1(b).  As set forth above, the Debtors and their professionals have commenced an aggressive marketing of the Purchased Assets. Nevertheless, the terms of the sale of the Purchased Assets, including, in particular, the potential distribution of Purchased Assets among lots, potential bases to calculate the purchase price of such Purchased Assets, and the extent of assumed liabilities, are not final as of the date hereof. The Debtors will file separately with the Court a form of APA, against which any Potential Bidder must submit its bid for the Purchased Assets. Ultimately, the transaction(s) and term(s) proposed could differ materially from the form of APA presented at this time.  Consequently, the Debtors are setting forth in the disclosures below the anticipated terms of the APA for the Purchased Assets, which ultimately may differ.[7]  Accordingly, to the extent required, the Debtors request a limited waiver of the provisions of Local Rule 6004-1 with respect to the ultimate APA executed to the extent applicable.

---

[7]    As set forth above, pursuant to the Sale Procedures, the Debtors intend to file with the Court and serve on interested parties any APA entered into with any Stalking Horse Purchaser.  In addition, following any designation of a Prevailing Bid, such Bid (including the applicable APA) will be filed with the Court and served on interested parties.  As such, notice of the terms of any executed APA will be provided to interested parties prior to approval of any Sale.

**Highlighted Provisions of APA Under Local Rule 6004-1(b)**

| | |
|---|---|
| **Sale to an Insider** | The Sale and current form of APA does not contemplate a sale to an Insider. |
| **Agreements with Management** | The Sale and current form of APA does not provide for any releases by and between the Stalking Horse Purchaser and the Debtors of any claims or causes of action. |
| **Private Sale/No Competitive Bidding** | The Sale is being conducted pursuant to the competitive bidding process detailed in the Motion. |
| **Closing and Other Deadlines** | The APA sets forth the conditions and terms for the Closing of the Sale, and the APA provides an outside Closing date of September 26, 2019. |
| **Good Faith Deposit** | The proposed Sale Procedures provide that all bidders will be required to post a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in the amount of 10% of the competing bidder's offer. |
| **Interim Arrangements with Proposed Buyer** | The APA sets forth customary provisions regarding the Debtors' conduct of their businesses pending the Closing Date. |
| **Use of Proceeds** | Upon Closing, the net sale proceeds shall be, to the extent permitted and appropriate, distributed or reserved in accordance with applicable cash collateral and financing orders, or as otherwise permitted by the Bankruptcy Code and applicable Bankruptcy Court Order. |
| **Tax Exemption** | No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Sale. |
| **Record Retention** | The APA provides for Debtors' access to books and records. |
| **Sale of Avoidance Actions** | The Debtors' Avoidance Actions are an excluded asset under the APA. |
| **Requested Findings as to Successor Liability** | The proposed sale order will provide that Successful Bidder is not a successor to Debtors or these bankruptcy estates by any reason or theory of law or equity, and that Successful Bidder shall not be subject to successor liability for any matters arising from conduct occurring prior to Closing. All creditors or other persons are hereby barred from bringing any claim or asserting any |

| | Liens, Claims and Encumbrances, and other interests against Successful Bidder or the Assets, except as relates to Assumed Liabilities. |
| --- | --- |
| **Sale Free and Clear of Unexpired Leases** | The Debtors are seeking to sell the Assets free and clear of all Claims, and other interests, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code. |
| **Credit Bid** | The proposed Sale Procedures do not purport to limit or restrict credit bid rights under section 363(k) of the Bankruptcy Code. |
| **Relief from Bankruptcy Rule 6004(h)** | As noted in the Motion below, the Debtors are requesting relief from the 14-day stay imposed by Rules 6004(h) and 6006(d). |

## Request For Relief Under Bankruptcy Rules 6004(h) And 6006(d)

75.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Procedures Order and the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

76.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Banks. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy ¶ 6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides

that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

## Notice

77.     As of the date hereof, no trustee, examiner, or creditors' committee has been appointed in the Debtors' Chapter 11 Cases.  Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the U.S. Trustee; (b) counsel to the DIP Agent and the Pre-Petition Agent; (c) counsel to NXT; (d) counsel to any official committee appointed in these Chapter 11 Cases, (e) all parties that have filed a request for notice pursuant to Bankruptcy Rule 2002; (f) all parties who are known by the Debtors to assert liens against the Purchased Assets; (g) the Internal Revenue Service and applicable local taxing authorities.  In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court: (a) enter the Sale Procedures Order in substantially the form attached hereto as Exhibit A, (i) approving bidding procedures in connection with the sale of substantially all of their assets; (ii) scheduling a hearing to consider the sale of assets; and (iii) approving the form and manner of notice thereof; (b) enter a Sale Order (or Sale Orders) in a form to be determined, (i) authorizing and approving the sale of the Purchased Assets free and clear of Claims and (ii) approving the assumption and assignment of the Potential Designated Contracts; and (c) grant such other and further relief to the Debtors as the Court may deem proper.

PHIL1 7975327v.8

Dated: July 7, 2019          /s/ Domenic E. Pacitti
Wilmington, Delaware         Domenic E. Pacitti (DE Bar No. 3989)
                             Michael W. Yurkewicz (DE Bar No. 4165)
                             Sally E. Veghte (DE Bar No. 4762)
                             **KLEHR HARRISON HARVEY**
                             **BRANZBURG LLP**
                             919 North Market Street, Suite 1000
                             Wilmington, Delaware 19801
                             Telephone:     (302) 426-1189
                             Facsimile:     (302) 426-9193
                             Email:  dpacitti@klehr.com
                                     myurkewicz@klehr.com
                                     sveghte@klehr.com

                             *Proposed Counsel to the Debtors*