## <u>ANNEX 1</u>

**Sale Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RUI HOLDING CORP., *et al.*,[1] | ) | Case No. 19-11509 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

## SALE PROCEDURES

By the motion filed July 7, 2019 (the "Sale Motion"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") sought approval of, among other things, the procedures through which they will solicit bids ("Bids") to determine the highest or otherwise best offer for the sale of all or substantially all of the assets owned by the Debtors related to their business (collectively, the "Purchased Assets") under the provisions of title 11 of the United States Code (the "Bankruptcy Code").

The Purchased Assets consist of the business assets used to conduct the restaurant business.

On August [●], 2019, the United Stated Bankruptcy Court for the District of Delaware (the "Court") entered an order (the "Sale Procedures Order")[2] that, among other things, authorized the Debtors to determine the highest or otherwise best bid or bids for the Purchased Assets through the process and procedures set forth below (the "Sale Procedures"). To the extent permitted in and subject to the Sale Procedures Order, the Debtors reserve the right to modify or waive certain or all of the Sale Procedures, after consultation with counsel to the DIP Agent, Pre-Petition Agent, the Required Lenders, the Stalking Horse Purchaser and any official committee appointed in these Chapter 11 Cases.

On August 28, 2019, the Bankruptcy Court authorized the Debtors to enter into that certain Asset Purchase Agreement by and among Restaurants Unlimited, Inc., Restaurants Unlimited Texas, Inc., RU Corp. and Landry's, LLC, dated as of August 27, 2019 (the "Stalking Horse Agreement"), pursuant to which Landry's LLC (together with its permitted successors,

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RUI Holding Corp. (6192); RU Corp. (8259); Restaurants Unlimited, Inc. (8365); and Restaurants Unlimited Texas, Inc. (5733). The Debtors' headquarters and mailing address is: 411 First Ave. South, Suite 200, Seattle, WA 98104. The Debtors operate restaurants under the following names: Clinkerdagger; Cutters Crabhouse; Fondi Pizzeria; Henry's Tavern; Horatio's; Kincaid's; Maggie Bluffs; Manzana; Newport Seafood Grill; Palisade; Palomino; Portland City Grill; Portland Seafood Company; Scott's Bar and Grill; Simon & Seafort's; Skate's on the Bay; Stanford's; and Stanley & Seafort's.

[2]    Capitalized terms not otherwise defined in these Sale Procedures shall have the meanings ascribed to them in the Sale Procedures Order, Sale Motion or the Stalking Horse Agreement, as applicable.

designees and assigns) shall serve as the "Stalking Horse Purchaser" with respect to the Purchased Assets.

Pursuant to the Sale Procedures Order, the Debtors seek authority to sell the Purchased Assets in a single or multiple transactions free and clear of liens, claims, encumbrances, and interests to the Qualified Bidder (as defined below) that is determined to have made the highest or otherwise best offer for the Purchased Assets at a public auction (the "<u>Auction</u>") in accordance with the Sale Procedures set forth below (the "<u>Prevailing Bidder</u>" or collectively, the "<u>Prevailing Bidders</u>").  In conjunction with the sale of the Purchased Assets, the process provides for the assumption by the Debtors and the assignment to the Prevailing Bidders of certain executory contracts and unexpired leases which the Prevailing Bidders and/or the Debtors may designate pursuant to the Sale Procedures Order.

**<u>Participation Requirements and Due Diligence</u>**

(a)     In order to participate in the bidding process, the Auction, or otherwise be considered for any purpose hereunder, a person interested in purchasing the Purchased Assets (a "<u>Potential Bidder</u>") must first deliver the following materials to the Debtors and their counsel:

(i)     An executed confidentiality agreement in form and substance satisfactory to the Debtors and their counsel (the "<u>Confidentiality Agreement</u>").  Without limiting the foregoing sentence, the Confidentiality Agreement will provide that all non-public information about the Debtors received by a Potential Bidder, or if the bidder is qualified, a Qualified Bidder (as defined below), will be kept strictly confidential and used only in connection with analyzing a transaction for the Purchased Assets.

(ii)     Written evidence that enables the Debtors and their advisors to determine, in their sole discretion, in consultation with the DIP Agent and the Pre-Petition Agent, whether a Potential Bidder has the financial and other ability to close the contemplated sale transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in connection therewith.

(iii)     The advisors to the Debtors shall provide these Sale Procedures, together with a copy of the form Asset Purchase Agreement (the "<u>APA</u>") which will be filed separately with the Court, to each Potential Bidder, <u>provided</u>, <u>however</u>, any Bid for all or substantially all of the Purchased Assets shall include a form of APA marked against the Stalking Horse Agreement and subject to the conditions and terms set forth in (e) below. All Potential Bidders, whether deemed Qualified Bidders (as defined below) or not, consent to the jurisdiction of the Bankruptcy Court to determine matters concerning the sale, their Bid and otherwise with respect to the process and waive any right to any other venue.

(b)     Any Potential Bidder wishing to conduct due diligence concerning a prospective acquisition transaction of the Purchased Assets shall be granted access to all relevant information regarding the Purchased Assets and the related business of each of the Debtors reasonably necessary to enable a Potential Bidder to evaluate the Purchased Assets and the prospective transaction.  The Debtors shall make such access available to Potential Bidders during normal

business hours as soon as reasonably practicable following execution of the Confidentiality Agreement.  Potential Bidders interested in conducting due diligence should contact Configure Partners LLC, 450 Lexington Ave., New York, NY 100017, Attn: Vin Batra (vbatra@configurepartners.com).  Notwithstanding the foregoing, the debtors and their advisors are not required to provide confidential or proprietary information to any person if the Debtors, in consultation with the DIP Agent and the Pre-Petition Agent and their advisors, believe that such disclosure would be detrimental to the interests of the Debtors' estates.  All due diligence must be completed before the Bid Deadline (as defined below).  No condition(s) allowing or regarding further due diligence will be accepted or authorized after the Bid Deadline.  Potential Bidders are required to exercise their own discretion before relying on any information regarding the Purchased Assets provided by the Debtors.  Neither the Debtors nor their representatives (nor DIP Agent, the Pre-Petition Agent nor their representatives) are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto.

(c)    The Debtors and their advisors, in consultation with DIP Agent and the Pre-Petition Agent, shall: (i) receive and evaluate any Bids from Potential Bidders; (ii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid (as defined below); and (iii) take any other actions contemplated under these Sale Procedures.

**Submission of Bids**

(d)    Any Potential Bidder interested in purchasing the Purchased Assets must submit a Bid prior to **4:00 p.m. prevailing Eastern time on September 16, 2019** (the "Bid Deadline"). The Debtors may extend the Bid Deadline, and shall promptly notify all Potential Bidders of any such extension.  In order for such Bid to be considered, however, it must be a "Qualified Bid." The Debtors and their advisors, in consultation with the DIP Agent and the Pre-Petition Agent, will determine if a Bid is a Qualified Bid based on the requirements herein.  A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtors and their advisors, in their sole discretion, in consultation with counsel to the DIP Agent, the Pre-Petition Agent, the Required Lenders and counsel to any official committee appointed in these Chapter 11 Cases, determine that such Potential Bidder submitted either a Qualified Aggregate Bid or a Qualified Partial Bid. The Stalking Horse Purchaser, or their designee, shall be deemed a Qualified Bidder for all purposes under the Sale Procedures, and the Bid submitted by the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement shall be deemed to be a Qualified Bid for all purposes under the Sale Procedures.

(e)    A Bid will be considered a "Qualified Aggregate Bid" only if the Bid is for the sale of all or substantially all of the Purchased Assets and fulfills the following requirements prior to the Bid Deadline (capitalized terms used in this section are defined later in the Sale Procedures):

(i)    Provides that the Qualified Bidder's Bid shall remain open and irrevocable until the earlier of (X) thirty (30) days following the date of entry of a Sale Order; (Y) the date of the closing of the sale of the Purchased Assets pursuant to the Sale Order; or (Z) such date as the Debtors affirm in writing that they do not intend to pursue a sale transaction based on such Qualified Bidder's Bid (the "Bid Expiration Date");

(ii)     Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

(iii)     Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the proposed transaction, in each case acceptable to the Debtors in their sole discretion, in consultation with counsel to the DIP Agent and the Pre-Petition Agent;

(iv)     Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the APA, or a representation that no such authorization or approval is required;

(v)     Provides that the purchase price will be paid in cash, cash equivalents, assumption of debt, or such other consideration acceptable to the Debtors, in consultation with the DIP Agent and the Pre-Petition Agent;

(vi)     Provides by wire transfer of immediately available funds to the Debtors or an appropriate escrow agent before the Bid Deadline of an earnest money deposit equal to the greater of (X) 10% of the dollar amount of the purchase price of such Bid; or (Y) 10% of the value otherwise ascribed to such Bid (the "Deposit"), provided, however, that Pre-Petition Agent and DIP Agent or its designee shall not be required to submit a Deposit in connection with the submission of a Bid or the exercise of its credit bid rights;

(vii)     Provides evidence satisfactory to the Debtors, in consultation with the DIP Agent and the Pre-Petition Agent, that the Qualified Bidder is reasonably likely to obtain prompt regulatory approval and any other consents, licenses, or permits, if any is required, to purchase the Purchased Assets;

(viii)     Is submitted in a writing in the form of the APA with any proposed changes to the APA set forth in an electronic form both clean and marked to reflect such changes signed by the Qualified Bidder, that:

(1)     Identifies the Qualified Bidder and any members of its investor group, if applicable;

(2)     Is not subject to conditions, representations or terms that the Debtors determine, in consultation with the DIP Agent and the Pre-Petition Agent, to be unacceptable;

(3)     Specifies the consideration allotted to each Purchased Asset, or class of Purchased Assets, as applicable, such Qualified Bidder proposes to purchase pursuant to the APA;

(4)     Is not conditioned upon the Bankruptcy Court's approval of any Bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment;

(5)    Does not contain any financing or due diligence contingencies to closing of the proposed transaction;

(6)    Does not contain any condition to closing of the transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval);

(7)    Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets and the proposed transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Purchased Assets in making its Bid or that of any of its legal, financial or other advisors, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors or the Purchased Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the APA ultimately accepted and executed by the Debtors;

(8)    Identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the Debtors to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code) along with the Bid; and

(ix)    Contains other information reasonably requested by the Debtors.

(f)    A "Qualified Partial Bid" for less than substantially all of the Purchased Assets will be considered for the Auction, and Qualified Bidders submitting Qualified Partial Bids shall be allowed to participate in the Auction only if the Qualified Partial Bid, or the Qualified Partial Bid when combined with other additional non-overlapping Qualified Partial Bids, if accepted and executed without modification, would yield individual asset sales amounting to a Qualified Aggregate Bid or would otherwise exceed the value of or be considered a better offer than any Qualified Aggregate Bid after considering, among other things, the Bid Assessment Criteria (as defined below).  Bids that offer to purchase only a portion of the Debtors' business market may, at the discretion of the Debtors after consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, not be considered Qualified Partial Bids.  The Debtors in their sole discretion, in consultation with the DIP Agent and the Pre-Petition Agent shall determine which non-overlapping Qualified Partial Bids to include in determining whether they amount to a Qualified Aggregate Bid and shall assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Bids against all other Qualified Bids.  To constitute a Qualified Partial Bid, a Bid must fulfill the following requirements prior to the Bid Deadline:

(i)    Fulfills each of the requirements set forth in paragraphs (e)(i) through and including (e)(ix) above;

(ii)    Conspicuously states that the Qualified Bidder offers to purchase a portion of the Purchased Assets, which assets shall be described in detail; and

(iii)    Fully discloses the identity of each entity participating in connection with such Bid, and the complete terms of any such participation.

(g)    A Qualified Bidder that desires to make a Bid must deliver written electronic copies of its Bid prior to the Bid Deadline to the following representatives of the Debtors: Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn:    Domenic E. Pacitti (dpacitti@klehr.com) and Michael W. Yurkewicz (myurkewicz@klehr.com).  The Debtors shall deliver copies of any such Bids to counsel to the DIP Agent, the Pre-Petition Agent, the Required Lenders and to any official committee appointed in these Chapter 11 Cases.

(h)    Persons who collectively are referred to as a "Qualified Bidder" need not be affiliated persons and need not act in concert with one another and the Debtors may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, however, all bidders shall remain subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

(i)    After the Bid Deadline, the Debtors, in consultation with the DIP Agent and the Pre-Petition Agent, shall determine which Qualified Aggregate Bid or group of Qualified Partial Bids represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder").  Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid or a Qualified Partial Bid will be advised of such Initial Highest Bid and the Debtors may, at its discretion: (a) distribute copies of other Qualified Aggregate Bids or Qualified Partial Bids to other Qualified Bidders prior to or during the Auction; or (b) proceed with the open or sealed bidding process set forth in the Sale Procedures Order to the extent authorized therein.

**Due Diligence From Potential Bidders or Qualified Bidders**

(j)    Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Purchased Assets.  Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtors to determine that a Potential Bidder is not a Qualified Bidder.  Similarly, each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Purchased Assets as the Auction progresses.  Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtors to determine that the Qualified Bidder may no longer participate in the Auction.

**_"As Is, Where Is"_**

(k)     The sale of the Purchased Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates or any other party, except to the extent set forth in the APA between the Debtors and the Prevailing Bidder.  Except as otherwise provided in the Prevailing Bidder's APA, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Claims") pursuant to section 363(f) of the Bankruptcy Code, such Claims to attach to the net proceeds of the sale of the Purchased Assets, with the same validity and priority as existed immediately prior to such sale.

**The Auction**

(l)     If more than one Qualified Bid has been submitted for the Purchased Assets in accordance with these Sale Procedures, the Debtors will conduct the Auction on **September 18, 2019, at 10:00 a.m., prevailing Eastern time**, with respect to such Qualified Bids in order to determine the highest and best Bid (the "Prevailing Bid") to submit for approval by the Bankruptcy Court at the Sale Hearing (as defined below).  The Auction shall be organized and conducted by the Debtors at the Philadelphia offices of their counsel, Klehr Harrison Harvey Branzburg LLP, 1835 Market Street, Suite 1400, Philadelphia, Pennsylvania 19103 or such other location as may be announced prior to the Auction to all Qualified Bidders, the DIP Agent, the Pre-Petition Agent, the Required Lenders, the U.S. Trustee and any official committee appointed in these Chapter 11 Cases.

(m)     The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by the Debtors, the Debtors' advisors, the DIP Agent, the Pre-Petition Agent, the Required Lenders and their advisors, any duly appointed official committee, the U.S. Trustee, and any landlord of a Debtors' location and their respective counsel, financial advisors, and/or other authorized representatives.  All creditors of the Debtors' estates shall be permitted to attend; _provided_, _however_, that in order to attend the Auction, a creditor must advise the Debtors in writing no later than 48 hours prior to the Auction, provided, further, however, that the Debtors may seek relief from the Bankruptcy Court in the event that they object to such creditor's attendance.

(n)     The Debtors are authorized to conduct the Auction in accordance with such procedures and requirements as may be established at the discretion of the Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, which rules may include the determination of the amount of time between Qualified Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

(o)     The Qualified Bid that is deemed the Initial Highest Bid, determined as set forth above, shall be the first Qualified Bid to begin the Auction.  The next Qualified Bid at the

Auction shall be an amount equal to or greater than the Initial Highest Bid *plus* if the Stalking Horse Bid is the Initial Highest Bid, the amount of the approved Breakup Fee and Expense Reimbursement *plus* the Minimum Bid Increment (as defined below). Thereafter, the Auction will continue in the manner determined by the Debtors above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, although received from a Qualified Bidder that made a Qualified Bid prior to the Bid Deadline, need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in increments greater than the prior Qualified Bid *plus* $250,000.00 or such other increment as determined by the Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, and announced at the start of or during the Auction (the "Minimum Bid Increment").

(p)       In the case of a Qualified Bid based upon Qualified Partial Bids, such Qualified Bid may be altered or re-submitted in the sole discretion of the Qualified Bidders, provided that such Bid remains a Qualified Partial Bid in accordance with the requirements set forth in paragraph (f) above. A Qualified Partial Bid will be considered for any given round of the Auction only if such Bid individually or in combination with other Qualified Partial Bids yields a Qualified Aggregate Bid (individually, a "Qualified Partial Overbid" and collectively, a "Qualified Aggregate Overbid"), provided that the Qualified Aggregate Overbid must, considered as a whole, meet all the requirements of paragraph (e) above. The Debtors shall, in their sole discretion and in consultation with the DIP Agent, the Pre-Petition Agent. The Required Lenders and any official committee appointed in these Chapter 11 Cases, determine which Qualified Partial Overbids to include in the Qualified Aggregate Overbid, and shall, in each round of the Auction, as necessary, assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Overbid as against all other Qualified Bids received in that round of the Auction.

(q)       The Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, shall determine, in their sole discretion and subject to final determination by the Bankruptcy Court, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

(r)       At the conclusion of the Auction: (i) the Debtors shall, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, select (X) the Prevailing Bid(s) and (Y) the second highest or best offer for the Purchased Assets (the "Back-Up Bid"); (ii) the Debtors shall notify the Prevailing Bidder that such person's offer has been determined by the Debtors to be the Prevailing Bid and will be contingent only on Bankruptcy Court approval, and shall notify the person that made the Back-Up Bid (the "Back-Up Bidder") that such person's offer has been determined by the Debtors to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid to close as set forth below and Bankruptcy Court approval; and (iii) the Debtors shall file a notice with the Bankruptcy Court announcing the Prevailing Bidder or Bidders. Prior to the commencement of the Sale Hearing, the Prevailing Bidder or Bidders shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder or Bidders to all of the terms and conditions contemplated by the Prevailing Bid.

(s)     In making the determination of which Qualified Bid(s) constitutes the Prevailing Bid(s), the Debtors may, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, including, but not limited to: (a) the number, type, and nature of any changes to the APA requested by the Qualified Bidder, including the type and amount of the Purchased Assets sought and the liabilities of the Debtors to be assumed in the Bid; (b) the amount and nature of the total consideration, including the extent of assumed liabilities; (c) the likelihood of the Bidder's ability to close a transaction, the conditions thereto, and the timing thereof, including whether the Bidder has or can obtain all necessary consents, licenses, permits, or other regulatory approvals to operate the Purchased Assets sought in the Bid; (d) any excluded assets, executory contracts, or unexpired leases; (e) any purchase price adjustments; (f) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid; (g) whether the Bid is a bulk bid or a partial bid for only some of the Purchased Assets; and (h) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").[3]

(t)     The Deposit of the Prevailing Bidder or the Back-Up Bidder, as the case may be, shall be applied by the Debtors against the purchase price to be paid by the Prevailing Bidder or the Back-Up Bidder, as applicable, at the closing of the relevant transaction approved by the Bankruptcy Court.  The Prevailing Bidder's Deposit shall be held by the Debtors and forfeited to the Debtors if the Prevailing Bidder breaches its obligations to close under the APA in accordance with the Prevailing Bid and such forfeited Deposit shall constitute collateral of the DIP Agent and Pre-Petition Agent, and be subject to the debtor-in-possession financing orders.

(u)     The Debtors shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtors' acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

**Timeline**

Set forth below for convenience is a chart reflecting the various deadlines and dates set forth herein and the Sale Procedures Order:

| Bid Deadline | September 16, 2019 at 4:00 p.m. prevailing Eastern time |
|---|---|
| Sale Objection Deadline | September 16, 2019 at 4:00 p.m. prevailing Eastern time |
| Cure/Assignment Objection Deadline | September 16, 2019 at 4:00 p.m. prevailing Eastern time |
| Auction | September 18, 2019 at 10:00 a.m. prevailing Eastern time |
| Adequate Assurance Objection Deadline | September 20, 2019 at 4:00 p.m. prevailing Eastern time |
| Sale Hearing | September 23, 2019 at 1:30 p.m. prevailing Eastern time |

---

[3]     The Bid Assessment Criteria listed herein are not mandatory, not exhaustive, and are provided for illustrative purposes only.  The Debtors, in their sole discretion in the exercise of their business judgment and in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, may consider any criteria that the Debtors consider reasonably relevant to the value of any Qualified Bid.

**Back-Up Bidder**

(v)      If for any reason the Prevailing Bidder fails to consummate the acquisition of the Purchased Assets in accordance with the Prevailing Bid, and in any event no later than ten (10) days from the entry of the Sale Order, the Debtors are authorized to proceed with the sale of the applicable Purchased Assets to the Back-Up Bidder in accordance with the Back-Up Bid without further order of the Bankruptcy Court so long as the Sale to the Back-Up Bidder is approved at the Sale Hearing, or upon further hearing and order of the Bankruptcy Court; provided, however, solely with respect to any assumption and assignment of the Potential Designated Contracts to the Back-Up Bidder, a hearing shall be held on no less than five (5) business days' notice, with objections due at least one (1) day prior to such hearing, unless otherwise ordered by the Court. For the avoidance of doubt, the scope of such hearing shall be limited to issues relating to the identity of the Back-Up Bidder such as adequate assurance of future performance, and the assumption and assignment of any Potential Designated Contacts to the Back-Up Bidder.   If for any reason the Back-Up Bidder fails to consummate the acquisition of the Purchased Assets in accordance with the Back-Up Bid, the Back-Up Bidder's Deposit shall be forfeited to the Debtors and such forfeited Deposit shall constitute collateral of the DIP Agent and Pre-Petition Agent, and be subject to the debtor-in-possession financing orders.

**Deposit**

(w)      No later than the Bid Expiration Date, the Debtors shall return to each Qualified Bidder(s), other than the Prevailing Bidder and the Back-Up Bidder, their respective Deposit(s). No later than the seventh (7th) business day after the closing of the sale of the Purchased Assets to the Prevailing Bidder, the Debtors shall return the Back-Up Bidder's Deposit to the Back-Up Bidder.

**Modifications**

(x)      The Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, may (a) extend the deadlines set forth in the Sale Procedures Order or the Sale Procedures, (b) waive any requirement for a Bid to be a Qualified Bid or to be the Prevailing Bid, including, but not limited to, designating one or more Qualified Partial Bids for less than substantially all the Purchased Assets as the Prevailing Bid or Prevailing Bids, and/or (c) adopt, implement, and/or waive such other, additional or existing procedures or requirements that in their discretion serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend the Auction or participate in the Auction, as appropriate.

(y)      The Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, may (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of the Sale Order approving the Prevailing Bid, any Bid that, in the discretion of the Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases is (i) inadequate or insufficient, (ii)

not in conformity with the requirements of the Bankruptcy Code or the Sale Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors. At or before the conclusion of the Auction, the Debtors, in consultation with the DIP Agent, the Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in this case.

**Right to Credit Bid**

(aa)    Subject to Paragraph 10(a) of Exhibit 1 to the *Order Approving Stipulation (I) Authorizing and Directing Payment of PACA Trust Claims of Triple "B" Corp. D/B/A Charlie's Produce, Bix Produce Company, LLC and FreshPack Produce, Inc. and (II) Granting Related Relief* [Docket No. 125], the Pre-Petition Agent and the DIP Agent, or either of them, or their designees, shall be entitled to credit bid all or a portion of the outstanding obligations under the Prepetition Credit Agreement or the DIP Agreement in accordance with section 363(k) of the Bankruptcy Code and as directed by the Pre-Petition Lenders and DIP Lenders, as applicable, pursuant to the DIP Agreement. The Pre-Petition Agent and the DIP Agent, or their designees, each shall be deemed to be a Qualified Bidder for all purposes hereunder, and any Bid timely submitted by the Pre-Petition Agent and/or the DIP Agent shall be deemed to be a Qualified Bid for all purposes hereunder, regardless of whether such Bid is submitted by the Bid Deadline. If the Pre-Petition Agent and the DIP Agent, or either of them submits a credit bid, such parties shall no longer be part of the consultation parties with whom the Debtors must consult in selecting the highest and best bid; provided, however, that the Pre-Petition Agent and/or DIP Agent shall once again be part of the consultation parties provided that they confirm their agreement that their credit bid has been topped and they no longer intend to credit bid in the auction.

## <u>ANNEX 2</u>

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RUI HOLDING CORP., *et al.*,[1] | ) | Case No. 19-11509 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF BID DEADLINE, AUCTION, AND SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS[2]

NOTICE IS HEREBY GIVEN, as follows:

On July 7, 2019, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed a motion [Docket No. 15] (the "Sale Motion")[3] seeking approval of among other things (i) the sale (the "Sale") of substantially all of the Debtors' business assets (the "Purchased Assets") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (ii) procedures relating to the Sale (the "Sale Procedures"), (iii) procedures to determine cure amounts and deadlines for objections to certain contracts and leases that may be assumed and assigned (the "Contract Procedures"), (iv) the date, time and place for a sale hearing, and for objections to the sale and related relief.  On August 28, 2019, the Court held a hearing to consider the Sale Procedures and entered an order approving the same [Docket No. [●]] (the "Sale Procedures Order").

In connection with the Sale, the Debtors and the applicable Prevailing Bidder will seek entry of an order or orders from the Bankruptcy Court approving the Sale of the Purchased Assets (the "Sale Order").  The Sale Order will seek to sell the applicable Purchased Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RUI Holding Corp. (6192); RU Corp. (8259); Restaurants Unlimited, Inc. (8365); and Restaurants Unlimited Texas, Inc. (5733). The Debtors' headquarters and mailing address is: 411 First Ave. South, Suite 200, Seattle, WA 98104. The Debtors operate restaurants under the following names: Clinkerdagger; Cutters Crabhouse; Fondi Pizzeria; Henry's Tavern; Horatio's; Kincaid's; Maggie Bluffs; Manzana; Newport Seafood Grill; Palisade; Palomino; Portland City Grill; Portland Seafood Company; Scott's Bar and Grill; Simon & Seafort's; Skate's on the Bay; Stanford's; and Stanley & Seafort's.

[2]    This Notice is subject to the full terms and conditions of the Sale Motion, the Sale Procedures Order, the Sale Procedures and the Contract Procedures, which shall control in the event of any conflict.  The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

[3]    Capitalized terms not otherwise defined in this notice shall have the meanings ascribed to them in the Sale Procedures Order (as defined herein) or the Sale Motion, as applicable.

interests thereon to the maximum extent permitted by section 363 of the Bankruptcy Code. **The specific terms of sale will be provided in the proposed Sale Order and the Transaction Documents proposed to be entered into among the Debtors and the Prevailing Bidder for the applicable Assets.**

All interested parties are invited to submit a Qualified Bid and to make offers to purchase the Assets in accordance with the Sale Procedures and Sale Procedures Order. The deadline for submitting Qualified Bid is **September 16, 2019 at 4:00 p.m., prevailing Eastern time** (the "Bid Deadline") (or as otherwise permitted by the Sale Procedures). Interested bidders are encouraged to review these requirements carefully and, for further information, are invited to contact the Debtors' counsel, Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, DE 19801, Attn: Domenic E. Pacitti (dpaciti@klehr.com); or its investment banker Configure Partners LLC, 450 Lexington Ave., New York, NY 10001, Attn: Vin Batra (vbatra@configurepartners.com).

Consistent with the Sale Procedures Order, an auction of the applicable Purchased Assets is scheduled to be conducted on **September 18, 2019 at 10:00 a.m., prevailing Eastern time** (the "Auction"). The Auctions shall be organized and conducted at the offices of the Debtors' counsel, Klehr Harrison Harvey Branzburg LLP, 1835 Market Street, Suite 1400, Philadelphia, Pennsylvania 19103 or such other location as may be announced prior to the Auction to all Qualified Bidders, the DIP Agent, the Pre-Petition Agent, the Required Lenders, the U.S. Trustee, and any official committee appointed in these Chapter 11 Cases. Only Qualified Bidders, the Debtors, its advisors, the DIP Agent, the Pre-Petition Agent, the Required Lenders, any official committee appointed in these Chapter 11 Cases, the U.S. Trustee, and any landlord of a Debtors' location and their respective counsel, financial advisors, and/or authorized representatives are permitted to attend the Auction. Creditors of the Debtors' estates shall be permitted to attend; *provided*, *however*, that in order to attend the Auction, a creditor must advise the Debtors in writing no later than 48 hours prior to the Auction, provided, further, however, that the Debtors may seek relief from the Bankruptcy Court in the event that they object to such creditor's attendance. The time and place of the Auction may change with notice.

The Sale Hearing to consider the relief requested in the Sale Motion and to consider whether to approve the Prevailing Bid and the Back-Up Bid (the "Sale Hearing") shall be held before the Bankruptcy Court on **September 23, 2019 at 1:30 p.m., prevailing Eastern time**. The Sale Hearing will be held before the Honorable John T. Dorsey, United States Bankruptcy Court Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●] floor, courtroom no. [●], Wilmington, Delaware 19801. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the Bankruptcy Court's calendar.

At the Sale Hearing, the Bankruptcy Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of these Chapter 11 Cases, and the Debtors  may seek entry of an order which provides, except with respect to any assumed liabilities, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade

creditors, litigation claimants and other creditors, holding liens, claims, encumbrances or interests of any kind or nature whatsoever against or in all or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated or subordinated), arising under or out of, in connection with, or in any way related to the Debtors, the Assets or the operation of the Debtors' business prior to the closing date of the sale, are forever barred, estopped and permanently enjoined from asserting, against the Prevailing Bidder(s), their property or the applicable Purchased Assets, such person's or entities' liens, claims, encumbrances or interests in and to the applicable Purchased Assets.

The Debtors propose that, to be timely and otherwise eligible for consideration by the Court, objections to the approval of the sale of the Purchased Assets to the Prevailing Bidder – other than an objection to the proposed assumption and assignment of the Potential Designated Contracts or to any proposed Cure Costs including, but not limited to, the sale of the Purchased Assets free and clear of Claims pursuant to section 363(f) of the Bankruptcy Code for all parties in interest must: (a) be in writing; (b) clearly specify the grounds for the objection; (c) conform to the Bankruptcy Rules and the Local Rules; and (d) be filed with the Court and served so as to be received by the following parties (collectively, the "Objection Notice Parties") by no later than **4:00 p.m. prevailing Eastern time on September 16, 2019** (the "Sale Objection Deadline"): (a) the Debtors, Restaurants Unlimited, Inc., 411 1st Avenue S., Seattle, WA 98104, Attn: Jim Eschweiler, CEO and David Bagley, CRO; (b) counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com) and Michael W. Yurkewicz (myurkewicz@klehr.com); (c) counsel to the DIP Agent and Pre-Petition Agent, Hunton Andrews Kurth LLP, Riverfront Plaza East Tower, 951 East Byrd Street, Richmond, VA 23219, Attn: Tyler P. Brown (tpbrown@huntonak.com) and Justin F. Paget (jpaget@huntonak.com); and Gellert Scali Busenkell & Brown, LLC, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801, Attn: Michael Busenkell (mbusenkell@gsbblaw.com); (d) counsel to any statutory committee appointed in these cases; (e) counsel to NXT, Goldberg Kohn, Ltd., 55 East Monroe, Suite 3300, Chicago, Illinois 60603, Attn: Randall Klein (Randall.klein@goldbergkohn.com) and Prisca Kim (Prisca.kim@goldbergkohn.com); and (f) Office of The United States Trustee, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer (linda.richenderfer@usdoj.gov).

Set forth below for convenience are the various deadlines and dates set forth herein:

| Bid Deadline | September 16, 2019 at 4:00 p.m. prevailing Eastern time |
| --- | --- |
| Sale Objection Deadline | September 16, 2019 at 4:00 p.m. prevailing Eastern time |
| Cure/Assignment Objection Deadline | September 16, 2019 at 4:00 p.m. prevailing Eastern time |
| Auction | September 18, 2019 at 10:00 a.m. prevailing Eastern time |
| Adequate Assurance Objection Deadline | September 20, 2019 at 4:00 p.m. prevailing Eastern time |
| Sale Hearing | September 23, 2019 at 1:30 p.m. prevailing Eastern time |

The Sale Order, if approved, may authorize the assumption by the Debtors and assignment to the Prevailing Bidder of various executory contracts and unexpired leases that are the property of the Debtors (collectively, the "Assumed Contracts"). The Court has approved certain procedures (the "Contract Procedures") that govern the assumption and assignment of

Assumed Contracts.  The Contract Procedures are set forth in detail in the Sale Motion and were approved pursuant to the Sale Procedures Order.

The Debtors reserve the right to modify the Sale Procedures as necessary, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtors, in consultation with counsel to the DIP Agent, Pre-Petition Agent, the Required Lenders and any official committee appointed in these Chapter 11 Cases, after or as they deem appropriate to maximize value for the Debtors' estates and creditors.

A copy of the Sale Motion, Sale Procedures Order, and related sale pleadings can be viewed on the Court's website at https://ecf.deb.uscourts.gov  and on the website of the Debtors' noticing and claims agent, Epiq Corporate Restructuring, LLC at https://dm.epiq11.com/restaurants.  Further information and copies of pleadings also may be obtained by calling Epiq Corporate Restructuring, LLC at 877-277-3908 (U.S. Toll-Free) or 503-520-4458 (International) or emailing restaurants@epiqglobal.com.
.

Dated:  August [●], 2019
Wilmington, Delaware

/s/
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Sally E. Veghte (DE Bar No. 4762)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193
Email:    dpacitti@klehr.com
          myurkewicz@klehr.com

*Counsel to the Debtors*

# <u>ANNEX 3</u>

**Assignment Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| RUI HOLDING CORP., *et al.*,[1] | ) | Case No. 19-11509 (JTD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF POTENTIAL ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND SALE HEARING[2]

NOTICE IS HEREBY GIVEN, as follows:

On July 7, 2019, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed a motion [Docket No. 15] (the "Sale Motion")[3] seeking approval of among other things (i) the sale (the "Sale") of substantially all of the Debtors' business assets (the "Purchased Assets") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (ii) bid procedures relating to the Sale (the "Sale Procedures"), (iii) procedures to determine cure amounts and deadlines for objections to certain contracts and leases that may be assumed and assigned (the "Contract Procedures"), and (iv) the date, time and place for a sale hearing, and for objections to the sale and related relief. On August 28, 2019, the Court held a hearing to consider the Sale Procedures and entered an order approving the same [Docket No. [●]] (the "Sale Procedures Order").

On August 28, 2019, the Debtors were authorized to enter into that certain Asset Purchase Agreement by and among Restaurants Unlimited, Inc., Restaurants Unlimited Texas, Inc., RU Corp. and Landry's, LLC, dated as of August 27, 2019 (the "Stalking Horse Agreement"), pursuant to which Landry's LLC (together with its permitted successors, designees and assigns) shall serve as the "Stalking Horse Purchaser" with respect to the Purchased Assets.

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RUI Holding Corp. (6192); RU Corp. (8259); Restaurants Unlimited, Inc. (8365); and Restaurants Unlimited Texas, Inc. (5733). The Debtors' headquarters and mailing address is: 411 First Ave. South, Suite 200, Seattle, WA 98104. The Debtors operate restaurants under the following names: Clinkerdagger; Cutters Crabhouse; Fondi Pizzeria; Henry's Tavern; Horatio's; Kincaid's; Maggie Bluffs; Manzana; Newport Seafood Grill; Palisade; Palomino; Portland City Grill; Portland Seafood Company; Scott's Bar and Grill; Simon & Seafort's; Skate's on the Bay; Stanford's; and Stanley & Seafort's.

[2]  This Notice is subject to the full terms and conditions of the Sale Motion, the Sale Procedures Order, the Sale Procedures, the Contract Procedures and the Stalking Horse Agreement, which shall control in the event of any conflict. The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

[3]  Capitalized terms not otherwise defined in this notice shall have the meanings ascribed to them in the Sale Procedures Order (as defined herein) or the Sale Motion, as applicable.

In connection with the Sale, the Debtors and the applicable Prevailing Bidder will seek entry of an order or orders from the Bankruptcy Court approving the Sale of the Purchased Assets (the "Sale Order"). The Sale Order will seek to sell the applicable Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon to the maximum extent permitted by section 363 of the Bankruptcy Code. **The specific terms of sale will be provided in the proposed Sale Order and the APA proposed to be entered into among the Debtors and the Prevailing Bidder for the applicable Purchased Assets.**

At the Sale Hearing on **September 23, 2019 at 1:30 p.m. prevailing Eastern time**, or such other time as the Bankruptcy Court shall determine, the Debtors intend to seek the Bankruptcy Court's approval of the Sale of the Purchased Assets to the Prevailing Bidder(s). The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the Bankruptcy Court's calendar.

Pursuant to the Motion, the Debtor may seek to assume, sell and assign certain of its unexpired leases, license agreements and executory contracts (collectively, the "Potential Designated Contract") free and clear of all liens, claims, encumbrances, and interests upon satisfaction of the cure amounts required under section 365(b)(1)(A) of the Bankruptcy Code (the "Cure Costs"). The Potential Designated Contracts and the corresponding Cure Costs are listed on the attached **Exhibit A**.

To be timely and otherwise eligible for consideration by the Court, objections, if any, to (i) the proposed Cure Costs, (ii) the proposed assumption and assignment of the Potential Designated Contracts, or (iii) objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received no later than **4:00 p.m., prevailing Eastern time on September 16, 2019** (the "Cure/Assignment Objection Deadline").

Objections, if any, to the adequate assurance of future performance with respect to a Prevailing Bidder must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received no later than **4:00 p.m., prevailing Eastern time on September 20, 2019** (the "Adequate Assurance Objection Deadline," and together with the Cure/Assignment Objection Deadline, the "Contract Objection Deadlines")

The Contract Notice Parties are: (a) the Debtors, Restaurants Unlimited, Inc., 411 1st Avenue S., Seattle, WA 98104, Attn: Jim Eschweiler, CEO and David Bagley, CRO; (b) counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com) and Michael W. Yurkewicz (myurkewicz@klehr.com); (c) counsel to the DIP Agent and Pre-Petition Agent, Hunton Andrews Kurth LLP, Riverfront Plaza East Tower, 951 East Byrd Street, Richmond, VA 23219, Attn: Tyler P. Brown (tpbrown@huntonak.com) and Justin F. Paget (jpaget@huntonak.com); and Gellert Scali Busenkell & Brown, LLC, 1201 N. Orange Street,

Suite 300, Wilmington, DE 19801, Attn: Michael Busenkell (mbusenkell@gsbblaw.com); (d) counsel to any statutory committee appointed in these cases; counsel to NXT, Goldberg Kohn, Ltd., 55 East Monroe, Suite 3300, Chicago, Illinois 60603, Attn: Randall Klein (Randall.klein@goldbergkohn.com) and Prisca Kim (Prisca.kim@goldbergkohn.com); and (e) Office of The United States Trustee, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer (linda.richenderfer@usdoj.gov).

At any time prior to (i) the closing of any sale transaction for the Purchased Assets, or (ii) in the case of Designation Rights Assets, October 31, 2019 (as applicable, the "Contract Designation Deadline"), the Prevailing Bidder(s) may direct the Debtors to serve a notice excluding any of the Potential Designated Contracts on (i) the Non-Debtor Counterparty to such Potential Designated Contracts and (ii) all Objection Notice Parties other than the Debtors, indicating, by reasonably specific information, which Potential Designated Contracts have been excluded, and stating that the Prevailing Bidder has excluded such Potential Designated Contracts. Upon consummation of the sale with the Prevailing Bidder and service of such notice, the executory contracts and/or unexpired leases referenced in such notice (x) shall no longer be considered Potential Designated Contracts; (y) shall not be deemed to be, or to have been, assumed or assigned; and (z) shall remain subject to assumption, rejection or assignment by the Debtors. At any time prior to the Contract Designation Deadline, the Prevailing Bidder may also direct the Debtors to serve a notice to designate a Potential Designated Contract that had previously been excluded to be included and considered as a Potential Designated Contract, and require the Debtors to give not less than five (5) Business Days' notice to the Non-Debtor Counterparty to such Potential Designated Contracts of the Prevailing Bidder's proposed assumption and assignment thereof to the Prevailing Bidder.

If any Non-Debtor Counterparty to a Potential Designated Contract files a timely objection meeting the requirements hereof, objecting to the assumption by the Debtors and assignment to the Prevailing Bidder of such Potential Designated Contract (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtors and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtors and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Court at the Sale Hearing, unless the Debtors, the Prevailing Bidder and the Non-Debtor Counterparty to the Potential Designated Contract in dispute agree otherwise. Except with respect to Designation Rights Assets, which shall be treated in accordance with Section 2.7 of the Stalking Horse Agreement, if the Court determines at the Sale Hearing that the Potential Designated Contract will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered a Potential Designated Contract. If any objection related to a Disputed Designation or Disputed Cure Costs is continued beyond the Sale Hearing, the Prevailing Bidder shall escrow the portion of the Cure Costs that is disputed pending such resolution.

Any Non-Debtor Counterparty to a Potential Designated Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment  of  a

Potential Designated Contract by the Contract Objection Deadlines, absent further order of the Court is deemed to have consented to such Cure Costs and the assumption and assignment of such Potential Designated Contract by the Debtor and to the Prevailing Bidder, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates or the Prevailing Bidder.

If the Non-Debtor Counterparty to a Potential Designated Contract fails to timely object to the assumption and assignment of a Potential Designated Contract or the proposed Cure Cost relating thereto by the Contract Objection Deadlines, as applicable, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Potential Designated Contract shall be deemed to be assumed by the Debtors and assigned to the Prevailing Bidder, subject to the next paragraph, and the proposed Cure Cost related to such Potential Designated Contract shall be established and approved in all respects.

The Debtors' decision to assume and assign the Potential Designated Contract is subject to Court approval and consummation of the Sale with a Prevailing Bidder. Upon entry of an order approving the Sale, except for those Designated Contracts that have been excluded or been designated as a Designated Rights Asset, the Debtors shall be deemed to have assumed and assigned each of the Potential Designated Contracts as of the date of and effective only upon the closing date of an Asset sale transaction with a Prevailing Bidder, and absent such closing, each of the Potential Designated Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code. Any inclusion of any document on the list of Potential Designated Contracts shall not constitute or be deemed to be a determination or admission by the Debtors that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved). The Prevailing Bidder shall have no rights in and to a particular Potential Designated Contract, and the Non-Debtor Counterparty shall have no rights against a Prevailing Bidder, until such time as the particular Potential Designated Contract is assumed and assigned in accordance with the procedures set forth herein.

Except as may otherwise be agreed to in an asset purchase agreement with a Prevailing Bidder or by the parties to a Potential Designated Contract, the defaults under the Potential Designated Contract that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: without any reduction, or credit against, the amount of the Prevailing Bid, the Stalking Horse Purchaser or Prevailing Bidder, as applicable, shall pay all Cure Costs relating to an assumed executory contract or unexpired lease within ten days after the later of (i) the closing date specified in the APA entered into with a Prevailing Bidder or (ii) the date on which such executory contract or unexpired lease is deemed assumed and assigned, in accordance with the Sale Procedures Order.

A copy of the Sale Motion, Sale Procedures Order, and related sale pleadings can be viewed on the Court's website at https://ecf.deb.uscourts.gov and on the website of the Debtors' noticing and claims agent, Epiq Corporate Restructuring, LLC at https://dm.epiq11.com/restaurants. Further information and copies of pleadings also may be

obtained by calling Epiq Corporate Restructuring, LLC at 877-277-3908 (U.S. Toll-Free) or 503-520-4458 (International) or emailing restaurants@epiqglobal.com.

| | |
|---|---|
| Dated: August [●], 2019<br>Wilmington, Delaware | /s/ |
| | Domenic E. Pacitti (DE Bar No. 3989)<br>Michael W. Yurkewicz (DE Bar No. 4165)<br>Sally E. Veghte (DE Bar No. 4762)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>919 North Market Street, Suite 1000<br>Wilmington, Delaware 19801<br>Telephone:    (302) 426-1189<br>Facsimile:    (302) 426-9193<br>Email:    dpacitti@klehr.com<br>        myurkewicz@klehr.com<br>        sveghte@klehr.com |
| | *Counsel to the Debtors* |

## EXHIBIT A

| Debtor Party | Non-Debtor Counterparty | Potential Designated Contract | Cure Cost |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**<u>EXHIBIT A</u>**
**to Sale Procedures Order**

**Stalking Horse Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**by and among**

**RESTAURANTS UNLIMITED, INC.,**

**RESTAURANTS UNLIMITED TEXAS, INC.,**

**RU CORP.,**

**And**

**LANDRY'S, LLC**

**August 27, 2019**

# TABLE OF CONTENTS

**Page**

Article I        DEFINITIONS ................................................................................2

Article II        PURCHASE AND SALE ..............................................................12

    Section 2.1        Purchase and Sale of Purchased Assets ................................12
    Section 2.2        Excluded Assets ....................................................................14
    Section 2.3        Assumption of Assumed Liabilities and Costs of
                       Operating Designation Rights Assets ....................................16
    Section 2.4        Excluded Liabilities ..............................................................16
    Section 2.5        Consideration ........................................................................16
    Section 2.6        Adjustment of Purchase Price ...............................................16
    Section 2.7        Cure Costs; Schedule Updates; Designation Rights ............18
    Section 2.8        Closing ..................................................................................21
    Section 2.9        Deliveries at Closing .............................................................21
    Section 2.10       Allocation ..............................................................................22
    Section 2.11       Excluded Locations ...............................................................23
    Section 2.12       Good Faith Deposit ...............................................................23

Article III       SELLERS' REPRESENTATIONS AND WARRANTIES ............23

    Section 3.1        Organization of Sellers; Good Standing ...............................24
    Section 3.2        Authorization of Transaction ................................................24
    Section 3.3        Noncontravention; Consents and Approvals..........................25
    Section 3.4        Compliance with Laws ..........................................................25
    Section 3.5        Title to Purchased Assets ......................................................25
    Section 3.6        Contracts ...............................................................................25
    Section 3.7        Intellectual Property .............................................................26
    Section 3.8        Litigation ...............................................................................27
    Section 3.9        Employees and Employment Matters .....................................27
    Section 3.10       Employee Benefit Plans ........................................................27
    Section 3.11       Real Property.........................................................................28
    Section 3.12       Permits ..................................................................................28
    Section 3.13       Brokers' Fees ........................................................................29
    Section 3.14       No Other Representations or Warranties ...............................29

Article IV        BUYER'S REPRESENTATIONS AND WARRANTIES ............30

    Section 4.1        Organization of Buyer...........................................................30
    Section 4.2        Authorization of Transaction ................................................30
    Section 4.3        Noncontravention..................................................................30
    Section 4.4        Financial Capacity ................................................................31
    Section 4.5        Adequate Assurances Regarding Executory Contracts..........31
    Section 4.6        Good Faith Purchaser............................................................31

Section 4.7    Brokers' Fees ........................................................................31
Section 4.8    Condition of Business .............................................................31

Article V    PRE-CLOSING COVENANTS ....................................................32

Section 5.1    Certain Efforts; Cooperation ..................................................32
Section 5.2    Notices and Consents .............................................................32
Section 5.3    Bankruptcy Actions ................................................................34
Section 5.4    Conduct of Business ...............................................................36
Section 5.5    Certain Restricted Conduct .....................................................37
Section 5.6    Notice of Developments ..........................................................38
Section 5.7    Access .....................................................................................39
Section 5.8    Press Releases and Public Announcements ..............................39
Section 5.9    Bulk Transfer Laws ................................................................39
Section 5.10   Contracts .................................................................................40
Section 5.11   Casualty, Condemnation, Loss of Lease ..................................40

Article VI    OTHER COVENANTS ................................................................41

Section 6.1    Cooperation ............................................................................41
Section 6.2    Further Assurances .................................................................41
Section 6.3    Availability of Business Records .............................................41
Section 6.4    Employee Matters ...................................................................42
Section 6.5    Recording of Intellectual Property Assignments .....................44
Section 6.6    Transfer Taxes ........................................................................44
Section 6.7    Wage Reporting ......................................................................44
Section 6.8    Acknowledgements .................................................................44
Section 6.9    Insurance Policies ...................................................................44
Section 6.10   Collection of Accounts Receivable ..........................................45
Section 6.11   Use of Name and Marks ..........................................................45
Section 6.12   Liquor License Approvals .......................................................45
Section 6.13   Data Privacy Protection ..........................................................46
Section 6.14   Covenant Not to Sue ...............................................................46
Section 6.15   401-K Plan ..............................................................................46

Article VII    CONDITIONS TO CLOSING ....................................................47

Section 7.1    Conditions to Buyer's Obligations ..........................................47
Section 7.2    Conditions to Sellers' Obligations ..........................................48
Section 7.3    No Frustration of Closing Conditions ......................................48

Article VIII    TERMINATION .........................................................................48

Section 8.1    Termination of Agreement ......................................................48
Section 8.2    Procedure upon Termination ...................................................50
Section 8.3    Breakup Fee and Expense Reimbursement ...............................50
Section 8.4    Effect of Termination ..............................................................51

Article IX      MISCELLANEOUS ..................................................................................51

　　Section 9.1      Remedies.................................................................................51
　　Section 9.2      Expenses.................................................................................52
　　Section 9.3      Entire Agreement ...................................................................52
　　Section 9.4      Incorporation of Schedules, Exhibits and Disclosure
　　　　　　　　　　Schedule .................................................................................52
　　Section 9.5      Amendments and Waivers ......................................................52
　　Section 9.6      Succession and Assignment ...................................................52
　　Section 9.7      Notices ...................................................................................53
　　Section 9.8      Governing Law; Jurisdiction..................................................54
　　Section 9.9      Consent to Service of Process ...............................................54
　　Section 9.10     WAIVERS OF JURY TRIAL .................................................54
　　Section 9.11     Severability ...........................................................................54
　　Section 9.12     No Third Party Beneficiaries .................................................55
　　Section 9.13     No Survival of Representations, Warranties and
　　　　　　　　　　Agreements ...........................................................................55
　　Section 9.14     Construction ...........................................................................55
　　Section 9.15     Computation of Time ..............................................................55
　　Section 9.16     Mutual Drafting......................................................................55
　　Section 9.17     Disclosure Schedule...............................................................56
　　Section 9.18     Headings; Table of Contents..................................................56
　　Section 9.19     Counterparts; Facsimile and Email Signatures ......................56
　　Section 9.20     Time of Essence.....................................................................56
　　Section 9.21     Stock Sale...............................................................................57

Exhibit A     -     Form of Bill of Sale
Exhibit B     -     Form of Assignment and Assumption Agreement
Exhibit C     -     Form of Trademark Assignment Agreement
Exhibit D     -     Form of Copyright Assignment Agreement
Exhibit E     -     Form of Domain Name Assignment Agreement
Exhibit F     -     Form of Management Agreement
Exhibit G     -     Form of Sale Procedures Order

Schedule 2.3       -     Assumed Liabilities
Schedule 3.3(b)    -     Consents and Approvals
Schedule 3.6       -     Material Contracts
Schedule 3.7       -     Intellectual Property
Schedule 3.8       -     Litigation
Schedule 3.10      -     Employee Benefit Plans
Schedule 3.11(b)   -     Real Property
Schedule 3.12(a)   -     Permits
Schedule 3.12(b)   -     Liquor Licenses

PHIL1 8179118v.9

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended or modified, this "Agreement") is entered into as of August 27, 2019, by and among Restaurants Unlimited, Inc., a Minnesota corporation ("RUI"), Restaurants Unlimited Texas, Inc., a Texas corporation ("RUI Texas"), RU Corp., a Washington corporation ("RUC" and together with RUI and RUI Texas, "Sellers"), and Landry's, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Sellers are engaged in the business of operating a portfolio of casual and upscale dining restaurants under the following trade names: Clinkerdagger; Cutters Crabhouse; Fondi Pizzeria; Henry's Tavern; Horatio's; Kincaid's; Maggie Bluffs; Manzana; Newport Seafood Grill; Palisade; Palomino; Portland City Grill; Portland Seafood Company; Scott's Bar and Grill; Simon & Seafort's; Skate's on the Bay; Stanford's and Stanley & Seafort's (collectively, the "Business");

WHEREAS, Sellers and RUI Holding Corp. ("Holding") have commenced proceedings (collectively, the "Chapter 11 Cases") under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to a Sale Order, Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, pursuant to sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities as of the Closing;

WHEREAS, Sellers intend to seek the entry of an order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, pursuant to the Sale Procedures Order, the Sellers shall conduct an Auction to determine the highest and otherwise best offer for the Purchased Assets; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

# ARTICLE I
# DEFINITIONS

"<u>401(k) Plan</u>" means the Restaurants Unlimited 401(k) Plan.

"<u>Accounts Receivable</u>" means (a) all accounts, accounts receivable, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, including (x) any such Accounts Receivable generated by Sellers during the three day period immediately prior to the Closing Date other than Credit Card Receivables (such accounts, the "<u>Specified Accounts</u>") and (y) any amounts received by or payable to Sellers with respect to the Specified Accounts, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"<u>Administrative Claim</u>" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"<u>Affiliate</u>" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Alternate Transaction</u>" means a transaction or series of related transactions pursuant to which Sellers, pursuant to the Sale Procedures Order, (a) accept a Qualified Bid, other than that of Buyer, as the highest and best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a Plan or refinancing, all of substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.9(a)ii</u>.

"<u>Assumed Contracts</u>" means those Leases and other Contracts that have been assigned to and assumed by Buyer pursuant to <u>Section 2.7</u> and section 365 of the Bankruptcy Code. For the avoidance of doubt, "Assumed Contracts" shall not include any Contract or Lease that is excluded and rejected pursuant to <u>Section 2.7</u>.

"<u>Assumed Liabilities</u>" means those liabilities and obligations enumerated on <u>Schedule 2.3</u> attached hereto.

"<u>Assumed Permits</u>" means all Permits relating to the Business that are transferable in accordance with their terms, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"<u>Auction</u>" means the auction for the sale and assumption of the Purchased Assets.

"<u>Backup Bid</u>" has the meaning set forth in <u>Section 5.3(c)</u>.

"<u>Backup Bidder</u>" has the meaning set forth in <u>Section 5.3(c)</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bid Deadline</u>" means September 16, 2019.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2.9(a)i</u>.

"<u>Breakup Fee</u>" has the meaning set forth in <u>Section 5.3(b)</u>.

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Cash Payment</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Casualty</u>" has the meaning set forth in <u>Section 5.11(b)</u>.

"<u>Casualty Proceeds</u>" has the meaning set forth in <u>Section 5.11(b)</u>.

"<u>Certified True-Up</u>" has the meaning set forth in <u>Section 2.6(c)</u>.

"<u>Chapter 11 Cases</u>" has the meaning set forth in the recitals.

"<u>Claim</u>" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.8</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2.8</u>.

"<u>COBRA</u>" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"<u>Condemnation</u>" has the meaning set forth in <u>Section 5.11(a)</u>.

"<u>Condemnation Proceeds</u>" has the meaning set forth in <u>Section 5.11(a)</u>.

"<u>Confidentiality Agreement</u>" means that confidentiality agreement dated June 21, 2019 by Landry's LLC in favor of RUI, regarding the terms and conditions on which Sellers would make available certain information.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets.

"Continuing Restaurant" means any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts or Designation Rights Assets.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"Contract and Cure Schedule" has the meaning set forth in Section 2.7(a).

"Contract Designation Deadline" has the meaning set forth in Section 2.7(d).

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Credit Card Receivables" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any Continuing Restaurants operated by Sellers that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers, including all Credit Card Receivables generated with respect to sales occurring during the three days immediately prior to the Closing Date, including any amounts received by or payable to Sellers with respect to such sales occurring during such three days immediately prior to the Closing Date.

"Cure Costs" means, for only the Assumed Contracts, all amounts that are determined by a final and nonappealable order of the Bankruptcy Court must be paid, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Buyer as provided herein.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

4

"Designation Rights Asset" has the meaning set forth in Section 2.7(b).

"Designation Rights Asset Proceeds" has the meaning set forth in Section 2.7(f).

"Designation Rights Asset Term" has the meaning set forth in Section 2.7(f).

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other material benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Account" has the meaning set forth in Section 2.12.

"Escrow Agent" has the meaning set forth in Section 2.12.

"Escrow Agreement" has the meaning set forth in Section 2.12.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" means any contract or agreement not listed as an Assumed Contract or a Designation Rights Asset, or is at any point excluded from being an Assumed Contract or a Designation Rights Asset.

"Excluded Claims" means all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against third parties to the extent related to any Excluded Asset or Excluded Liability.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Petty Cash" means, collectively, any petty cash of Sellers (i) on the premises of any of the Continuing Restaurants in excess of $4,000, or (ii) on any premises or at any other location that is not a Continuing Restaurant.

"Excluded Restaurants" means any restaurant location that is the subject of the *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing the Rejection of Certain Unexpired Leases, (II) Authorizing Abandonment of Certain Personal Property, Each Effective Nunc Pro Tunc to the Petition Date, and (III) Granting Related Relief* [Docket No. 16] or any subsequent motion seeking to reject the Lease of a restaurant location.

"Excluded Utility Deposits" means (a) any utility deposits related exclusively to Excluded Assets and (b) any post-Petition Date adequate assurance deposits provided to the provider of any utility services or held by Sellers.

5

"Expense Reimbursement" has the meaning set forth in Section 5.3(b).

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"Good Faith Deposit" has the meaning set forth in Section 2.12.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Health Plans" means all health plans including, but not limited to, health, dental, life, disability and long-term care insurance.

"Holding" has the meaning set forth in the recitals.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) trade secrets and Recipes; and (e) all other intellectual property rights related to the Business, including all social media accounts related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a)iii.

"Inventory" means all of Sellers' consumable food, alcoholic beverages, and other beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

6

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Decree of any Governmental Entity.

"Leased Real Property" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Sellers which is used in the Business.

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Lien" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien (statutory or otherwise, including PACA/PASA Claims), claim, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Liquor Licenses" shall have the meaning set forth in Section 3.12(b).

"Liquor License Approvals" shall have the meaning set forth in Section 6.12.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"Management Agreement" means an agreement in the form as shall be reasonably acceptable to Buyer and Sellers, and which provides that all costs of operations of the Purchased Assets and Designation Rights Assets from and after the Closing Date shall be paid on a current basis by Buyer and the economic benefit of the operations of the Purchased Assets accrues to the Buyer.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, except to the extent that such change has

7

a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (iv) any changes directly attributable to the announcement of this Agreement or any Related Agreement; (v) resulting from any act of God or other force majeure event (including natural disasters); (vi) in the case of Sellers or the Business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement, filing or pendency of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; (vii) seasonal changes in the results of operations (provided that such seasonal changes are consistent with the historic experience of the Business); (viii) changes in Law or in GAAP or interpretations thereof; or (ix) inaction by Sellers due to Buyer's refusal to consent to a request for consent by Seller under Section 5.5 hereof; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"Material Contract" has the meaning set forth in Section 3.6.

"Newco" has the meaning set forth in Section 9.21.

"Newco Stock" has the meaning set forth in Section 9.21.

"Offeree" has the meaning set forth in Section 6.4(a).

"Ordinary Course of Business" means the ordinary course of business of Sellers consistent with past custom and practice and subject to any modifications of such practice as a result of the filing of the Chapter 11 Cases.

"PACA/PASA Claims" means any valid claims against the Sellers under the Perishable Agricultural Commodities Act of 1930 or any similar state statutes of similar effect or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181, *et seq*. timely filed and served pursuant to an order of the Bankruptcy Court issued in the Chapter 11 Cases.

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) with respect to leased or licensed personal

PHIL1 8179118v.9

property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract; (c) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings in an aggregate amount not to exceed $100,000; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (f) matters that would be disclosed on an accurate survey or inspection of the real property but which do not interfere in any material respect with the right or ability to use the property as currently used or operated or to convey fee simple title; and (g) any Liens associated with or arising in connection with any Assumed Liabilities.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" means the date of the filing of the Chapter 11 Cases.

"PII" has the meaning set forth in Section 6.13.

"Plan" means a plan of reorganization or liquidation proposed by the Sellers and/or the Committee.

"Pre-Petition Taxes" has the meaning set forth in Section 2.6(a).

"Prevailing Bid" has the meaning set forth the Sale Procedure Order.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Professional Services" means any legal services, accounting services, financial advisory services, investment banking services or any other professional services provided by the Sellers' advisers obtained pursuant to any order of the Bankruptcy Court.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets.

"Purchased Avoidance Actions" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller or Holding, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code relating to the Business and the Purchased Assets.

"Qualified Bid" means competing bids qualified for the Auction in accordance with the Sale Procedures Order.

"Qualified Bidder" has the meaning set forth in Sale Procedures Order.

"Recipes" has the meaning set forth in Section 2.1(g).

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Management Agreement, Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Rent" has the meaning set forth in Section 2.6(a).

"Rent Amount" has the meaning set forth in Section 2.6(a).

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Restaurant Petty Cash" means any petty cash of Sellers on the premise of any Continuing Restaurant, other than Excluded Petty Cash.

"Retained Security Deposits" has the meaning set forth in Section 2.6(a).

"RUC" has the meaning set forth in the preamble.

"RUI" has the meaning set forth in the preamble.

"RUI Texas" has the meaning set forth in the preamble.

"Sale Closing Deadline" means September 30, 2019.

"Sale Hearing" means the hearing scheduled with the Bankruptcy Court to consider the sale portion of the Sale Motion.

"Sale Motion" means a motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases consistent with the terms of this Agreement approving the Sale Motion and sale to Buyer consistent with the terms of this Agreement and otherwise reasonably acceptable to Buyer and Sellers.

"Sale Order Deadline" means September 23, 2019, unless extended by the Seller.

"Sale Procedures" means the procedures approved pursuant to the Sale Procedures Order, and satisfactory, in form and substance, to the Buyer, in its reasonable discretion.

"Sale Procedures Order" means an order of the Bankruptcy Court approving the sale procedures relief requested in the Sale Motion.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Sellers' Accounts" has the meaning set forth in Section 2.9(b)ii.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of James E. Eschweiler and Crystal Grays.

"Specified Accounts" has the meaning in the definition of Accounts Receivable set forth above.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

11

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employees" has the meaning set forth in Section 6.4(a).

"True-Up" has the meaning set forth in Section 2.6(b).

"True-Up Statement" has the meaning set forth in Section 2.6(b).

"Workers Comp Liabilities" has the meaning set forth in Section 2.6(a).

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets.** Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of Sellers' rights, title and interests in and to the assets described in this Section 2.1 (the "Purchased Assets"), free and clear of all Liens (other than Permitted Liens), for the consideration specified in Section 2.5. Without limiting the generality of the foregoing, the Purchased Assets shall include, without limitation, the following (except to the extent listed as an Excluded Asset):

(a)    Restaurant Petty Cash;

(b)    all Accounts Receivable of Sellers as of the Closing (other than the Credit Card Receivables);

(c)    all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing, but excluding (i) alcoholic beverage Inventory in jurisdictions where the Law does not permit Buyer to take title to such Inventory through asset purchase; (ii) alcoholic beverage Inventory in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals from the pertinent Governmental Entity; provided, however, Sellers shall transfer, assign, convey and deliver to Buyer such alcoholic beverage Inventories in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or relevant Governmental Entity; and (iii) Inventory located at a restaurant that is covered by a Lease that does not constitute an Assumed Contract;

(d)    (w) all deposits under the Leases at each Continuing Restaurant, (x) all deposits under all Assumed Contracts that are not Leases, and (y) other prepaid charges and expenses of Sellers;

(e)    all rights of Sellers under the Contracts that are set forth on <u>Schedule 2.7</u> to the extent such Contracts become Assumed Contracts that have been assumed by and assigned to Buyer pursuant to <u>Section 2.7</u>;

(f)    all Intellectual Property owned by Sellers;

(g)    all of Sellers' recipes, methods, procedures, cooking/preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages (whether alcoholic or non-alcoholic), or otherwise (in each case, written or oral or in any other form whatsoever) (collectively, "<u>Recipes</u>");

(h)    all open purchase orders with suppliers related to the Continuing Restaurants;

(i)    all tangible personal property, including all machinery, equipment, tools, point of sale systems, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, cutlery, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers (including any of the foregoing property that is subject to a lease, but only to the extent that Buyer assumes such lease as an Assumed Contract), other than tangible personal property located at a restaurant that is covered by a Lease that does not constitute an Assumed Contract;

(j)    all cars, trucks, forklifts, other industrial vehicles and other motor vehicles set forth on <u>Schedule 2.1(h)</u>;

(k)    all Records, including Records related to Taxes paid or payable by any Seller related to the Continuing Restaurants (<u>provided</u> that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Debtors upon request and at no charge);

(l)    all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(m)    all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(n)    all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Continuing Restaurants, including all Liquor Licenses to the extent transferrable and held by Sellers, other than alcohol permits (including Liquor

Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Entity in which case Sellers shall transfer, assign convey and deliver to Buyer such permits in each instance upon issuance of the requisite approvals from the relevant Governmental Entity;

(o)    the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(p)    all other rights, demands, claims, credits, allowances, rebates or other refunds (including any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Continuing Restaurants as of the Closing, including customer deposits (whether maintained in escrow or otherwise), advances and prepayments (but excluding any Retained Security Deposits);

(q)    except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including, without limitation, the Purchased Avoidance Actions;

(r)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(s)    the right to receive and retain mail relating to, Accounts Receivable payments and other communications of Sellers (other than the Credit Card Receivables) and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(t)    all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Continuing Restaurants; and

(u)    all other assets that are related to or used in connection with the Business (but excluding all of the Excluded Assets).

**Section 2.2**    <u>Excluded Assets</u>. Notwithstanding <u>Section 2.1</u>, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties and rights of Sellers (the "<u>Excluded Assets</u>"):

(a)    all Excluded Petty Cash and all other cash, cash equivalents, bank deposits and similar cash items of Sellers (including any cash received by Sellers with respect to

14

the Credit Card Receivables) other than (x) Restaurant Petty Cash or (y) any cash received by Sellers with respect to the Specified Accounts;

(b)      all bank accounts of Sellers;

(c)      all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(d)      all equity securities of any Seller and all net operating losses of any Seller;

(e)      Excluded Utility Deposits, all deposits for electricity, telephone, or utilities, the Excluded Security Deposits and the Credit Card Receivables;

(f)      all Excluded Contracts;

(g)      the Excluded Claims;

(h)      any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees);

(i)      any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (2)) to the extent that such portions relate to the Business or any Purchased Asset;

(j)      all liquor licenses associated with any Excluded Restaurants or which the Sellers hold in safe keeping as of the date hereof;

(k)      all Permits other than the Assumed Permits;

(l)      all of Sellers' right, title and interest in and to all of the assets primarily related to the Excluded Restaurants;

(m)      all directors' and officers' liability insurance policies;

(n)      all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits, Tax prepayments and estimated Tax payments;

(o)     all assets maintained or held (including all deposits) pursuant to or in connection with the Health Plans or the 401(k) Plan; and

(p)     the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3    Assumption of Assumed Liabilities and Costs of Operating Designation Rights Assets** . On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Sections 2.7), Buyer shall assume and become responsible for the Assumed Liabilities and no other liabilities of Sellers or any of their Affiliates (other than the liabilities associated with operating the Designated Rights Assets arising from and after the Closing), and from and after the Closing agrees to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, all Assumed Liabilities in accordance with the terms thereof. At the Closing, Buyer shall assume and become responsible for all costs associated with the Designation Rights Assets, and from and after the Closing agrees to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, all costs associated with the Designation Rights Assets arising from and after the Closing.

**Section 2.4    Excluded Liabilities**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities").

**Section 2.5    Consideration**. In consideration of the sale of the Business and the Purchased Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

(a)     the payment of an amount in cash (the "Cash Payment") equal to (i) **$37,200,000.00** less (ii) the Good Faith Deposit;

(b)     the assumption by Buyer of the Assumed Liabilities;

(c)     the payment of an amount in cash in an amount not to exceed $450,000 in payment of Sellers' estimated accrued and unpaid workers compensation liabilities; and

(d)     the payments and adjustments to the Cash Payment otherwise required under Section 2.6 below.

**Section 2.6    Adjustment of Purchase Price**.

(a)     Sellers agree to pay all base rent, CAM, taxes, percentage rent based on revenues generated before the Closing Date, and other amounts due and owing under the

16

Leases for Continuing Restaurants for all periods prior to the Closing Date that are due, owing and payable before the Closing Date (together, all such amounts shall collectively be referred to as "Rent") (other than Rent included within Assumed Liabilities) and agree that the Purchase Price will be reduced for any such amount of Rent that has not been paid. Pursuant to Section 2.3 and Schedule 2.3, Buyer agrees to pay all base rent, CAM, CAM reconciliation, taxes, percentage rent based on revenues generated before, on or after the Closing Date, and other amounts due and owing under the Leases for Continuing Restaurants for all periods prior to the Closing Date, the Closing Date and after the Closing Date that are first due, owing and payable on or after the Closing Date (which such payments by Buyer, for the avoidance of doubt, will not entitle Buyer to any adjustment to the Purchase Price).

(b)    Within three Business Days prior to the Closing, the Sellers shall deliver to Buyer a good faith estimate of: (v) real property and personal property taxes owing at the Continuing Restaurants for periods prior to the Petition Date ("Pre-Petition Taxes"), (w) the pro-rated Rent for the month in which the Closing occurs paid by Sellers (based upon the number of days in the month on and after the Closing Date), including percentage rent that has not been paid by Sellers that is payable before the Closing Date based on revenues generated before the Closing Date ("Rent Amount"), (x) the Credit Card Receivables, (y) the amount of Sellers' accrued but unpaid workers compensation liabilities as of immediately prior to the Closing Date ("Workers Comp Liabilities"), and (z) all utility deposits and customer deposits (collectively, the "Retained Security Deposits"). Sellers and Buyer shall work in good faith to address any objections that they may have to the foregoing amounts prior to Closing.  At the Closing, (A) the Buyer shall pay to Sellers the amount of the estimated Workers Comp Liabilities in an amount not to exceed $450,000 and (B) the Cash Payment shall be (i) decreased by the amount of the Pre-Petition Taxes not otherwise paid by Sellers as of the Closing Date, the Credit Card Receivables, and the Retained Security Deposits and (ii) increased or decreased by the Rent Amount, as applicable.

(c)    Within forty-five (45) days after the Closing Date, Buyer shall cause to be prepared, at Buyer's expense, a reconciliation of (t) Pre-Petition Taxes, (u) Rent Amount, (v) the Workers Comp Liabilities, (w) the Retained Security Deposits, and (x) all other cash amounts, including Excluded Petty Cash and the Credit Card Receivables, that the Parties owe to each other based upon the terms of this Agreement, the definitions of Assumed Liabilities and Excluded Liabilities, and the facts known to the Parties as of that date (together with supporting calculations in reasonable detail, the "True-Up Statement") which shall show the amount of such expenses payable by Sellers and the amount payable by the Buyer (the "True-Up").  Upon completion of such statement, Buyer shall deliver the True-Up Statement to Sellers.

(d)    If the True-Up, as set forth on the True-Up Statement as conclusively determined as set forth in Section 2.6(f) (the True-Up as so determined, the "Certified True-Up"), provides that Sellers owe Buyer, then Sellers shall promptly (but in any event within five (5) Business Days) wire transfer immediately available funds in such amount to such accounts designated by Buyer.  The amounts payable by Sellers pursuant to this Section 2.6(d) shall constitute an allowed superpriorty administrative expense in the Chapter 11

17

Cases with priority over any and all administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code until paid, other than any superpriority administrative expense claims arising under the Final Order (i) Authorizing Postpetition Financing, (ii) Authorizing use of Cash Collateral, (iii) Granting Liens and Providing Suprepriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, and (vi) Granting Related Relief [Docket No. 117].

(e)    If the Certified True-Up shows that the Buyer owes Sellers with respect to the Purchased Assets, then Buyer shall promptly (and in any event within five (5) Business Days) wire transfer immediately available funds in such amount to such accounts designated by Sellers.

(f)    Unless Sellers notify Buyer in writing within fifteen (15) days after receipt by Sellers of the True-Up Statement of any objections thereto (specifying in reasonable detail the basis therefor), such statement shall be final and binding for all purposes with respect to the matters included therein.  If Sellers timely notify Buyer of any such objection, Buyer and Sellers shall attempt in good faith to reach an agreement as to the matter in dispute.  If the Parties shall have failed to resolve any such dispute within ten (10) Business Days after receipt of timely notice of such objection, then any such disputed matter may, at the election of Buyer or Sellers, be submitted to and determined by the Bankruptcy Court.  The True-Up Statement shall, after resolution of any dispute pursuant to this <u>Section 2.6(f)</u>, be final, binding and conclusive on all Parties hereto. The True-Up Statement shall not affect any Party's obligation to pay any amount to the other Parties, or right to receive a payment from the other Parties, unless the matter is specifically addressed therein.

(g)    To maintain and fund the wind down of Sellers' estates and the closure of the Chapter 11 Cases, Buyer shall remit to Sellers a cash payment in the amount of $750,000 payable via wire transfer of immediately available funds on the Closing Date.

**Section 2.7    <u>Cure Costs; Schedule Updates; Designation Rights</u>**.

(a)    Attached as <u>Section 2.7(a) of the Disclosure Schedules</u> is a Contract and Cure Schedule (the "<u>Contract & Cure Schedule</u>"), which the Sellers shall file with the Bankruptcy Court, and serve on each counterparty listed in the Contract & Cure Schedule within two (2) Business Days from the entry of the Sale Procedures Order. The Contract and Cure Schedule contains a list of each Contract of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost has been designated for such Contract as "$0.00").  Counterparties having an objection to the Cure Costs listed in the Contract & Cure Schedule, and any supplements thereto, shall have fourteen (14) days, after the date the Contract & Cure Schedule is filed with the Bankruptcy Court and served on the Contract counterparty to file objections to the Cure Costs listed, or as shall be provided in the Sale Procedures Order, be irrevocably bound to Cure Cost stated.  Without limiting the foregoing, if it is discovered that a Contract that should have been listed on the Contract & Cure Schedule was not so listed, Sellers shall, promptly following the discovery thereof, file a notice with the Bankruptcy Court supplementing the Contract and Cure Schedule and notify Buyer in writing of any such

Contract and Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"). Counterparties having an objection to the Cure Costs listed in the Contract & Cure Schedule supplement shall have fifteen (15) days, after the date the Contract & Cure Schedule supplement is filed with the Bankruptcy Court and served on the Contract counterparty to file objections to the Cure Costs listed, or as shall be provided in the Sale Procedures Order, be irrevocably bound to Cure Cost stated. Subject to the rights and procedures set forth in this <u>Section 2.7</u>, including <u>Sections 2.7(b), (d), and (e)</u>, if Buyer does not elect to reject any Contract listed in the Contract & Cure Schedule, or in any supplement thereto, each Contract shall be assumed and assigned to Buyer and Buyer shall promptly pay the Cure Costs applicable to such Contract.

(b)    At least five (5) Business Days prior to the Closing, the Buyer shall designate, in writing, certain contracts, agreements, and leases as Designation Rights Assets (the "<u>Designation Rights Asset(s)</u>").

(c)    [Intentionally omitted].

(d)    Buyer may, at any time and from time to time through (and including) (i) with respect to any Assumed Contract(s), the date of the Closing, and (ii) with respect to any Designation Rights Assets, October 31, 2019 (as applicable, the "<u>Contract Designation Deadline</u>"), notify Seller to include in the definition of Assumed Contracts, any Contract of any of the Sellers not otherwise included in the definition of Assumed Contracts, and require such Seller to give not less than five (5) Business Days' notice to the non-Seller parties to any such Contract of the Sellers' proposed assumption and assignment thereof to Buyer; <u>provided</u>, that no such change of the definitions of Assumed Contracts referred to in this sentence shall reduce or increase the amount of the Cash Payment.

(e)    Buyer may, at any time and from time to time through (and including) the applicable Contract Designation Deadline, exclude from the definition of Assumed Contracts, any Contract or Lease of any of Sellers otherwise included in the definition of Assumed Contracts; <u>provided</u>, that no such change of the definitions of Assumed Contracts referred to in this sentence shall reduce or increase the amount of the Cash Payment or the obligation of Buyer to pay the costs of such Contract and Lease from the Closing Date through and including the effective date of the rejection by Sellers of such Contract or Lease.

(f)    With respect to any Designation Rights Asset, (i) the Management Agreement shall reflect that the Management Agreement covers such Designation Rights Asset during the term (the "<u>Designation Rights Asset Term</u>") commencing as of the Closing Date and continuing until the <u>later</u> of (A) the applicable Contract Designation Deadline, (B) the date such Designation Rights Asset is assumed by the applicable Seller and assigned to Buyer, and (C) the <u>later</u> of (1) five (5) Business Days after the date Sellers receive written notice from Buyer designating the exclusion of such Designation Rights Asset and (2) the effective date of rejection of any Designation Rights Asset that is not designated for assumption, (ii) the Management Agreement shall provide that Buyer shall

19

directly pay or reimburse Sellers for (or, if applicable, reasonably cooperate with Sellers in pursuing any claims under any insurance policy that relates to such Designation Rights Asset and is transferred to Buyer at the Closing in respect of) any incremental costs, expenses or liabilities incurred by Sellers in the Ordinary Course of Business solely in connection with the operation of such Designation Rights Asset during the Designation Rights Asset Term, including incremental costs, expenses or liabilities arising from or incurred in connection with the administration of the Chapter 11 Cases, solely as it relates to such Designation Rights Asset(s) during the Designation Rights Term (with Professional Services and reasonable fees and expenses of any other estate professionals not to be more than $50,000 in the aggregate), (iii) from and after the Closing to the end of the Designation Rights Asset Term, the Buyer shall be responsible for all costs associated with the Designation Rights Assets, and shall timely honor, pay and discharge, all costs associated with the Designation Rights Assets, (iv) all consideration or proceeds received by Sellers, if any, in respect of, and other benefits deriving from, such Designation Rights Asset shall constitute Purchased Assets and be promptly delivered to Buyer (the "Designation Rights Assets Proceeds"), (v) the foregoing shall not affect the validity of the transfer to Buyer of any other Purchased Asset whether or not related to such Designation Rights Asset and (vi) after the Closing, Buyer shall provide all employees necessary for the operation of the Designation Rights Assets. Buyer shall provide all cooperation and assistance reasonably required by Sellers to enable Sellers to provide, or cause to be provided, the services contemplated by this Section 2.7.

(g) Sellers shall be responsible for the verification of all Cure Costs for each Assumed Contract and shall use commercially reasonable efforts to correctly calculate the proper Cure Costs, if any, for each Assumed Contract prior to the filing of the Contract & Cure Schedule. To the extent that any Assumed Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Cure Costs related to such Assumed Contract, or any portion thereof, shall be paid by Buyer (if the Cure Costs are Assumed Liabilities) within seven (7) days of the Closing Date, or such other date that the Assumed Contract is assumed by the applicable Seller and assigned to the Buyer. Notwithstanding the foregoing, unless otherwise ordered by the Bankruptcy Court, (A) no prepetition Cure Costs with respect to any Designation Rights Asset shall be due until such Designation Rights Asset is assumed pursuant to this Section 2.7 and (B) Buyer shall not have any Liabilities with respect to any Excluded Contract except with respect to Designation Rights Assets through and including the Designation Rights Asset Term. Any Cure with regard to an Assumed Contract that is a Lease that requires any action other than the payment of money shall be confirmed and agreed to by Buyer at the Closing or at such subsequent time when such Assumed Contract is assumed by Sellers and assigned to Buyer.

(h) Notwithstanding anything herein to the contrary, if any Designation Rights Asset becomes an Excluded Contract, Buyer shall thereafter be responsible, in addition to any other costs for which the Buyer is liable under this Section 2.7, for all costs applicable to the period after the Closing, including costs of closing the restaurant at that location, including de-imaging costs, with respect to such Excluded Contract.

Section 2.8    <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place remotely by electronic exchange of counterpart signature pages commencing at 11:00 a.m. local time on the date  (the "<u>Closing Date</u>") that is the first Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in <u>Article VII</u> (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. The Closing shall be deemed to have occurred at 12:01 a.m. (prevailing time at each Continuing Restaurant) on the Closing Date, but in any event on or before the Sale Closing Deadline. Notwithstanding the foregoing, the Parties anticipate that the Closing will occur on September 30, 2019.

Section 2.9    <u>Deliveries at Closing</u>.

(a)    At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.    one or more Bills of Sale substantially in the form of <u>Exhibit A</u> attached hereto ("<u>Bill of Sale</u>") (if requested by Buyer, Sellers shall execute a separate Bill of Sale with respect to each Continuing Restaurant);

ii.    one or more Assignment and Assumption Agreements substantially in the form of <u>Exhibit B</u> attached hereto ("<u>Assignment and Assumption Agreement</u>") (if requested by Buyer, Sellers shall execute a separate Assignment and Assumption Agreement with respect to each Continuing Restaurant);

iii.    instruments of assignment substantially in the forms of <u>Exhibit C</u>, <u>Exhibit D</u> and <u>Exhibit E</u> attached hereto for each registered trademark, registered copyright and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "<u>Intellectual Property Assignments</u>");

iv.    to the extent applicable, a non-foreign affidavit from each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such Seller is not a "foreign person" as defined in Section 1445 of the IRC;

v.    a Management Agreement substantially in the form of <u>Exhibit F</u>;

vi.    originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to the Buyer through the Sellers' datasite;

vii.    physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

21

viii.    certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

ix.    all other documents, instruments and writings reasonably requested by Buyer to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

(b)    At the Closing, Buyer shall deliver to Sellers, or the designated third-party recipients pursuant to <u>Section 2.5</u>, the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

i.    the Assignment and Assumption Agreement(s);

ii.    the Cash Payment by wire transfer of immediately available funds to one or more bank accounts designated by Sellers or the designated third-party recipients thereof (including to such other third party recipients as provided in <u>Sections 2.5 and 2.6</u>)) in writing to Buyer (the "<u>Sellers' Accounts</u>");

iii.    a Management Agreement substantially in the form of <u>Exhibit F</u>;

iv.    a letter instructing the Escrow Agent to release the Good Faith Deposit to Sellers, duly executed by Buyer; and

v.    all other documents, instruments and writings reasonably requested by Sellers to be delivered by Buyer at or prior to the Closing pursuant to this Agreement.

(c)    Upon written notice from Buyer to Sellers that a Designation Rights Asset has become a Purchased Asset, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.    one or more Bills of Sale with respect to that Purchased Asset; and

ii.    one or more Assignment and Assumption Agreements with respect to that Assumed Contract.

**Section 2.10**    <u>Allocation</u>. Within ninety (90) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Purchased Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate). Sellers shall have thirty (30) days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule. Sellers shall also retain the right to dispute Buyer's proposed and final allocations, with any unresolved dispute to be determined by the Bankruptcy Court. Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation. Neither Buyer nor Sellers shall

22

take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable Law.

**Section 2.11    Excluded Locations**.

(a)    As of the Closing, (i) any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts or Designation Rights Assets shall be deemed to have been classified as Continuing Restaurants, and (ii) any of Sellers' restaurant locations with respect to which the associated Leases have been classified as Excluded Contracts shall be deemed to have been classified as Excluded Restaurants.

(b)    Buyer shall indemnify and hold each Seller and its Representatives harmless from and against all claims, demands, penalties, losses, liability or damage to the extent arising from or relating to the operation of any of the Continuing Restaurants by Buyer from and after the Closing Date, including, without limitation, reasonable attorneys' fees and expenses, resulting from, or related to: (i) Buyer's breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement and the Related Agreements or applicable Law; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers or Representatives of any Seller by Buyer or any of its Representatives; (iii) any claims by any party engaged by Buyer as an employee or independent contractor arising out of such employment; (iv) the gross negligence (including omissions) or willful misconduct of Buyer, its officers, directors, employees, agents or representatives; and (v) violations of Law by Buyer, its officers, directors, employees, agents or representatives.

**Section 2.12    Good Faith Deposit**.

(a)    Prior to the date hereof, Buyer made a cash deposit in the amount of $3,720,000 (the "Good Faith Deposit") by wire transfer of immediately available funds and is being held by Wells Fargo, N.A. (the "Escrow Agent") in escrow (the "Escrow Account") pursuant to an Escrow Agreement (the "Escrow Agreement"). In the event that the Closing occurs, the Good Faith Deposit will be applied to satisfy an equal portion of the Cash Payment, and Buyer shall direct the Escrow Agent to release the Good Faith Deposit to Sellers at the Closing. In any other event, the Good Faith Deposit shall be released by the Escrow Agent to the Party entitled thereto in accordance with Section 8.3, and the Parties shall promptly direct the Escrow Agent to release the Good Faith Deposit accordingly. The Good Faith Deposit shall only constitute property of the Sellers' bankruptcy estates in the event that the Good Faith Deposit is required to be released to Sellers by the Escrow Agent in accordance with the terms of this Agreement.

**ARTICLE III**
**SELLERS' REPRESENTATIONS AND WARRANTIES**

Each of the Sellers jointly and severally represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"):

23

**Section 3.1**    **Organization of Sellers; Good Standing**.

(a)    Each Seller is duly incorporated, validly existing and in good standing under the Laws of its state of incorporation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)    Each Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2**    **Authorization of Transaction**. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)    each Seller has all requisite corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other corporate action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3**     <u>Noncontravention; Consents and Approvals</u>.

(a)     Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation, by-laws or other organizational documents of any Seller, (ii) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (iii) subject to the entry of the Sale Order, conflict with, any Assumed Contract, and, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     Except as set forth in <u>Schedule 3.3(b) of the Disclosure Schedule</u>, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4**     <u>Compliance with Laws</u>. Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect.

**Section 3.5**     <u>Title to Purchased Assets</u>. Sellers, as of the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under <u>Section 2.7</u>, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

**Section 3.6**     <u>Contracts</u>. Schedule 3.6 of the Disclosure Schedule sets forth the following Contracts (all Contracts listed or required to be listed herein are referred to as "<u>Material Contracts</u>") as of the date of this Agreement:

         i.      all Leases;

        ii.     all Contracts under which any Seller leases personal property in connection with the Business;

        iii.    all Contracts that provide for payments in excess of $100,000 over a 12-month period;

        iv.    all Contracts with any material supplier of the Business;

        v.     all Contracts with any Governmental Entity related to the Business;

        vi.    all employment, confidentiality and/or noncompetition Contracts with employees of any Seller and Contracts with independent contractors or consultants (or similar arrangements) engaged in connection with the Business, in each case providing for cash compensation exceeding $100,000 per year; and

        vii.    all other Contracts that are material to the operation of the Business and not previously disclosed pursuant to this Section 3.6.

Except as to matters which would not reasonably be expected to have a Material Adverse Effect and except as set forth on Section 3.6 of the Disclosure Schedules, each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of the applicable Seller and of the other parties thereto, enforceable against each of them in accordance with its terms and, upon consummation of the Contemplated Transactions, shall continue in full force and effect without penalty or other adverse consequence. Except as set forth on Section 3.6 of the Disclosure Schedules, no Seller is in default under any Material Contract, nor, to the Knowledge of Sellers, is any other party to any Material Contract in breach of or default thereunder, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a breach or default by any Seller or any other party thereunder. Except as set forth on Section 3.6 of the Disclosure Schedules, no party to any of the Material Contracts has exercised any termination rights with respect thereto, and no party has given notice of any significant dispute with respect to any Material Contract. Sellers have and will transfer to Buyer at the Closing, good and valid title to the Assumed Contracts, free and clear of all Liens other than Permitted Liens. Except as set forth on Section 3.6 of the Disclosure Schedules, Sellers have delivered to Buyer true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

**Section 3.7**    **Intellectual Property**.

    (a)    Schedule 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller and used in or related to the Business, (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all such Registered Intellectual Property free and clear of all Liens (except for Permitted Liens and subject to entry of the Sale Order), and all such Registered Intellectual Property is valid, subsisting and, to Sellers' Knowledge, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)     To Sellers' Knowledge and except as set forth on <u>Schedule 3.7 of the Disclosure Schedule</u>, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the Products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge and except as set forth on <u>Schedule 3.7 of the Disclosure Schedule</u>, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect.

**Section 3.8     Litigation**. Schedule 3.8 of the Disclosure Schedule sets forth all unresolved material Litigation brought by or against any Seller, and to Sellers' Knowledge, there is no other material Litigation threatened in writing, before any Governmental Entity against any Seller which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Contemplated Transactions.

**Section 3.9     Employees and Employment Matters**. No Seller is a party to or bound by any collective bargaining agreement covering the Current Employees (as determined as of the date of this Agreement), nor is there any ongoing strike, walkout, work stoppage, or other material collective bargaining dispute affecting any Seller with respect to the Business. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this Agreement). Within five (5) days of the date hereof, Sellers shall make available to Buyer a list of all Current Employees.

**Section 3.10    Employee Benefit Plans**.

(a)     Schedule 3.10 of the Disclosure Schedule lists each material Employee Benefit Plan that Sellers maintain or to which Sellers contribute. With respect to each such Employee Benefit Plan:

i.      such Employee Benefit Plan, if intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC, has received a favorable determination letter from the United States Internal Revenue Service or may rely on a favorable opinion letter issued by the United States Internal Revenue Service or is comprised of a master or prototype plan that has received a favorable opinion letter issued by the United States Internal Revenue Service; and

ii.     Sellers have made available to Buyer all written plan documents and summary plan descriptions, as applicable, for each Employee Benefit Plans.

(b)     To the Knowledge of Sellers, each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in all material respects, in accordance with its terms and all applicable Laws. As of the date hereof, there is no material pending or, to Sellers' Knowledge, threatened in writing, Litigation relating to the Employee Benefit Plans.

(c)      Except as set forth on Section 3.10(c) of the Disclosure Schedule, with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

**Section 3.11**    Real Property.

(a)      Sellers do not own any real property.

(b)      Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases for such Leased Real Property. Sellers have made available to Buyer true and complete copies of such Leases, as amended through the date hereof. Except as set forth on Schedule 3.11(b) of the Disclosure Schedule, the Leased Real Property has no material defects that at any one location would reasonably be expected to cost $50,000 or more to repair, and is otherwise in good operating condition and repair and is adequate and suitable to conduct the business of the Sellers as currently conducted.

**Section 3.12**    Permits.

(a)      Schedule 3.12(a) of the Disclosure Schedule contains a list of all material Permits that Sellers hold as of the date hereof in connection with the operations of the Business. As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge, all required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect.

(b)      Schedule 3.12(b) of the Disclosure Schedule sets forth a complete and correct list as of the date of this Agreement of all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller, including the Person in whose name such license is issued, date of issuance and renewal date (collectively, the "Liquor Licenses"). Each of the Sellers is in compliance in all material respects with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller where the Leases constitute Assumed Contracts, subject to and in accordance with all applicable provisions of the Liquor Licenses. To the Knowledge of Sellers, except as set forth in Schedule 3.12(b) of the Disclosure Schedule, since December 31, 2017, (i) there has been no material Litigation brought or threatened in writing to be brought by or before a Governmental Entity in respect of any such Liquor License or the activities of such Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License is subject to any due but unpaid

Tax obligation owed to a Governmental Entity, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (iii) no such Liquor License has been threatened by a Governmental Entity to be revoked, limited or not renewed

Section 3.13    **Brokers' Fees**. Except for amounts due to Configure Partners, LLC (which amounts are to be paid by Sellers from the Purchase Price), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

Section 3.14    **No Other Representations or Warranties**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>Article III</u> (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>Article III</u> (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF ANY SELLER OR ANY OF THEIR AFFILIATES). THE DISCLOSURE OF ANY MATTER OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

BUYER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

THE PROVISIONS OF THIS <u>SECTION 3.14</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1** **Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2** **Authorization of Transaction**.

(a) Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b) The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c) This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3** **Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in <u>Section 2.9</u>) will (i) conflict with or result in a breach of the certificate of formation or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or

require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

Section 4.4  **Financial Capacity**. As of the Closing, Buyer (i) will have the resources (including sufficient funds available to pay the Purchase Price and any other expenses and payments incurred by Buyer in connection with the transactions contemplated by this Agreement) and capabilities (financial or otherwise) to perform its obligations hereunder, and (ii) will not have incurred any obligation, commitment, restriction or Liability of any kind, that would materially impair or materially adversely affect such resources and capabilities.

Section 4.5  **Adequate Assurances Regarding Executory Contracts**. Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.6  **Good Faith Purchaser**. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets. Buyer has negotiated and entered into this Agreement in good faith and without collusion or fraud of any kind.

Section 4.7  **Brokers' Fees**. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

Section 4.8  **Condition of Business**. Buyer is an informed and sophisticated purchaser, and has engaged or had the opportunity to engage expert advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and assumption of liabilities such as the Assumed Liabilities as contemplated hereunder. Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Buyer acknowledges that Sellers have given Buyer reasonable and open access to the key employees, documents and facilities of the Business. Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article III of this Agreement, Sellers (including each of their directors, officers, employees, agents, stockholders, Affiliates, consultants, counsel, accountants and other representatives) make no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical

31

condition or value of any of the Purchased Assets or the future profitability or future earnings performance of the Business. Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Certain Efforts; Cooperation**.

(a)    Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in Article VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Chapter 11 Cases (including, soliciting higher or better offers for the Purchased Assets in any Auction in conformity with the terms of this Agreement).

(b)    On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order); provided, however, that (i) Buyer shall reimburse Sellers for any costs incurred in this regard and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(c)    Buyer shall at all times take all appropriate actions necessary to permit, and shall refrain from taking any action that would prevent, the Bankruptcy Court to make findings in the Sale Order that (a) Buyer is a good-faith buyer under section 363(m) of the Bankruptcy Code, (b) that the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under section 363(n) of the Bankruptcy Code, and (c) Buyer is not a successor to the Sellers.

**Section 5.2    Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, other

than such ordinary and necessary professional fees as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(b)    Sellers and Buyer shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and necessary professional fees as are required for Sellers to comply with the obligations hereunder, and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(c)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and incorporate the other Party's reasonable comments, (C) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.3    Bankruptcy Actions.**

(a)    Sale Procedures.  The Sale Procedures, to be approved pursuant to the Bankruptcy Court's entry of the Sale Procedures Order in a form of order attached as Exhibit G hereto.

(b)    Breakup Fee. Upon the consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than Buyer) who submits a Prevailing Bid for the Purchased Assets at the Auction, Sellers shall cause the Escrow Agent to immediately return the Good Faith Deposit to the Buyer on the closing date of such transaction and, within three (3) Business Days, pay to Buyer cash or other immediately available funds in an amount equal to $1,116,000 (the "Breakup Fee") and an expense reimbursement of actual, necessary and documented out of pocket expenses associated with this Agreement (including travel, due diligence, professional fees, etc.) of up to a maximum amount of $300,000 (the "Expense Reimbursement"). The Parties agree that the Breakup Fee, the Expense Reimbursement and the return of the Good Faith Deposit shall be the full and liquidated damages of Buyer arising out of any termination of this Agreement pursuant to Section 8.1(e) in connection with the closing of an Alternative Transaction.  The provisions of this Section 5.3(b) shall survive any termination of this Agreement pursuant to Section 8.1.  The Breakup Fee and the Expense Reimbursement shall be approved in the Sale Procedures Order as an allowed administrative expense claim in the Chapter 11 Cases, and shall be paid to Buyer within three (3) Business Days following the closing of such sale to a third party, and shall be paid to Buyer prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee or the Expense Reimbursement).  In the event the Purchased Assets are acquired in an Alternative Transaction by any secured lender pursuant to a credit bid authorized by the Bankruptcy Court, such secured lender shall be responsible for the payment of the Breakup Fee and the Expense Reimbursement in cash at a closing on such sale. The provisions for the payment of the Breakup Fee or the Expense Reimbursement are an integral part of the transactions contemplated by this Agreement and without these provisions Buyer would not have entered into the Agreement.

(c)    Backup Bid.  At the conclusion of the Auction, Sellers shall identify and certify the bid that constitutes the second highest or best offer for the Purchased Assets (which Buyer acknowledges may be Buyer) (the "Backup Bid" and the Qualified Bidder submitting such bid, the "Backup Bidder").  The Backup Bidder may be required by Sellers to close on the Backup Bid no later than sixty (60) days of the conclusion of the Auction and no sooner than ten (10) Business Days after the date the Backup Bidder receives written notice of the requirement to close on the Backup Bid, which notice shall be given no later than thirty (30) days after the Auction.  In the event that the Backup Bidder fails to close on the transaction contemplated in the Backup Bid, Sellers shall be permitted to retain the Backup Bidder's good faith deposit as liquidated damages and that shall be Seller's sole and exclusive remedy in connection with such failure.

(d)    <u>Sale Order</u>.  The Sale Order shall be entered no later than three (3) days after the Sale Hearing. The Sale Order shall be in a form acceptable to the Buyer in its reasonable discretion and provide, among other things, that:

      i.      this Agreement is valid and enforceable;

      ii.      this Agreement and the Contemplated Transactions are approved;

      iii.      on the Closing Date, the Purchased Assets shall be sold to Buyer free and clear of any and all Liens (except for Permitted Liens), including any liens granted during the Chapter 11 Cases;

      iv.      on the Closing Date, the Assumed Contracts shall be assumed by Sellers and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code and Sellers shall pay the Cure Costs that are Excluded Liabilities the Buyer shall pay the Cure Costs that are Assumed Liabilities due in connection with the assumption and assignment of Assumed Contracts;

      v.      all causes of actions against any counterparty to the Assumed Contracts, related in any way to the Assumed Contracts, shall be forever released and waived by the Sellers. The Sellers, however, shall be entitled to assert any defenses against any claim asserted by any counterparty to the Assumed Contracts;

      vi.      after the Closing Date, subject to <u>Section 2.7(d)</u>, the Buyer shall have the continuing right to review and determine whether to elect to acquire the Designation Rights Assets;

      vii.      after the Closing Date the Buyer shall have the obligation to timely pay all costs associated with the Designation Rights Assets; and

      viii.      all persons and entities, including, governmental, tax and regulatory authorities, lenders, trade and other creditors holding interests or claims of any kind or nature whatsoever against the Sellers or their assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with or in any way relating to the Sellers, the Purchased Assets, or the operations of the Sellers prior to the Closing shall have no claims against the Buyer, its affiliates, successors or assigns, property or the Purchased Assets such persons' or entities' interests or claims, subject to rights of parties or individuals for claims arising out of Assumed Liabilities.

(e)    The Sale Order shall contain findings by the Bankruptcy Court that (a) Buyer is a good-faith buyer under section 363(m) of the Bankruptcy Code, (b) Buyer is not a successor to the Sellers, and (c) the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under section 363(n) of the Bankruptcy Code, unless in the reasonable judgment of Sellers' professionals, after consultation with Buyer, Sellers believe there

exists a factual basis that would preclude the Bankruptcy Court from making such a finding.

(f)     Sellers and Buyer agree to use commercially reasonable efforts to cooperate, assist and consult with each other to obtain the issuance and entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.  The Sale Order shall also indicate that the transactions set forth in this Agreement may be consummated immediately upon entry of the Sale Order and pursuant to Fed. R. Bankr. P. 6004(h), the sale of the Purchased Assets is not stayed pending the expiration of fourteen (14) days from the date of entry of the Sale Order. In the event the Sale Order is appealed, Sellers shall use their commercially reasonable efforts to oppose any such appeal.

(g)     Bankruptcy Court Approval of Sale.  Sellers and Buyer shall cooperate, assist and consult with each other and each use commercially reasonable efforts, to secure the entry of the Sale Order.  In connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, Buyer shall take all actions reasonably required in the discretion of the Buyer or otherwise as directed by the Bankruptcy Court to provide "adequate assurance of future performance" by Buyer under the Assumed Contracts after the Closing.

(h)     Liquor Licenses.  Sellers shall seek to have included in the Sale Order a provision that immediately upon the Closing Buyer shall be entitled to continue to sell alcoholic beverages at the premises included in the Purchased Assets or Designation Rights Assets upon the same terms as the Sellers were selling such alcoholic beverages until such time as the Buyer has had the time and opportunity to obtain its own Liquor Licenses.

**Section 5.4    Conduct of Business**. From the date hereof until the earlier of the termination of this Agreement pursuant to Section 8.1 or the Closing Date, except (i) as disclosed on Section 5.4 of the Disclosure Schedules, (ii) as may be required by the Bankruptcy Court, (iii) for the consequences resulting from the continuation of the Chapter 11 Cases, or (iv) as may be required or contemplated by this Agreement, subject to the terms of its credit agreement with their debtors in possession lenders, each Seller shall conduct, and shall cause its Affiliates to conduct, the Business and maintain the Purchased Assets in the Ordinary Course of Business and use its commercially reasonable efforts to preserve intact the Purchased Assets (and all goodwill relating thereto) and all respective relationships with customers, vendors, creditors, employees, landlords, agents, and others having business relationships with them. Without limiting the generality of the foregoing, during the period from the date of this Agreement to the Closing, except as otherwise contemplated by this Agreement or as Buyer shall otherwise consent in writing, each Seller shall, and shall cause each of its respective Affiliates to, do the following:

(a)     pay all post-petition bills and invoices for post-petition goods or services promptly when due, including rent, CAM, taxes and other amounts due under the Leases that may become part of the Purchased Assets;

(b)     notify Buyer of any material adverse change in its condition (financial or otherwise), business, properties, assets or liabilities, or of the commencement of or any

material development or disposition with respect to any material governmental complaints, investigations, or hearings (or any written threats thereof);

(c)     in the Ordinary Course of Business, maintain and repair all of the equipment on the premises and the premises themselves so that the Business may continue to operate the facilities consistent with past practice in a manner hospitable to customers and guests;

(d)     maintain in the Ordinary Course of Business customary amounts of cash, cash equivalents and similar cash items at the location of each restaurant in cash registers, safes, strongboxes and lock boxes consistent with past practice;

(e)     maintain in the Ordinary Course of Business customary amounts and quality of Inventory consistent with past practice;

(f)     use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits (including Liquor Licenses) necessary or required by Law to own, lease and operate its respective properties (and the Purchased Assets) and to carry on the Business or that are material to the operation of the Business or the Purchased Assets, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date (or 60 days thereafter); and

(g)     maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Petition Date.

**Section 5.5     Certain Restricted Conduct**. Except as set forth on Section 5.5 of the Disclosure Schedules and except as otherwise set forth in this Agreement or as Buyer shall otherwise consent in advance in writing, during the period from the date of this Agreement to the Closing, no Seller shall, and each Seller shall cause each of its respective Affiliates not to, with respect to the Purchased Assets:

(a)     sell, lease, license, transfer, or dispose of other than in the Ordinary Course of Business any Purchased Assets;

(b)     authorize or enter into any Contract, arrangement, or commitment other than a Contract that is in the Ordinary Course of Business;

(c)     dispose of or permit to lapse any rights in, to or for the use of any material Intellectual Property Right,

(d)     other than in the Ordinary Course of Business, including maintenance and repair, authorize, undertake, make, or enter into any commitments obligating any Seller to (i) make or accelerate any capital expenditures that cannot reasonably be substantially completed prior to the Closing or (ii) undertake or approve any material renovation or rehabilitation of any Leased Real Property that cannot reasonably be substantially completed prior to the Closing;

(e)      (i) increase any compensation or enter into or amend, in a way that increases benefits, any employment, severance or other agreement with any of its officers, directors or employees, (ii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any existing Employee Benefit Plan (other than the 401(k) Plan which is subject to <u>Section 6.15</u> below), except for changes which are required by Law and changes which are not more favorable to participants than provisions presently in effect, (iii) hire any employee or individual independent contractor with annual compensation in excess of $75,000 (except to the extent such hire is in replacement of an existing employee with comparable compensation), or enter into any new employment or severance agreements that would result in post-termination payments that in the aggregate would exceed $5,000 becoming due or payable upon termination of employment or of the individual independent contractor, or (iv) assume or enter into any labor or collective bargaining agreement relating to the Business, any employee, or any Purchased Asset;

(f)      take any action that would constitute or result in an event of default under any debtor-in-possession financing facility agreement or order, and/or cash collateral agreement;

(g)      permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien, except for Permitted Liens, Liens existing on the date of this Agreement and Liens granted before a Closing in connection with any debtor-in-possession financing facility agreement or order, and/or cash collateral agreement;

(h)      do any other act that would, to the Knowledge of Sellers, cause any representation or warranty of any Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect; or

(i)      authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

No Seller nor any of its Affiliates shall:  (i) renew any Lease nor suffer any person other than such Seller, its employees, agents, servants and invitees to occupy or use the premises or any portion thereof, without in any case the express written consent of Buyer, which consent shall not be unreasonably withheld or (ii) terminate, amend, extend, renew, modify, breach, waive or allow any rights to lapse under any Lease.  Any attempt to do any of the foregoing without such written consent shall be null and void.  If Sellers request such a consent from Buyer, the request shall be in writing specifying the terms of the renewal; the identity of the proposed assignee or sub-lessee; the duration of said desired sublease or renewal, the date same is to occur, the exact location of the space affected thereby and the proposed rentals on a square foot basis chargeable thereunder.  Such request for Buyer consent shall be submitted to Buyer at least three (3) days in advance of the date on which Sellers desire to make such event occur.

**Section 5.6      <u>Notice of Developments</u>**. From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form

of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.6 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

Section 5.7    **Access**.

(a)    Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

(b)    All information obtained pursuant to this Section 5.7 shall be subject to the terms and conditions of the Confidentiality Agreement.

Section 5.8    **Press Releases and Public Announcements**. After notice to and consultation with Buyer, Sellers shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Buyer, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction. Buyer, without the prior consent of Sellers, may issue such press release or make such public statement, filing or disclosure (x) prior to Closing, as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction and (y) after Closing, as it may wish.

Section 5.9    **Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.10    Contracts**. If at any time Sellers become aware, on or before the Closing, of any heretofore unrejected Contract to which any of Sellers is a party that satisfies the conditions of Section 3.6, but has not been included on Schedule 3.6 of the Disclosure Schedule, Sellers shall promptly thereafter advise Buyer of the existence of such Contract and provide Buyer with a copy thereof. Buyer shall have the right, for a period of five (5) Business Days following the delivery of any such Contract, to review such Contract and during such period Sellers shall refrain from modifying, termination or rejecting such Contract without Buyer's express prior written consent. Buyer shall have the option, exercisable by written notice to Sellers given within such five (5) Business Day period, to request that Sellers assume, assign and sell such Contract to Buyer or make such Contract a Designated Asset. If Buyer timely exercises such option, Sellers shall use commercially reasonable efforts to assume, assign and sell such Contract to Buyer, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Assumed Contracts or Designated Assets; provided, however, that Buyer shall be responsible for the payment of any Cure Amount in connection with the assumption and assignment of such Assumed Contract, except as otherwise provided in Section 2.7 and provided such Cure Amount is an Assumed Liability. If Buyer fails or declines to exercise such option, Sellers shall reject such Contract upon five (5) Business Days' notice to Buyer.

**Section 5.11    Casualty, Condemnation, Loss of Lease**.

(a)    If, prior to Closing, any Leased Real Property and the associated improvements or any part thereof shall be subject to a taking by any Governmental Entity through condemnation, eminent domain or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking) (collectively, "Condemnation"), Buyer shall take title to the Purchased Assets relating to such affected Leased Real Property and improvements notwithstanding such Condemnation. At the Closing, Buyer, shall succeed to (x) the rights of the applicable Seller to the Condemnation proceeds, including insurance proceeds, with respect to a Condemnation ("Condemnation Proceeds"), and (y) the rights to settle any such Condemnation proceeding, and Buyer shall, at Closing succeed to the rights of the applicable Seller to all required proofs of loss, assignments of claims and similar items. The Sellers, at Closing, shall assign to Buyer all right, title and interest to any claims or proceeds Seller may have. The Sellers shall not settle any such proceedings without the consent of Buyer, such consent not to be unreasonably withheld or delayed. Sellers' compliance with this Section 5.11(a) shall cure any breach of covenant or inaccuracy of any representation and warranty arising as a result of a Condemnation.

(b)    If, prior to Closing, any Leased Real Property and the associated improvements or any part thereof shall be destroyed or damaged by fire, earthquake, flood or other casualty (collectively, "Casualty"), Buyer shall take title to the Purchased Assets relating to such affected Leased Real Property and improvements notwithstanding such Casualty. At the Closing, Buyer, shall succeed to (x) the rights of the applicable Seller to the Casualty proceeds, including insurance proceeds, with respect to such Casualty ("Casualty Proceeds"), including without duplication, giving Buyer a credit against the Purchase Price in the amount of the Casualty Proceeds actually received by the applicable Seller and not applied by the applicable Seller to repair prior to Closing, and (y) the rights to settle after Closing any loss under all policies of insurance applicable to the Casualty,

40

and Buyer shall, at Closing and thereafter, succeed to the rights of the Sellers to all required proofs of loss, assignments of claims and other similar items and Sellers shall, at Closing, assign same to Buyer.  The Sellers shall not settle any such claims without the consent of Buyer; such consent not to be unreasonably withheld or delayed.  Sellers' compliance with this <u>Section 5.11(b)</u> shall cure any breach of covenant or inaccuracy of any representation and warranty arising as a result of a Casualty.

**ARTICLE VI**
**OTHER COVENANTS**

The Parties agree as follows with respect to the period from and after the Closing, provided that (i) Sellers shall not incur any costs, associated with the obligation hereunder, other than such ordinary and necessary professional fees as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed:

**Section 6.1      Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2      Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this <u>Section 6.2</u>, to the extent that either Buyer or Sellers discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3      Availability of Business Records**. From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) seven years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to

41

Taxes, the expiration of the statute of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge.

**Section 6.4    Employee Matters**.

(a)    Each Seller shall, effective as of the day prior to the Closing Date, discharge all Current Employees. Prior to the Closing, Buyer shall offer (or cause a designee of Buyer to offer), to employ those Current Employees desired to be employed by Buyer (i) to operate the Continuing Restaurants, with employment commencing as of the Closing Date or (ii) to be employed in the Buyer's head office with employment commencing on the Closing Date. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be collectively referred to as an "Offeree." Prior to the Closing Date, Buyer will provide Sellers with a schedule setting forth a list of the names of all Offerees. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee." Except to the extent Sellers fail to comply in any material respects with Section 6.4(c)(i) and Section 6.4(c)(iii), Buyer hereby agrees that the offer to an Offeree shall include a level of base salary or wages that are substantially comparable in the aggregate to the base salary or wages provided to such Offeree by Sellers as of the Closing Date and that the benefits offered to such Offeree shall be the same benefits that Buyer's Affiliates' similarly situated employees are offered.

(b)    Each Current Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the date of this Agreement,

i.    Sellers shall allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the Current Employees who are members of executive management and other employees reasonably requested during normal business hours;

ii.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

iii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such

Representative with respect to its determination of appropriate terms and conditions of employment for any Offeree;

iv.     Buyer acknowledges its responsibility to provide COBRA coverage to Excluded Employees pursuant to Q&A 8(c) of Treasury Regulation §54.4980B-9;

v.      Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers no later than the date such wages or salary would normally be paid. Seller shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date. In accordance with Buyer's obligations under the Assumed Liabilities, upon receipt of an invoice from Sellers for such payroll, Buyer shall promptly fund such payroll to Sellers so that it can be timely paid by Sellers;

vi.     Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees. In addition, as part of the wind-down expenses, Sellers shall (or shall cause its designee to) process all employee and Tax reporting covering the periods prior to the Closing in connection with the Excluded Employees and the Transferred Employees that will be required to be prepared and delivered after the Closing. Nothing herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement shall create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise; and

vii.     In connection with the Closing, and to the extent permitted by Law, Sellers shall transfer to Buyer an amount, in cash, representing the aggregate contributions of each Transferred Employee then participating in any flexible spending arrangements of Sellers, net of reimbursements paid prior to the date of transfer (but not less than zero).  Buyer shall cause such amounts to be credited to each such Transferred Employee's accounts under Buyer's corresponding health and dependent care spending account plan in effect for such employees as of the Closing Date, and all claims for reimbursement which have not been paid as of the date of the transfer to Buyer and credited under the Sellers' flexible spending plan shall be paid pursuant to and under the terms of the Buyer's plan. In the event that applicable Law prohibits the transfer of the flexible spending accounts to Buyer, Buyer shall take such actions as are necessary to administer post-Closing Sellers' flexible spending plan.  Sellers shall reasonably cooperate with Buyer in connection

43

with Buyer's administration of the flexible spending plan, including without limitation promptly transferring control of any accounts to Buyer.

**Section 6.5    Recording of Intellectual Property Assignments**. All of the Intellectual Property Assignments shall be recorded and filed by Buyer with the appropriate Governmental Entities as promptly as practicable following the Closing.

**Section 6.6    Transfer Taxes**. To the extent not exempt under section 1146 of the Bankruptcy Code, Buyer shall pay any stamp, documentary, registration, transfer, added-value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the transactions contemplated by this Agreement. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.7    Wage Reporting**. Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.8    Acknowledgements**. Buyer acknowledges that it has received from Sellers certain projections, forecasts and prospective or third party information relating to Sellers, the Business, the Purchased Assets, the Assumed Liabilities or any related topics. Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information, (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts and information so furnished, and (iii) neither Buyer nor any other Person shall have any claim against any Seller, its Affiliates or their respective Representatives with respect thereto. Accordingly, without limiting the generality of Section 3.14, Sellers make no representations or warranties with respect to such projections, forecasts or information.

**Section 6.9    Insurance Policies**.

(a)    To the extent that any current or prior Insurance Policy is not transferable to Buyer at the Closing in accordance with the terms thereof, each Seller, as applicable, shall hold such Insurance Policy for the benefit of Buyer, shall reasonably cooperate with Buyer (at Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Purchased Assets or the Assumed Liabilities. In the event Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, Sellers shall reasonably cooperate with Buyer to terminate such Insurance Policy to the extent only applicable to the Purchased Assets, and Sellers shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Sellers in connection therewith (or, if applicable, Buyer's pro rata portion thereof) or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

(b)    To the extent that any current or prior Insurance Policy of any Seller relates to the Purchased Assets or Assumed Liabilities and the Excluded Assets or the Excluded Liabilities, and such Insurance Policy is transferred to Buyer at the Closing, Buyer shall

44

hold such Insurance Policy with respect to the Excluded Assets or Excluded Liabilities, as applicable, for the benefit of Sellers, shall reasonably cooperate with Sellers in pursuing any claims thereunder, and shall pay over to Sellers promptly any insurance proceeds paid or recovered thereunder with respect to the Excluded Assets or the Excluded Liabilities.

(c)    Notwithstanding subparagraphs (a) and (b) above, nothing in this Article or Agreement shall transfer any directors and officers' liability insurance policies relating to the Sellers to the Buyer.

(d)    Sellers' obligations under this Section shall only continue until the Chapter 11 Cases are closed or dismissed.

**Section 6.10    Collection of Accounts Receivable**.

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.11    Use of Name and Marks**. Neither Sellers nor any of their Affiliates shall use, license or permit any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Purchased Assets.

**Section 6.12    Liquor License Approvals**. Sellers shall reasonably cooperate with Buyer in connection with Buyer's filings with any Governmental Entity or third party with respect to any of the Liquor Licenses and obtaining the necessary consents and approvals pertaining to transfer

45

and/or issuance of the Liquor Licenses to Buyer ("Liquor License Approvals"), including by entering into the Management Agreement and, if reasonably requested by Buyer, initiating and/or participating, at Buyer's sole cost and expense, in such Legal Proceedings reasonably requested by Buyer to obtain such Liquor License Approvals.

Section 6.13    **Data Privacy Protection**. Buyer acknowledges that the Purchased Assets include personally identifiable information ("PII") within the meaning of section 363(b) of the Bankruptcy Code, along with associated personal information about the Sellers' customers. In connection with the same, Buyer agrees to: (i) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (ii) abide by all applicable Laws and regulations with respect to PII and (iii) take such further actions with respect to PII as may be agreed between the Parties. Sellers agree to take such action reasonably requested by Buyer, including amending their privacy policies with respect to PII, as may be necessary to transfer the PII to Buyer, including sending a notice to the subjects of the PII and giving each such subject the right to object to the transfer of the PII. Buyer agrees that it shall, absent a customer's consent received after adequate notice: (a) abide by the Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers) and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets. Buyer shall require consent of a customer for any additional use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection. Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

Section 6.14    **Covenant Not to Sue**. Buyer hereby covenants and agrees that it shall not bring suit or otherwise assert (a) any claim relating to any Purchased Avoidance Actions or (b) any claims against Sellers' current or former officers and directors which constitute Purchased Assets before any court, arbitrator, mediator or administrative agency anywhere in the world. Buyer further covenants and agrees that it shall not assign the Purchased Avoidance Actions or claims against Sellers' current or former officers and directors to any third party.

Section 6.15    **401-K Plan**. Not less than two (2) Business Days before the anticipated Closing Date, the board of directors of each Seller shall adopt resolutions and take such corporate action as is necessary to terminate any Employee Benefit Plan that is maintained pursuant to Section 401(k) of the Code, including the 401(k) Plan, effective as of the date prior to the Closing Date, with the form and substance of such resolutions subject to Buyer's prior review and reasonable approval.   Following the Closing, the assets thereof shall be distributed to the participants, and Buyer shall, to the extent permitted by any "eligible retirement plan" (within the meaning of Section 401(a)(31) of the Code) of Buyer or any of its subsidiaries (the "Buyer 401(k) Plan") and consistent with Buyer policies with respect to Buyer's current employees, permit the Transferred Employees who are then actively employed to make rollover contributions of "eligible rollover distributions" (within the meaning of Section 401(a)(31) of the Code, inclusive of loans to participants), in the form of cash (or, in the case of loans, notes), in an amount equal to the

46

eligible rollover distribution portion of the account balance distributed to such Transferred Employee from the Seller 401(k) Plan to the Buyer 401(k) Plan.  Buyer shall be responsible for the post-Closing administration and winding down of the 401(k) Plan following its termination by Sellers. Sellers shall reasonably cooperate with Buyer in connection with Buyer's administration of the winding down of the 401(k) Plan, including without limitation promptly providing all employee data and 401(k) Plan information reasonably necessary to make Form 5500 filings and perform any audits in connection with the winding down of the  401(k) Plan.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1**    **Conditions to Buyer's Obligations**. Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2 or Section 3.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.9(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order shall have been entered by the Bankruptcy Court, which shall include a waiver of the fourteen (14) day stay set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, and shall be a final, non-appealable order;

(e)    from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(f)    Sellers shall have delivered a certificate from an authorized officer of each Seller to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(e) has been satisfied.

47

**Section 7.2    Conditions to Sellers' Obligations**. Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.9(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order entered by the Bankruptcy Court and shall not be subject to a stay pending appeal; and

(e)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3    No Frustration of Closing Conditions**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

## ARTICLE VIII
## TERMINATION

**Section 8.1    Termination of Agreement**. This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

PHIL1 8179118v.9

(a)     by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any material covenant contained in this Agreement in any material respect, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.1 shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(c)     by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any material covenant contained in this Agreement in any material respect, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.2 shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Sellers;

(d)     by Buyer, on the one hand, or Sellers, on the other hand, if the Closing shall not have occurred by Sale Closing Deadline; provided, however, that (i) Buyer shall not have the right to terminate this Agreement under this Section 8.1(d) or Section 8.1(b) if, at the time of such termination, Sellers would then be entitled to terminate this Agreement pursuant to Section 8.1(c) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(c)), and (ii) Sellers shall not have the right to terminate this Agreement under this Section 8.1(d) or Section 8.1(c) if, at the time of such termination, Buyer would then be entitled to terminate this Agreement pursuant to Section 8.1(b) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(b));

(e)     by Buyer if (i) the Sale Order shall not have been entered by the Bankruptcy Court by the Sale Order Deadline; (ii) if any of the Sellers files (y) any motion with the Bankruptcy Court seeking an order approving, or (z) any Plan involving, any Alternate Transaction; or (iii) if Sellers enter into a definitive agreement with a third party for an Alternate Transaction; or

(f)     automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon:

   i.     the issuance of a final and non-appealable order, decree, or ruling by a Governmental Entity to permanently restrain, enjoin or otherwise prohibit the Closing;

   ii.     approval by the Bankruptcy Court of an Alternate Transaction, unless Buyer is designated a "back-up bidder" under the Sale Order; or

iii.    the consummation of an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, in no event may Buyer terminate this Agreement under Sections 8.1(b) or (d) solely on account of Buyer's failure to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract or on account of Buyer's failure to comply with the covenants set forth in Section 5.1(c).

**Section 8.2**    **Procedure upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3**    **Breakup Fee and Expense Reimbursement**.

(a)    Immediately upon the consummation of an Alternate Transaction, Sellers shall cause the Escrow Agent to return the Good Faith Deposit to the Buyer and shall pay to Buyer the Breakup Fee and the Expense Reimbursement within three (3) Business Days following the date of such consummation.

(b)    The Parties agree that the Breakup Fee, the Expense Reimbursement and the return of the Good Faith Deposit shall be the full and liquidated damages of Buyer arising out of any termination of this Agreement pursuant to Section 8.1(e) in connection with the closing of an Alternative Transaction.

(c)    Sellers' obligation to return the Good Faith Deposit and pay the Breakup Fee and Expense Reimbursement pursuant to this Section 8.3 shall survive termination of this Agreement and shall constitute an administrative expense of Sellers under section 503(b) of the Bankruptcy Code.

(d)    If the Agreement is terminated by Sellers pursuant to Section 8.1(c), then Sellers and Buyer shall jointly instruct the Escrow Agent to, and the Escrow Agent shall, pay the Good Faith Deposit as liquidated damages to Sellers within one (1) Business Day following the date of such termination and the return of the Good Faith Deposit shall be the full and liquidated damages of Sellers arising out of any termination of this Agreement.

(e)    In addition to any rights the Buyer may have to the Breakup Fee and Expense Reimbursement as set forth herein, in the event this Agreement is terminated automatically or Buyer or Sellers properly terminate this Agreement for any reason other than termination by Sellers pursuant to Section 8.1(c), Sellers and Buyer shall jointly instruct the Escrow Agent to, and the Escrow Agent shall, pay the Good Faith Deposit to Buyer upon such termination and neither Party shall have any liability under this Agreement. If this Agreement is terminated by Buyer pursuant to Section 8.1(e) and Sellers close on an Alternative Transaction, receipt of the Breakup Fee and Expense Reimbursement (together with Buyer's receipt of the Good Faith Deposit from the Escrow Agent) shall be the liquidated damages of Buyer and Buyer's sole and exclusive remedy for the breach by Sellers of this Agreement.  If the Agreement is terminated by Buyer

50

pursuant to Section 8.1(e) and Sellers do not close on an Alternative Transaction, the Buyer's receipt of the Deposit from the Escrow Agent shall be the liquidated damages of Buyer and Buyer's sole and exclusive remedy for the breach by Sellers of this Agreement.

**Section 8.4**    **Effect of Termination**.

(a)    Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)    The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 8.4 shall relieve Buyer or Sellers of their respective obligations under the Confidentiality Agreement.

(c)    No termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the transactions contemplated hereby are not consummated (a) this Agreement shall become null and void and of no further force and effect (except that Article I (Definitions), Section 2.12 (Good Faith Deposit), Article IX (Miscellaneous), and this Article VIII (Termination) shall survive any such termination); and (b) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this Article VIII automatically or by Sellers for any reason other than under Section 8.1(c), Sellers shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further liability of any kind to Sellers, any of its Affiliates, or any third party on account of this Agreement. The Parties hereby agree that it is impossible to determine accurately the amount of damages that Sellers would suffer if the transactions contemplated hereby were not consummated as a result of a breach of this Agreement by Buyer. As a result, notwithstanding anything in this Agreement to the contrary, Sellers hereby agrees that, in the event of a termination of this Agreement by Sellers under Section 8.1(c), (i) the Good Faith Deposit shall be delivered to Sellers as liquidated damages against Buyer for all liabilities of Buyer under this Agreement and (ii) such liquidated damages shall be the sole and exclusive remedy, at Law and equity, of Sellers against Buyer for Buyer's breach and such termination and Buyer shall have no further liability of any kind to Sellers, any of their Affiliates, or any third party on account of this Agreement.

(d)    Nothing herein shall preclude the Sellers from exercising their remedies under Section 9.1.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.1**    **Remedies**. Each of Buyer and Sellers recognizes that if it breaches or refuses to perform any covenant set forth in this Agreement, monetary damages alone would not be adequate to compensate the other for its injuries. Each Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by a Party to enforce such

covenants, the other Party shall waive the defense that there is an adequate remedy at Law. Buyer and each Seller agrees to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. Buyer and each Seller agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 9.2    Expenses**. Except as otherwise provided in this Agreement or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 9.3    Entire Agreement**. This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Confidentiality Agreement.

**Section 9.4    Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.5    Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.6    Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer may elect to have

52

any or all of the Purchased Assets conveyed or transferred to, or any or all of the Assumed Obligations assumed by, one or more of its Affiliates or as may be designated by Buyer from time to time prior to the Closing; provided, however, Buyer shall remain liable for all of its obligations to Sellers under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

 **Section 9.7**  **Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

  If to any Sellers, then to:

    Restaurants Unlimited, Inc.
    411 1st Ave South #200
    Seattle, WA 98104
    Attention: James Eschweiler, CEO
    Email: jeschweiler@r-u-i.com

  with a copy to:

    Klehr Harrison Harvey Branzburg LLP
    919 North Market Street, Suite 1000
    Wilmington, DE 19801
    Attention: Domenic E. Pacitti, Esquire
    Email: dpacitti@klehr.com

  If to Buyer, then to:

    Landry's, LLC
    1510 West Loop South
    Houston, Texas 77027
    Attention: Steve Scheinthal & Dash Kohlhausen
    Email: sscheinthal@ldry.com
    dkohlhausen@ldry.com

  with copies (which shall not constitute notice) to:

    Cole Schotz P.C.
    500 Delaware Avenue
    Suite 1410
    Wilmington, DE 19801

Attention: Norman L. Pernick
Email: npernick@coleschotz.com

Shearman & Sterling LLP
1100 Louisiana, Suite 3300
Houston, Texas 77002
Attention: John W. Menke
Email: john.menke@shearman.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.7</u>.

**Section 9.8**    <u>**Governing Law; Jurisdiction**</u>. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

**Section 9.9**    <u>**Consent to Service of Process**</u>. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.7</u>.

**Section 9.10**    <u>**WAIVERS OF JURY TRIAL**</u>. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.11**    <u>**Severability**</u>. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable

54

provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.12    **No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

Section 9.13    **No Survival of Representations, Warranties and Agreements**. None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of the other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) this Article IX, and (iii) all defined terms set forth in Article I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

Section 9.14    **Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

Section 9.15    **Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

Section 9.16    **Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

PHIL1 8179118v.9

**Section 9.17    Disclosure Schedule**. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is reasonably apparent on the face of the disclosure contained in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties and/or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced. The information contained in the Disclosure Schedule is in all events subject to the Confidentiality Agreement.

**Section 9.18    Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.19    Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.20    Time of Essence**. Time is of the essence of this Agreement.

**Section 9.21    Stock Sale**. Notwithstanding any provisions of this Agreement to the contrary, if Buyer so elects in a written notice to Sellers, Sellers shall, prior to the Closing Date, transfer and assign all or a portion of the Purchased Assets to one or more newly formed direct or indirect Subsidiaries of Sellers ("Newco" or "Newcos") in exchange for all issued and outstanding stock of Newco ("Newco Stock"), provided that Sellers determine in their reasonable discretion that such actions contemplated by this Section 9.21 would not result in any material adverse effect on the Sellers, their bankruptcy estates or their respective stakeholders.  If Buyer elects, in accordance with the terms of the first sentence of this Section 9.21, to cause Sellers to transfer any Purchased Assets to one or more Newcos, at the Closing, Sellers shall sell, transfer, and assign all of the Newco Stock to Buyer in full satisfaction of the obligations of Sellers to sell, transfer, and assign the Purchased Assets conveyed to the Newcos that are to be sold to Buyer in accordance with this Agreement (in each case free and clear of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, claims for successor liability under any theory of Law or equity), interests, or Liens, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date). If Buyer elects to cause Sellers to cause all or a portion of the Purchased Assets to be transferred to the Newcos in accordance with the first sentence of this Section 9.21, Buyer and Sellers shall enter into such amendments to this Agreement as shall be necessary to effectuate the sale of Newco Stock to Buyer and all Newco Stock held by Sellers shall be deemed to constitute a part of the Purchased Assets. Buyer shall indemnify and hold  Sellers and their bankruptcy estates harmless from (i) any additional Transfer Taxes, or sale or use taxes arising out of any transfer or assignment of Purchased Assets to the Newcos and (ii) the excess of (A) any income, gains, profits or similar Taxes arising out of or related to any transfer, assignment or contribution of Purchased Assets to the Newcos plus (B) any income, gains profits or similar Taxes (including any additional Taxes Sellers are required to pay resulting from the Internal Revenue Service's denial of any loss claimed by Sellers upon the contribution of Purchased Assets to the Newcos or upon a sale of the Newco Stock) arising out of or related to the sale of Newco Stock to Buyer over the amount of such Taxes that would be payable if Buyer acquired the Purchased Assets (and assumed liabilities) directly from Seller. In the event of a sale of Newco Stock to Buyer, the Purchase Price allocable to the Purchased Assets and liabilities assumed by Buyer in accordance with Section 2.10 shall be allocated among the Purchased Assets held by the Newcos that acquired hereunder in accordance with the provisions of Section 2.7.  The Buyer shall reimburse Sellers for all costs and expenses (including any actual, necessary and reasonable legal fees and expenses in an amount not to exceed $50,000) associated with the transactions contemplated by this Section 9.21.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

## SIGNATURE PAGE TO
## ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS:**

**RESTAURANTS UNLIMITED, INC.**
**RESTAURANTS UNLIMITED TEXAS, INC.**
**RU CORP.**

By _____
    Name:
    Title:

**BUYER:**

**LANDRY'S, LLC**

By _____
    Name: Steven L. Scheinthal
    Title: Executive Vice President

**Intending to be legally bound and for good and valuable consideration, the undersigned hereby guarantees the obligations hereunder of Buyer:**

**GOLDEN NUGGET LLC**

By _____
    Name: Steven L. Scheinthal
    Title: Senior Vice President

**EXHIBIT A**

**<u>Form of Bill of Sale</u>**

## BILL OF SALE

This Bill of Sale, dated as of [_____], 2019 (this "Bill of Sale"), is made and entered into by and among Restaurants Unlimited, Inc., a Minnesota corporation ("RUI"), Restaurants Unlimited Texas, Inc., a Texas corporation ("RUI Texas"), RU Corp., a Washington corporation ("RUC" and together with RUI and RUI Texas, "Sellers"), and Landry's, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of August [●], 2019 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens) [at the locations set forth on Exhibit A].

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Bill of Sale.

3.      This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

A-2

5.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      EXCEPT AS AND TO THE EXTENT PROVIDED IN THE ASSET PURCHASE AGREEMENT, SELLERS EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER ORAL OR WRITTEN, AND WHETHER GIVEN OR MADE OR DEEMED TO HAVE BEEN GIVEN OR MADE AT ANY TIME OR TIMES IN THE PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING THE NATURE OR CONDITION OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION ANY AND ALL WARRANTIES AS TO THE MERCHANTABILITY OF THE PURCHASED ASSETS OR THE SUITABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR FOR ANY PURPOSE.

8.      This Bill of Sale shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

9.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

A-3

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**RESTAURANTS UNLIMITED, INC.**
**RESTAURANTS UNLIMITED TEXAS, INC.**
**RU CORP.**

By: _____
     Name: James Eschweiler
     Title: Chief Executive Officer

**BUYER:**

**LANDRY'S, LLC**

By: _____
     Name:
     Title:

A-4

**EXHIBIT A**

**Purchased Locations**

PHIL1 8179118v.9

**EXHIBIT B**

**<u>Form of Assignment and Assumption Agreement</u>**

PHIL1 8179118v.9

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [_____], 2019 (this "Agreement"), is made and entered into by and among Restaurants Unlimited, Inc., a Minnesota corporation ("RUI"), Restaurants Unlimited Texas, Inc., a Texas corporation ("RUI Texas"), RU Corp., a Washington corporation ("RUC" and together with RUI and RUI Texas, "Sellers"), and Landry's, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of August [●], 2019 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assumed Contracts, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, pursuant to Section 2.3 of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Sellers hereby assign and delegate the Assumed Contracts and the Assumed Liabilities [set forth on Exhibit A] to Buyer and Buyer hereby accepts assignment and delegation of and assumes the Assumed Contracts and the Assumed Liabilities as set forth in the Asset Purchase Agreement.  Buyer assumes none of the Excluded Liabilities and the parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Agreement.

3.      This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Agreement shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement. To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**RESTAURANTS UNLIMITED, INC.**
**RESTAURANTS UNLIMITED TEXAS, INC.**
**RU CORP.**

By: _____
        Name: James Eschweiler
        Title: Chief Executive Officer

**BUYER:**

**LANDRY'S, LLC**

By: _____
        Name:
        Title:

B-4

**EXHIBIT A**

**<u>Assumed Contracts</u>**

PHIL1 8179118v.9

**EXHIBIT C**

**Form of Trademark Assignment Agreement**

# TRADEMARK ASSIGNMENT AGREEMENT

This Trademark Assignment Agreement ("Assignment"), dated as of [_____], 2019, is made and entered into by and among Restaurants Unlimited, Inc., a Minnesota corporation ("RUI"), Restaurants Unlimited Texas, Inc., a Texas corporation ("RUI Texas"), RU Corp., a Washington corporation ("RUC" and together with RUI and RUI Texas, "Sellers"), and Landry's, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of August [●], 2019 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, Sellers' rights and benefits with respect to all trademarks and trademark applications owned by Sellers, each of which are set forth on Exhibit A attached hereto (collectively, the "Marks"), free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets, including the Marks.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Marks, together with the goodwill of the business symbolized by the Marks, the right to sue for past infringement of such Marks and the registrations thereof free and clear of all Liens (other than Permitted Liens), and hereby instructs, authorizes and directs the United States Patent and Trademark Office, and the corresponding entity or agency in any applicable foreign country, to record Buyer as assignee and owner of the Marks.

2.     From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment.

3.     This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.     No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective

C-2

successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**RESTAURANTS UNLIMITED, INC.**
**RESTAURANTS UNLIMITED TEXAS, INC.**
**RU CORP.**

By: _____
      Name: James Eschweiler
      Title: Chief Executive Officer

**BUYER:**

**LANDRY'S, LLC**

By: _____
      Name:
      Title:

C-4

**Exhibit A to Trademark Assignment Agreement**

**MARKS**

PHIL1 8179118v.9

# EXHIBIT D

## <u>Form of Copyright Assignment Agreement</u>

## COPYRIGHT ASSIGNMENT AGREEMENT

This Copyright Assignment Agreement ("Assignment"), dated as of [_____], 2019, is made and entered into by and among Restaurants Unlimited, Inc., a Minnesota corporation ("RUI"), Restaurants Unlimited Texas, Inc., a Texas corporation ("RUI Texas"), RU Corp., a Washington corporation ("RUC" and together with RUI and RUI Texas, "Sellers"), and Landry's, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of August [●], 2019 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, Sellers' rights and benefits with respect to all copyrights copyright registrations and copyright applications owned by Sellers, each of which are set forth on Exhibit A attached hereto (collectively, the "Copyrights"), free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets, including the Copyrights.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Copyrights, together with any and all moral rights therein, the goodwill of the business symbolized by the Copyrights, the right to sue for past infringement of such Copyrights and the registrations thereof free and clear of all Liens (other than Permitted Liens), and hereby instructs, authorizes and directs the Register of Copyrights of the United States, and the corresponding entity or agency in any applicable foreign country, to record Buyer as assignee and owner of the Copyrights.

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment.

3.      This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

D-2

4.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**<u>SELLERS</u>:**

**RESTAURANTS UNLIMITED, INC.**
**RESTAURANTS UNLIMITED TEXAS, INC.**
**RU CORP.**

By: _____
   Name: James Eschweiler
   Title: Chief Executive Officer

**<u>BUYER</u>:**

**LANDRY'S, LLC**

By: _____
   Name:
   Title:

D-4

## Exhibit A to Copyright Assignment Agreement

## COPYRIGHTS

PHIL1 8179118v.9

**EXHIBIT E**

**Form of Domain Name Assignment Agreement**

E-1

## DOMAIN NAME ASSIGNMENT AGREEMENT

This Domain Name Assignment Agreement ("Assignment"), dated as of [_____], 2019, is made and entered into by and among Restaurants Unlimited, Inc., a Minnesota corporation ("RUI"), Restaurants Unlimited Texas, Inc., a Texas corporation ("RUI Texas"), RU Corp., a Washington corporation ("RUC" and together with RUI and RUI Texas, "Sellers"), and Landry's, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, dated as of August [●], 2019 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, Sellers' rights and benefits with respect to all domain names (including all sub-domain names and extensions thereof and thereto) owned by Sellers, each of which are set forth on Exhibit A attached hereto (collectively, the "Domain Names"), free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets, including the Domain Names.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Domain Names, free and clear of all Liens (other than Permitted Liens), and hereby instructs, authorizes and directs any and all registrars thereof to transfer the Domain Names to Buyer.

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment.

3.      This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and

E-2

agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

       5.    None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

       6.    This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement.  Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement.  To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

       7.    This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

       8.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original

*[Signature Page Follows]*

PHIL1 8179118v.9

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS**:

**RESTAURANTS UNLIMITED, INC.**
**RESTAURANTS UNLIMITED TEXAS, INC.**
**RU CORP.**

By: _____
      Name: James Eschweiler
      Title: Chief Executive Officer

**BUYER**:

**LANDRY'S, LLC**

By: _____
      Name:
      Title:

E-4

**<u>Exhibit A to Domain Name Assignment Agreement</u>**

**DOMAIN NAMES**

PHIL1 8179118v.9